# UNITED STATES BANKRUPTCY COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 10-01596 (___) |
| RQB Resort, LP,[1] | ) | Chapter 11 |
| Debtor. | ) | |

| | | |
|---|---|---|
| In re: | ) | Case No. 10-01599 (___) |
| RQB Development, LP, | ) | Chapter 11 |
| Debtor. | ) | |

## **DEBTORS' CHAPTER 11 CASE MANAGEMENT SUMMARY**

RQB Resort, LP and RQB Development, LP (collectively, the "Debtors"), file this Chapter 11 Case Management Summary (the "Case Summary") pursuant to the Court's Administrative Order Establishing Initial Procedures in Chapter 11 Cases dated January 28, 2009.

**A.     Description of Debtors' business.**

The Debtors are the owners of The Sawgrass Marriott Golf Resort & Spa (the "Resort"), a sixty-five acre preeminent resort destination located in Ponte Vedra Beach, Florida. The Resort is operated by Interstate Management Company

---

[1] RQB Resort, LP's tax identification number is 86-1161952. RQB Development, LP's tax identification number is 13-4322680. The principal address of each debtor is 1000 PGA Tour Boulevard, Ponte Vedra Beach, FL 32082.

("Interstate"), under a Hotel Management Agreement dated June 30, 2006, between the Debtors and Interstate. The Resort is franchised as a Marriott hotel under an agreement dated November 8, 1989, between the Debtors and Marriott International, Inc. An affiliate of the Debtors, SGR Asset Management, LLC ("SGR"), provides operational oversight of Interstate and the Resort, as well as management and development services, pursuant to agreements with the Debtors dated June 30, 2006 (the "Management and Development Agreements"). The resort is the largest convention and resort property between Atlanta and Orlando and one of the largest private employers in St. Johns County. In 2009 the Debtors paid over $1.3 million in property taxes and $500,000 in bed taxes to St. Johns County.

The amenities of the Resort include the following:

i. <u>The Hotel</u>. The Marriott Hotel tower at Sawgrass has 348 premium guest rooms, three restaurants, The Augustine Grille, Café on the Green and V. Kelly's Irish Pub, and 56,000 square feet of conference space and meeting rooms.

ii. <u>Golf Villas</u>. The Resort has 83 two-bedroom golf villas for families, golfers and groups. These villas provide 160 rental rooms. The villas include full kitchens and have views of the lakes and lagoons on the property.

iii. <u>The Cabana Club</u>. The Resort's beach club is on the Atlantic Ocean and provides a junior-Olympic sized pool, a baby pool and three

restaurants, including 619 Ocean View Restaurant and the Sea Porch Bar & Grill, both with views of the Atlantic Ocean. This Club has over 780 members and is one of only three such properties in Ponte Vedra. Hotel guests enjoy access to the Cabana Club's amenities.

    iv. <u>The Spa at Sawgrass</u>.  The Spa at Sawgrass has 25,000 square feet on 2.5 acres with an expansive list of services and 19 private treatment rooms.

    v. <u>Golf</u>.  The Marriott at Sawgrass is Florida's premier golf destination.  Under an Agreement with the PGA Tour, Inc. (the "TPC Agreement"), the Resort is the exclusive partner to the PGA Tour's Tournament Players Club ("TPC") at Sawgrass.  TPC includes THE PLAYERS Stadium Course at TPC Sawgrass, home of the PGA Tour's Tournament Players Championship, and the Championship Valley Course.  Pursuant to the TPC Agreement, the Resort has the exclusive right to 85% of all starting times each day on the Stadium Course and the Valley Course for the Resort's guests through the year 2089.  Under the TPC Agreement, Resort guests have "priority over all other users of the Golf Facility, including, without limitation, all classes of TPC members, PGA Tour members, their guests and other VIP's in selecting starting tee times on the Stadium Course and Valley Course each day".  The Resort also has access to seven other private golf courses in the surrounding area.  The Debtors have significantly expanded and enhanced their business relationship with TPC and the PGA Tour as the cornerstone golf portal for the Ponte Vedra area.

3

This focus has seen an increase in the number of high value transient golf guests to the Resort which the Debtors expect to increase in the future through their continued collaboration with the PGA Tour.

B. **Location of Debtors' operations.** The Debtors own the real property and improvements that comprise the Resort. The location of the Debtors' operations are as follows:

1. RQB Resort, LP: Sawgrass Marriott Resort, 1000 PGA Tour Boulevard, Ponte Vedra Beach, FL 32082; and Cabana Beach Club, 619 Ponte Vedra Blvd., Ponte Vedra Beach, FL 32082. These sites comprise approximately 26 acres at the hotel and 2.5 acres at the beach club.

2. RQB Development, LP: Villas and Spa, 1000 PGA Tour Boulevard, Ponte Vedra Beach, FL 32082. This site comprises approximately 64 acres and is the location for the 83 villas.

C. **The reasons for the Chapter 11 filing.**

The Debtors purchased the Resort in July of 2006 for $220,550.00. Subsequent to the purchase but prior to the economic downturn, the Debtors invested $30 million in service upgrades and capital improvements at the Resort. With these improvements, the Debtors experienced growth of approximately 10% in both revenue and occupancy rates in the first full year of ownership. The Resort generated net operating income of $9.7 million through December 31, 2006 (on a pro forma annualized basis). In 2007, the first full year of operations by the

Debtors, the Resort generated $11.2 million in net operating income through more aggressive marketing programs and a focus on increasing occupancy.

The current economic recession and associated disruption in the debt and equity capital markets have been extremely challenging for the Debtors. The current economic conditions have caused a significant downturn in business and consumer spending, including destination business conferences, which has adversely impacted the Debtors' operations. The resort and hotel market has seen a decline in business that has exceeded that experienced in the period following September 11, 2001, with revenues at high-end resort properties like the Resort declining industry-wide by more than 30%.

The Debtors rely heavily on convention business, which historically is approximately 65% of their annual revenue. Among other impacts of the financial crisis, discretionary spending for goods and services, such as those provided by the Debtors, have fallen precipitously. Corporations have scaled back in booking corporate and group outings at resorts such as the Resort, and those that continue to book do so with significantly reduced budgets. This has resulted in a significant reduction in the number of large corporate and group events that have come to the Resort, depriving the Debtors of a significant source of operating revenues.

In the third quarter of 2008 the Debtor commenced a restructuring plan that reduced fixed costs by $4.5 million. These savings were achieved by

reducing vendor costs, improving productivity and efficiency of staff at the Resort, and reduction in costs through line item reviews. The Resort continues to operate at the new levels of efficiency and Guest Services Scores have increased over that time period, reflecting an improvement in service standards delivered to guests. The Resort generated net operating income (net income before depreciation, taxes and interest) of $11.3 million through December 31, 2008.

Nevertheless, as a result of economic trends, the Debtors' revenues in 2009 fell by more than 25% from 2008. This reduction in revenue resulted in a lack of liquidity for the Resort and the inability of the Debtors to service their interest and interest rate swap obligations in the second half of the year. The Resort generated net operating income of $7.5 million through December 31, 2009, most of which was generated in the first six months.

Each of the Debtors is a borrower under a Loan Agreement dated June 30, 2006 (the "Loan Agreement"), with Goldman Sachs Commercial Mortgage Company. ("Goldman Sachs"). As of the Petition Date, the Debtors owe Goldman Sachs approximately $193 million in principal and accrued interest. Goldman Sachs has a senior security interest in substantially all of the Debtors' assets. The Debtors have not paid Goldman Sachs since August of 2009.

The Debtors expect that the Resort industry will recover in 2011. With the financial and operational restructuring opportunity available under the protection of the United States Bankruptcy Code, the Debtors believe they may

protect and optimize the value of their assets for all stakeholders and emerge from Chapter 11 with the stabilization of the economy in 2011.

The Debtors have been open and transparent with Goldman Sachs since the Loan Agreement was executed. As part of a proactive approach, the Debtors entered into discussions with the Goldman Sachs to restructure the loan with a meeting in New York on March 16th 2009. The Debtors informed Goldman Sachs that with the economic outlook at the time and the trends in business bookings the Debtors would have liquidity issues by July/August 2009. The Debtors and Goldman Sachs discussed stabilizing the loan with an extension of the payout term by 3 to 4 years and a reduced interest rate to allow the loan to be serviced by the Resort's operating cash flow. In reliance on Goldman Sachs' apparent willingness to restructure the loan, the Debtors did not seek alternative financing. The Debtors were compliant with their loan obligations at the time of the first restructuring meeting with Goldman Sachs on March 16, 2009 and continued to be compliant until August 2009.

In order to facilitate these discussions, the Debtors asked Perella Weinberg Partners ("PWP"), a leading New York restructuring bank, to assist in the negotiations in late June. Over the course of almost three months of Goldman Sachs negotiation and over twenty turns of a very detailed four page agreement, the Debtors believed that PWP had reached agreement with Goldman Sachs on a restructuring with the exception of an intercreditor issue comprising $2 million of

an unsecured swap claim. This term sheet involved no write down in the par value of Goldman Sachs' outstanding debt, and provided Goldman Sachs with 30% of the equity of the Debtors.

In October, Goldman Sachs informed the Debtors that it instead intended to foreclose on the Resort. When asked in early November why the restructuring was no longer an alternative, Goldman Sachs stated that its management had changed its mind and preferred to own the Resort. At this meeting the Debtors asked Goldman Sachs for an additional four months to find an alternative capital solution, which Goldman Sachs was prepared to give only in the event the Debtor gave up their rights to file Chapter 11, among other restrictions. At the time, Goldman Sachs told the Debtors that the only other solution would be the introduction of equity in the form of cash to the transaction but that they did not believe that the Debtors were capable of raising additional equity.

As a result, the Debtors engaged Jones Lang LaSalle ("JLL"), a leading New York based real estate investment bank, in December, 2009, to secure equity capital to provide Goldman Sachs with a reduction in principal as part of a debt restructuring. This capital raising was significantly compromised when Goldman Sachs, without notice, issued an acceleration notice on December 14, 2009, and filed a foreclosure complaint in State Court on or about January 8, 2010. Pursuant to the Complaint, a hearing was initially set on February 19, 2010

8

or a Motion to Show Cause why a Final Judgment of Foreclosure should not be entered.

JLL executed confidentiality agreements with over thirty potential investors and in January 2009 reduced the list to five qualified investors, any one of whom was prepared to invest at least $40 million in the Resort; but JLL has not been able to progress these discussions with Goldman Sachs which has refused to deal with JLL.

As of February 15, 2010, the Debtor RQB Resort had five bank accounts at Bank of America. Pursuant to a management agreement among the Debtors and the Debtor's hotel manager, Interstate, dated June 30, 2006 (the "Management Agreement"), several of Interstate's employees are signatories on those accounts. On February 17, 2010, the Debtors learned from Bank of America that Interstate attempted to make a preferential transfer of approximately $1.4 million from one of the Bank of America accounts to Goldman Sachs, contrary to the Debtors' directions to Interstate.

For that reason, on February 19, 2010, RQB Resort froze two of the Bank of America accounts on which Interstate was signatory, and opened a new RQB Resort operating account. The same day RQB Resort transferred approximately $2,700,000 from the two accounts to the new operating account in order to (i) to avoid Interstate's attempt to make preferential transfers to Goldman Sachs; (ii) to enable the Debtors to continue to operate the Resort and (iii) to fulfill

the Debtors' fiduciary duty to creditors by paying accounts payable and other obligations in the ordinary course. RQB Resort continued a sufficient balance in the old accounts to cover outstanding checks.[2]

Because of conflicting claims by Interstate and Goldman Sachs, on February 23, 2010, Bank of America placed a freeze on all of the Debtors' accounts.

### D. Officers and Directors.

The Debtors are Delaware limited partnerships and do not have officers or directors. Each of the Debtors is managed by a general partner. RQB Resort's general partner is RQB Resort GP, Inc. RQB Development's general partner is RQB Development GP, Inc. The members of the boards of directors of each general partner are (i) David O'Halloran, (ii) Patrick Murphy and (iii) Robert K. Rowell, an independent director. Mr. O'Halloran is the president and Mr. Murphy is the vice president of each of the general partners. RQB Resort is the owner of the Hotel and the Cabana Club and RQB Development is the owner of the Golf Villas, the Spa and related development rights.

The Debtors' affiliate, RQB America, LLC, entered into a Management and Development Agreement with the Debtors which was later assigned to SGR Asset Management LLC in the maximum monthly amount of

---

[2] Goldman Sachs does not have a perfected security interest in any of the BOA Accounts, or in the approximately $3,500,000 in those accounts because the BOA Accounts are in the name of, and under the sole control of, RQB Resort, LP. Under Florida Law perfection of a security interest in cash collateral requires possession or control of the cash by the lienholder (Florida Statute 679.1041).

$62,500 if no event of default exists under the Loan Agreement. No such fees have been paid since August 2009 when the Debtors defaulted under the Loan Agreement.

The Resort's operator, Interstate is also an affiliate of the Debtors and entitled to receive fees equal to 2.5% of Total Revenues received by the Resort (as defined in the Management Agreement) for each fiscal year. In addition, Interstate is entitled to an Incentive Fee equal to 10% of any of the Resort's Net Operating Income over $15 million during each fiscal year.

### E. Debtors' annual gross revenue.

The following table reflects the prior three years of operations at the Resort (in thousands):

|  | 2007 | 2008 | 2009 |
|---|---|---|---|
| Total Revenue | $55,129 | $56,747 | $42,623 |
| Net Operating Income | $11,221 | $11,275 | $ 7,450 |

### F. Amounts owed to creditors.

As of January 10, 2010, the Debtors owed approximately (i) $185,548,555 in principal, $2,930,255 in interest, $4,020,510 in default interest (an aggregate of $192,499,320) to Goldman Sachs under the Loan Agreement, secured by substantially all of the Debtors' assets, (ii) $7,324,307 unsecured debt to Goldman Sachs Bank USA under an interest rate swap agreement dated July 10, 2006, (iii) $1.4 million in accrued priority tax obligations to St. Johns County and

the State of Florida, (iv) $2.3 million in unsecured trade vendor debt, and (v) $771,050 to their affiliate, RQB Resort Investors, Inc.

### G. Value of the Debtors' assets.

The Debtors paid $220 million and have invested an additional $30 million in the Resort since its acquisition. As of December 31, 2008, the Debtors' assets, the real property and improvements that comprise the Resort and associated furniture, fixtures and equipment had a book value of approximately $263 million. The tax assessed value of the Debtors' land and improvements is $83 million. As of December 31, 2008, a prominent hotel industry appraisal firm, PKF Consulting Corporation, valued the Resort at over $300 million.

### H. Number of employees and wages owed as of the Petition Date.

As of the Petition Date, the Debtors did not have any employees. All 435 of the Resort's employees are employees of Interstate, the hotel operator. Under the terms of the Hotel Management Agreement, Interstate pays its employees with cash funded by the Debtors. As of the Petition Date, the Interstate employees are owed approximately $425,000.

### I. Status of Debtors' payroll and sales tax obligations.

Interstate pays all payroll taxes for the Debtors. It is the Debtors' understanding that Interstate is current on all payroll taxes. The Debtors are current on all of their sales and use taxes.

**J. Anticipated emergency relief needed within 14 days of the Petition Date.**

The Debtors anticipate filing the following motions requesting emergency relief within fourteen days of the Petition Date:

(1) RQB Resorts, LP's list of twenty largest creditors

(2) RQB Development, LP's list of twenty largest creditors

(3) Debtors' Chapter 11 Case Management Summary

(4) Motion for joint administration of the Chapter 11 cases

(5) Motion seeking an extension of the time to file schedules and statements

(6) Motion to limit notice and establish notice procedures

(7) Motion seeking authority to use cash collateral

(8) Motion for an order (i) authorizing the Debtors to honor prepetition gift certificates and customer deposits, (ii) directing banks to honor prepetition checks for payment of such obligations

(9) Motion for order authorizing the Debtors to (i) close prepetition bank accounts, (ii) open a debtor in possession account and (iii) transfer all funds to the debtor in possession account

(10) Motion for order authorizing Debtors to (i) maintain existing cash management system, and (ii) continue using existing business forms

(11) Motion for order authorizing the Debtors to pay Operator monies for prepetition wages, payroll taxes and benefits to non-officer employees and request for emergency hearing

(12) Application to employ Smith Hulsey & Busey as counsel for the Debtors

(13) Application to employ Adam & Reese, LLP as special counsel for the Debtors

(14) Application to employ Sentient Management, Ltd. as insolvency financial advisor

(15) Motion for approval of interim compensation procedures for professionals

SMITH HULSEY & BUSEY

By: */s/ Cynthia C. Jackson*
 Stephen D. Busey
 Cynthia C. Jackson

Florida Bar Number 498882
225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (Facsimile)
cjackson@smithhulsey.com

Counsel for the Debtors

690836.2