# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

In re:

RQB RESORT, LP, and
RQB DEVELOPMENT, LP,

_____Debtors._____/

Case No: 3:10-bk-1596

Chapter   11

Jointly Administered

## RESPONSE IN OPPOSITION TO DEBTORS'
## MOTION FOR RECONSIDERATION

Secured Creditor, Goldman Sachs Mortgage Company ("**GSMC**"), responds in opposition to the Motion for Reconsideration [D.E. 379] (the "**Motion**") filed by the Debtors, which seeks reconsideration of the Court's January 6th Order on the Debtors' Motion to Value the Secured Claim of Goldman Sachs Mortgage Company [D.E. 364] (the "**Valuation Order**").  In support of its Response, GSMC states as follows:

## INTRODUCTION

Disappointed by the Court's well-reasoned adoption of the HVS Final Appraisal in its December 30th ruling on valuation, the Motion simply reiterates arguments already made by Debtors' counsel, and rejected by the Court.  But the Motion does not only revisit positions already rejected by the Court, it distorts the facts and testimony presented to the Court at the valuation hearing in a desperate attempt to further erode GSMC's position for the benefit of equity.  The record and the evidence clearly indicates that the Court did not commit "clear error" in its valuation ruling.

The Court heard comprehensive testimony on the issue of the development rights and the related TPC Memberships and how they were considered by GSMC's expert in the HVS Final Appraisal. Both experts at trial acknowledged that it is simply not feasible for development of the Resort to occur now or in the immediate future. As such, the exact value of the development rights, and the related TPC Memberships that would be sold with the condominium units, is speculative and difficult to predict in terms of amount and timing. It is for this reason that Anne Lloyd-Jones did not ascribe specific values to components of the development rights, such as condominium sales, incremental cabana club income and the TPC Memberships. Instead, Anne Lloyd-Jones, used the appropriate methodology, as to which the Court agreed, of adjusting the discount rate in the discounted cash flow model to account for the investors' perceived realization of that value at some point in the future (which is consistent with the approach that the Debtors' own investment banker, Jones Lang LaSalle ("**JLL**") said it would use). This approach does not determine how much value is attributable to any particular component of the development rights, such as the TPC Memberships, but it does appropriately compensate the seller of the asset for the perceived value of the development potential.

Notwithstanding the inaccurate allegations in the Motion, the testimony before the Court established that the HVS Final Appraisal considered the value of the TPC Memberships as a component of the development rights as a whole because the TPC committed to provide those Memberships in a pre-petition agreement, and the value of those rights will inevitably be realized by the Resort (whether by the Debtors or any subsequent owner) years down the road, and therefore offer significant "synergy value"

to the Resort and TPC. In fact, the Debtors and their investment banker, JLL, have admitted as much by including the TPC Memberships in offering materials and investment proposals presented to potential investors and purchasers, even prior to the date of the bankruptcy. Notwithstanding the Debtors' repeated acknowledgments that the TPC Memberships, or the ability to secure them, represent a significant asset of the estate, the Debtors now seek to disingenuously assert that the Amended TPC Agreement does not currently exist and therefore cannot be considered in determining the overall value of the Resort and associated rights (at the same time the Debtors are also moving to assume this pre-petition agreement). This is simply not true. The ability to secure the TPC Memberships as a component of the development rights is a right that is tied to the overall value of the Resort, an opportunity that will invariably be available to any current or future owner of the Resort, the value of which will be realized years down the road when the development entitlements are utilized.

It is thus abundantly clear that the Debtors' Motion is not motivated by any "clear error" committed by this Court, but rather by the interests of the Debtors' equity investors who are inappropriately seeking to create value for equity, which is far out of the money, at the expense of GSMC. Such motivations do not warrant reconsideration of the Court's valuation determination. Accordingly, the Debtors' Motion falls well short of satisfying the standards necessary for reconsideration and therefore must be denied.

## LEGAL STANDARD

"Motions to reconsider should not be used to 'raise arguments which could, and should, have been made before the judgment was issued.'" *Handt v. Church*, 2003 WL

23812512 (S.D. Fla. 2003) (quoting *Lussier v. Dugger*, 904 F.2d 661, 667 (11ᵗʰ Cir. 1990)). Thus, "[a] motion for reconsideration should not be used as a vehicle to present authorities available at the time of the first decision or to reiterate arguments previously made." *Z.K. Marine, Inc. v. M/N Archigetis*, 808 F.Supp. 1561, 1563 (S.D. Fla. 1992).

There are only three very limited grounds that justify the exceptional measure of reconsidering a previous order: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice. *See Scelta v. Delicatessen Support Services, Inc.*, 89 F. Supp. 2d 1311, 1320 (M.D. Fla. 2000); *see also SEC v. Seahawk Deep Ocean Technology, Inc.*, 74 F. Supp. 2d 1188, 1192 (M.D. Fla. 1999); *Sussman v. Salem, Saxon & Neilson, P.A.*, 153 F.R.D. 689 (M.D. Fla. 1994). Here, nothing in the Debtors' Motion satisfies this high standard.

Courts have repeatedly noted that reconsideration is appropriate only where the "'Court has patently misunderstood a party, or has made a decision outside of the adversarial issues presented to the Court by the parties, or has made an error not of reasoning, but of apprehension. Such problems rarely arise and the motion to reconsider should be equally rare.'" *Ass'n For Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 477 (S.D. Fla. 2002) (citation omitted). As a result, "reconsideration of a previous order is an extraordinary remedy to be employed sparingly." *Burger King Corp. v. Ashland Equities, Inc.*, 181 F.Supp. 2d 1366, 1369 (S.D. Fla. 2002); *see also Hinds County, Miss, v. Wachovia Bank N.A.*, 2010 U.S. Dist. LEXIS 39976, *18-19 (S.D.N.Y, 2010) ("[r]econsideration of a previous order by the court is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial

resources.") (citation omitted); *Scelta*, 89 F. Supp. 2d at 1320 (reconsideration of a previous order is an extraordinary measure).

To prevail on reconsideration, the moving party must demonstrate why the Court should reconsider its prior decision and "set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision." *Scelta*, 89 F. Supp. 2d at 1320; *see also Ass'n For Disabled Americans*, 211 F.R.D. at 477 (same). "A 'manifest error' is not demonstrated by the disappointment of the losing party." *Oto v. Metropolitan Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) (same). Judged by these standards, the Debtors' Motion should be denied in its entirety.

## ARGUMENT

**I.**     **The Court did not commit "clear error" in relying on the HVS Final Appraisal in its entirety**

The Court did not commit "clear error" in relying on the entirety of the HVS Final Appraisal in its Valuation Order. In fact, the Court's reliance on the HVS Final Appraisal was entirely appropriate. At the December 9th and 10th final evidentiary hearing on the Debtors' Motion to Value the Secured Claim of Goldman Sachs Mortgage Company (the "**Valuation Hearing**") the Court heard extensive testimony from GSMC's expert Anne Lloyd-Jones ("**Ms. Lloyd-Jones**") regarding her valuation methods and processes – including her treatment of the 450 TPC Golf Memberships (the "**TPC Memberships**") – and expressly considered that testimony and the entirety of the HVS Final Appraisal in its Valuation Order. The Debtors are using the Motion to simply reiterate arguments previously made at the Valuation Hearing and which were rejected by the Court through its adoption of the HVS Final Appraisal and the well-

reasoned ruling from the bench provided in open court on December 30, 2010 (the

"**Valuation Ruling**"), as adopted in the Valuation Order. Accordingly, nothing in the

Debtors' Motion satisfies the high standard necessary for the court to reconsider the

Valuation Order.

      **a.**      **The experts agreed that it is not feasible for development of the Resort to occur now or in the near future.**

The two expert appraisers both agreed at the valuation hearing that it is not

feasible for development of the Resort to occur now or in the near future. In fact Jerry

Gisclair, the Debtors' expert stated as follows in his original May 2010 expert report:

> The current market is not favorable for development of hotels or residential condominiums and it [is]not likely to be until the current down cycle stabilizes and demand exceeds supply at some point in the future. We have estimated that to be at least <u>five to ten years</u> from the date of value partially based upon the projections below regarding average rate recovery for the subject market, but could be longer.

Debtors' Exhibit 1, at p. 94 (emphasis added). Likewise, in his updated November 2010

appraisal report, Mr. Gisclair stated as follows:

> The current market is not favorable for development of hotels or residential condominium and it is not likely to be until an extended period of stabilization is identified and demand exceeds supply at some point in the future. As illustrated in the market analysis, this is likely to be an extended period of time for Jacksonville given the amount of inventory that came on line in the past four years. Land prices have adjusted to this in the past 6-9 months, reflecting pricing in anticipation of an extending holding period until development is feasible.

Debtors' Exhibit 2, at p. 146.

Ms. Lloyd-Jones agreed in her testimony at trial that development of the Resort is

not feasible at this time:

Q.     And you acknowledge, at this point at least, it's not a project -- the development of those condominium sites, it's not a project that anyone would undertake with the expectation of financial success?

A.     Are you thinking in terms of a specific point in time?

Q.     No.

A.     Is that your question specifically to today?  Yes, I don't think anyone would undertake -- begin that project at this point in time, 2010.

Q.     With any expectation of financial success?

A.     Well, that's why they wouldn't undertake it.  So, yes, I agree.

Q.     Yes.

And you agree that the timing of any future development of those 34 acres cannot be determined at this time?

A.     I agree.

Transcript of Valuation Hearing, ("**Valuation Hearing Tr.**"), at 631:6 to 632:1.

Ms. Lloyd-Jones explained this long-term development potential of the Resort property, which includes the sale of TPC Memberships, in her November 2010 report as follows:

> Our selection of the equity yield and terminal capitalization rates take into consideration the long-term development potential of the site, including specifically the opportunity to develop as many as 500 residential units on the site.  Specifically, we have adjusted the equity yield and terminal capitalization rate downward, in recognition of the potential value that we believe an investor would ascribe to these opportunities.

GSMC Exhibit 2, at p. 61.  This approach of recognizing the value of the development rights is consistent with the approach that JLL testified that it would use: "What typically

happens is cap rates and discount rates will soften or harden based on what might be future. So in other words, if there is a huge amount of development potential, it may be reflected in a more generous cap rate as opposed to doing a development model and capturing those revenue streams." Valuation Hearing Transcript, at 386:15-21.

The evidence at trial also showed that the TPC Memberships under the Amended TPC Agreement can only be transferred together with condominium unit sales. As indicated on page 33 and Exhibit "E" to the Amended TPC Agreement (Debtors' Exhibit 12), the 450 TPC Memberships are designated for Unit Owners, with the term "Unit Owners" being defined on page 11 of the Amended TPC Agreement, as essentially purchasers of "Condominium Units." The term "Condominium" in turn is defined on page 5 of the Amended TPC Agreement as "The one (1) or more condominium buildings containing residential units that RQB intends to construct on the Land . . . ." In short, the value of the TPC Memberships is inextricably intertwined with the value of the development rights, and the value of the TPC Memberships can only be realized when the development rights are utilized and condominium units are sold. Any suggestion by the Debtors that the TPC Memberships have any immediate value that can realized now, separate and apart from the development rights, is clearly incorrect.

### b.  The Debtors have mischaracterized Ms. Lloyd-Jones' testimony

The Debtors' Motion mischaracterizes the testimony of Ms. Lloyd-Jones and her treatment of the TPC Memberships in connection with the HVS Final Appraisal. The Debtors suggest that the HVS Final Appraisal treats the TPC Memberships as stand alone assets that can be valued separate and apart from the development rights to which

they relate. Even more astounding is the Debtors' implication that the evidence at trial showed that the TPC Memberships have a current value of at least $18 million, and that the Court's $20.9 Million value ascribed to the development rights should be reduced to that extent. These representations are inaccurate and are not supported by the testimony and exhibits introduced into evidence at the Valuation Hearing.

A careful and thorough review of Ms. Lloyd-Jones' testimony – the testimony that this Court relied upon and found to be trustworthy and accurate – reveals that in preparing the HVS Final Appraisal Ms. Lloyd-Jones did not value the TPC Memberships as stand alone assets that could be valued separate and apart from the development rights to which they relate. Rather, Ms. Lloyd-Jones valued the entire Marriott Sawgrass Resort (the "**Resort**") and the accompanying development rights with the "expectation that a new owner would pursue and succeed in obtaining an agreement that is very similar in scope to the agreement that was already agreed to by the principal parties, TPC and RQB." Transcript of Valuation Hearing, ("**Valuation Hearing Tr.**") at 644:15-21; *see also Id.* at 646:21-25 ("What's in my value is the expectation that a buyer would secure the same or substantially similar exchange of rights, memberships for golf course usage in pursuit of the development.").

Regardless of whether the TPC has transferred the TPC Memberships to the Resort pursuant to the pre-petition Amended TPC Agreement, the Amended TPC Agreement was clearly in existence, and evidenced the TPC's desire to transfer the TPC Memberships to the Resort or any subsequent owner in exchange for, among many other considerations, agreeing to close the golf course for two additional weeks in

advance of the annual PGA tournament held at the TPC.  In fact, as the Debtors acknowledge, TPC entered into the Amended TPC Agreement with the Debtors back in 2008, in which the TPC agreed to transfer 450 TPC Memberships as part of a comprehensive amendment with a number of provisions benefitting both sides, including the Debtors' agreement to close the golf course for an additional two weeks prior to the Players Tournament.[1]  *See* Valuation Hearing Tr. at 639:14-18 ("...the existing agreement signed by whomever, unsigned by whomever, demonstrates TPC's willingness to enter into an agreement of this type.").  Notwithstanding the Debtors' attempts to mischaracterize and manipulate Ms. Lloyd-Jones' testimony, Ms. Lloyd-Jones, in fact, cogently testified that the prospect of being able to secure the TPC Memberships added enterprise and synergy value to the Resort and is a valued and significant component that any potential purchaser would consider:

> the fact that we know we have something they want, they have something we want, there's been an agreement in the past, I believe, it's reasonable to conclude that that kind of agreement would be available going forward and that any buyer would pursue that concurrent with pursuing the resort and capture the opportunity that -- in fact, I've talked a lot about synergy value. There's huge synergy value for TPC, because not only do they get the couple of weeks back that they want to prep the course, they get 450 members in the club where they can't currently sell memberships because the resort controls 85 percent of the tee times. So they can't grow unless something like this happens. All that means to me in my business

---

[1] The Amended and Restated TPC Courses Agreement (the "**Amended TPC Agreement**") entered into by and between the Debtors, the PGA Tour, Inc. (the "**Tour**"), and the Tournament Players Club at Sawgrass, Inc. (the "**TPC**," and together with the Tour and the Debtors, the "**Parties**"), and dated November 6, 2008, is a binding written contract executed between all the aforementioned parties.  The Amended TPC Agreement is unquestionably part of GSMC's collateral.  The mere fact the Debtors did not present the final Amended TPC Agreement to GSMC for its consideration and consent does not change the fact that the Debtors, the Tour, and the TPC entered into a binding written agreement when they executed the Amended TPC Agreement. GSMC's blanket lien on all of the Debtors' real and personal property extends to any proceeds or substitutions of that collateral, which would undoubtedly include any modifications or amendments encompassed in the Amended TPC Agreement.

judgment, that this makes sense and is reasonable to assume whether or not Goldman Sachs signed a deal, whether or not it's specifically part of the collateral as established in the original loan transaction.

Valuation Hearing Tr. at 640:2-24; *see generally id.* at 639:14 - 647:8. Moreover, when Mr. Busey questioned Ms. Lloyd-Jones about whether her $20.9 million valuation of the development includes the valuation of those 450 TPC memberships, Ms Lloyd-Jones succinctly explained that:

> It includes the expectation that a purchaser buying the hotel would do so, planning to enter into the same agreement with TPC, which agreement mutually benefits both parties.

Valuation Hearing Tr. at 644:3-9; *see also id.* at 640:13-20 ("I believe anybody buying the hotel, one of the pieces of due diligence they would do long before they went looking for sales of property on I-Drive in Orlando would be to have a conversation with TPC and say: Is this something that still works for you that's still in your best interest, is this a trade that makes sense?").

Fully understanding, and agreeing with, Ms. Lloyd-Jones' testimony and methodology, the Court explained why it adopted her valuation of the development rights:

> THE COURT: Anne Lloyd-Jones considered this [the TPC Memberships and development rights] with the rest of the property and with its development potential, and *she indicated that buyers and investors would look at this property for its development potential and as part of the property*, not for its sale potential. And certainly immediately it would not be developed, but within the 10-year span she gives it value for the developer, and so I accept her opinion of that.

December 30, 2010, Valuation Ruling Transcript. ("**Valuation Ruling Tr.**") at 18:11-19 (emphasis added).

The Debtors admit in their Motion that "Goldman Sach's prepetition security interest includes all of the Debtors' intangibles and that an intangible ordinarily ould include contractual rights such as those provided by the Amended Courses Agreement." Debtors' Motion, at p. 11. The Court correctly understood that the HVS Final Appraisal values an opportunity available to any purchaser or owner of the Resort, the ability to either assume the existing Amended Courses Agreement or enter into a similar agreement with the TPC to obtain, among other things, the 450 TPC Memberships, which would be in the best interests of both parties and which the TPC has expressed a willingness to consummate. The synergy value presented by that opportunity is unquestionably a part of GSMC's collateral and is inextricably interwoven into the value of the development rights and the Resort as a whole. This value was thus properly included in the HVS Final Appraisal and adopted by the Court.

c. **The Debtors and Jones Lang LaSalle have included the TPC Memberships in offering memoranda and materials**

Among other things, the Debtors are seeking to have the Court apply a double-standard with respect to the TPC Memberships that is inherently unfair and patently prejudicial to GSMC. While the Debtors object to Ms. Lloyd-Jones' including the opportunity represented by the TPC Memberships as part of the development rights, the Debtors themselves have consistently included the TPC Memberships in materials presented to potential purchasers and investors. More specifically, the Debtors' Presentation to [name redacted to preserve confidentiality] in April 2010, during the pendency of this bankruptcy case, included the TPC Memberships in calculating the "Total Value" of the Resort. *See* GSMC Exhibit 20, at p.3. Moreover, the Debtors

expressly represented to that potential investor that the Debtors, through SGR, had already secured the TPC Memberships. *See* GSMC's Exhibit 20, at p.7. It is disingenuous for the Debtors to assert that the TPC Memberships are not a part of the development rights where the Debtors themselves have repeatedly taken the position that the TPC Memberships is an asset owned by the Debtors.

In addition to the Debtors, JLL, the Debtors' investment bankers, have also included the TPC Memberships as an asset belonging to the Debtors. At the Valuation Hearing, GSMC introduced JLL's Broker Opinion of Value, which clearly shows that JLL marketed the TPC Memberships to potential investors and that they valued the TPC Memberships and the related development rights as part of the assets owned by the Debtors. GSMC Exhibit 11; *see also* Valuation Hearing Tr. at 322:11 - 323:4. As further evidence that the TPC Memberships were considered as an asset of the Debtors, JLL noted on materials circulated to potential investors that the Debtors have "the sole ability to offer 450 golf memberships to TPC Sawgrass to stimulate sale of the units." GSMC Exhibit 23. JLL's representations to investors clearly indicate that the Debtors and JLL viewed the rights to the 450 TPC Memberships as significant assets that enhance the value of the Resort, not mere worthless assets that have not yet come into existence as the Debtors unconvincingly suggest. Some potential purchasers and investors have also assigned value to the TPC Memberships in offers of interest expressed to the Debtors, even prior to the petition date. *See* GSMC Exhibit 16: Expression of Interest [name redacted to preserve confidentiality] (explaining that one

of the imbedded investment opportunities is the "Realization of unused TPC Golf Memberships").

To sum up, the Debtors have expressly admitted, and potential purchasers/investors have realized, that the rights to the TPC Memberships represent an opportunity to any potential purchaser that is intertwined with the development rights and the overall value of the Resort, GSMC's collateral. Even so, the Debtors are now taking the untenable position that the rights to the TPC Memberships do not exist and therefore they cannot be considered at all in valuing the Resort as a whole. The Debtors' positions with respect to the TPC Memberships are patently inconsistent and accordingly should be rejected.

### d.    The Debtors blatantly mischaracterize the value of the TPC Memberships

The Debtors blatantly mischaracterize the value associated with the TPC Memberships by pointing to irrelevant portions of the record that the Court did not rely upon in making its valuation determination. In the Motion, the Debtors seek at least an $18 million reduction in the Court's valuation, somehow implying that the evidence demonstrated at least an $18 million value to the TPC Memberships. That implication is inaccurate and contrary to the evidence presented at the Valuation Hearing and accepted by the Court.

The HVS Final Appraisal adopted by the Court values the "development rights" in their *entirety* at $20.9 million. *See* GSMC Exhibit 2, at P. 61-62. In explaining the value she assigned to the development rights, Ms. Lloyd-Jones testified that one of *several* components that comprise the development rights is the value that a reasonable

third party purchaser would ascribe to the TPC Memberships, which represents one of the development opportunities:

> Q. And so your $20.9 million includes the valuation of those 450 TPC memberships?
>
> A. It includes the expectation that purchaser buying the hotel would do so, planning to enter into the same agreement with TPC, which agreement mutually benefits both parties.

Valuation Hearing Tr. at 645:12-18. The development opportunities associated with the TPC Memberships are one of several components that Ms. Lloyd-Jones considered in determining a value for the development rights. Some of the other components – which comprise a considerable share of Ms. Lloyd-Jones' $20.9 million valuation – include excess land, underlying development entitlements and the potential to develop the Cabana Club. Accordingly, the Debtors' suggestion that the TPC Memberships were valued at $18 million is not only inaccurate, but is also implausible and simply not credible.

Even the Appraisal prepared by the Debtors' expert Mr. Gisclair, which projects an exceptionally slow and protracted economic recovery, still assigned a $7.9 million value to the development rights. The $7.9 million value expressly excluded the development opportunities associated with the TPC Memberships. Valuation Hearing Tr. at 145:25 - 146:3. The difference between the development rights as valued in the two appraisals is only $13 million, and yet astonishingly the Debtors still seek a reduction of at least $18 million to this Court's valuation. This is notwithstanding the fact that Mr. Gisclair's value of the non-TPC Membership related development rights are undoubtedly far more conservative than Mr. Lloyd-Jones' are for those same rights.

The Debtors' efforts to convince this Court to reduce the valuation by at least $18 million simply lacks credibility and should be disregarded entirely.

> ### i. The Court did not rely upon the Quarterly Reviews as determinative of value of the 450 TPC Memberships

The Debtors' reference the 2009 Quarterly Review Summary of the Sawgrass Resort & Spa (collectively, the "**Quarterly Reviews**") for the first two quarters of 2009, suggesting that GSMC's internal valuation of the TPC Memberships for the first half of 2009 is somehow relevant to the value of that component of the development rights in November of 2010. The Debtors' suggestion that GSMC's internal valuations from early 2009 have any relevance to the value of the development rights in late 2010 is unfounded and inappropriate.[2] Notwithstanding the Debtors' attempt to conflate dated valuations with the HVS Final Appraisal, in reaching its valuation and adopting the HVS Final Appraisal, the Court did not suggest that the value of the TPC Memberships, or the opportunity represented by them, were remotely close to $18 million. Instead, the Court expressly stated that it relied upon the HVS Final Appraisal and its approach for determining the value of the development rights as a whole at $20.9 million, which value included in it the opportunity to secure the TPC Memberships. *See* Valuation Ruling Tr. at 18:11-19. It is thus clear that the HVS Final Appraisal did not rely upon the Quarterly Reviews in reaching its overall value for the development rights, and that the Court in adopting the HVS Final Appraisal did not rely upon them either. Moreover, the values that GSMC assigned to the TPC

---

[2]     If the Debtors want the Court to consider the value of the Resort in 2009, the only valuation in the record ascribing a value as of that point in time is the JLL Broker Opinion of Value, which ascribed a value range to the Resort of $220M to $235M. GSMC Exhibit 11.

Memberships in early 2009 are almost 2 years old and have little if any relevance as to the value of the TPC Memberships as a component of the development rights in November of 2010.

### ii. The Quarterly Reviews are dated and entirely irrelevant

Besides being misleading, the Debtors' reference to severely dated Quarterly Reviews is a brazen attempt to "hide the ball" and further erodes their credibility. Quite noticeably, the Debtors only refer to the Quarterly Reports from the first and second quarter of 2009, while conveniently ignoring the valuations contained in the Quarterly Reports that followed for the third and fourth quarters of 2009, also part of the evidence at the Valuation Hearing. In fact, GSMC's Quarterly Report for the Fourth Quarter of 2009 assigned a value of between $5.1 million and $6.9 million to the opportunity represented by the TPC Memberships, a significant departure from the between $18 million to $22.5 million that the Debtors are asserting that GSMC assigned to the TPC Memberships back in early 2009. Debtors' Exhibit 5. Even so, it is clear that the Court did not value the TPC Memberships, or the opportunity represented by them, at anywhere near $18 million, nor is there any evidence in the record to suggest a value anywhere near that amount for November of 2010.

### e. The Amended TPC Courses Agreement was binding upon the Parties when executed on November 6, 2008

The Debtors do not contest that the original TPC Courses Agreement dated August 14, 1989 (the "**1989 Agreement**"), as assumed by the Debtors in 2006, is a part of GSMC's collateral. The Debtors, however, contend that the Amended TPC Agreement is not a part of GSMC's collateral because GSMC has allegedly not

consented to the agreement and because the parties agreed that the Amended TPC Agreement will not be effective until GSMC provides its consent. The Debtors overlook the basic reality that the parties entered into a binding written agreement pre-petition when they executed the Amended TPC Agreement, which agreement constitutes part of GSMC's pre-petition collateral. Because the 1989 Agreement and the rights stemming therefrom are unquestionably GSMC's collateral, any modification to that agreement or any amended TPC agreement constitutes GSMC's collateral or, at a minimum, proceeds of GSMC's collateral, under both the UCC and Section 552(b) of the Bankruptcy Code.[3]

Recognizing that the Amended TPC Agreement had been entered into between the parties, the Court noted in its Valuation Ruling that:

---

[3] Article 9 of the Uniform Commercial Code, Section 9-102(64), defines "proceeds" expansively to include (emphasis added):

> (A) *whatever is acquired upon the* sale, lease, license, *exchange, or other disposition of collateral*;

> (B) whatever is collected on, or distributed on account of, collateral;

> (C) *rights arising out of collateral*;

> (D) to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral; or

> (E) to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral.

The legislative history to Section 552(b) supports an even more expansive reading than that found in the UCC. The legislative history states precisely that "the term 'proceeds' is not limited to the technical definition contained in the UCC, but covers any property into which property subject to the security interest is converted." House Report No. 95-595, 95th Cong., 1st Sess. 376-377 (1977). Some courts have endorsed this even more expansive interpretation. *See James Cable Partners, L.P. v. Citibank (In re James Cable Partners, L.P.),* 141 B.R. 772, 775-776 (Bankr. M.D. Ga. 1992) ("It is clear that the coverage of section 552 is broader than that of the U.C.C.").

I considered that she did include it in her appraisal, and I considered it as an asset of the estate. Since it has been an asset of the estate, since there was testimony about negotiating a revised agreement, as I recall it was to allow a two-week period of time before the TPC professional tournament in order to allow, for whatever reason, to get the course in shape, to allow the professionals to practice. I don't recall there was any testimony on that, but I recall that that was a point of it. And my thought was -- and there was testimony that Goldman Sachs had not yet approved the modification to the agreement. *But I viewed the underlying agreement as being in place and the modification as not having been approved by Goldman Sachs.* And so I did recognize that she considered it in the value and I did believe it would be property of the estate. Those were my thoughts.

Valuation Ruling Tr. at 22:6-25 (emphasis added). The Court recognized that notwithstanding any alleged lack of consent from GSMC, the Amended TPC Agreement was entered into, and became a binding written agreement, on November 6, 2008, when it was executed by all the parties. While Ms. Lloyd-Jones relied upon the synergy value that the TPC Memberships represent to any owner of the Resort and the TPC, the Amended TPC Agreement itself – in its alleged "non-effective" form – is undoubtedly a part of GMSC's collateral and an asset of the Debtors' estate, which includes the TPC's agreement to convey to the Resort the 450 TPC Memberships.

### i. The Debtors should be estopped from arguing that the Amended TPC Agreement is not a part of GSMC's collateral

The Debtors should be estopped from arguing that the Amended TPC Agreement is not a part of GSMC's collateral. While the Debtors argue that the Amended TPC Agreement is not part of GSMC's collateral and that the TPC Memberships do not yet exist and therefore have no value, the Debtors have already been providing the TPC with its bargained for benefits under the Amended TPC Agreement. Without obtaining GSMC's consent, the Debtors have permitted the TPC

to close the golf courses for the two week period before the PGA tournament in the spring of 2009 and 2010. In addition, the Debtors have been receiving the Upcharge Income referred to in their motion as one of the benefits of the Amended TPC Agreement. At a minimum, the Debtors' consent to the two week closures by the TPC and the Debtors' realization of the Upcharge Income pursuant to the negotiated arrangement with the TPC evidences an implied-in-fact contract between the parties and the Debtors' conduct should estop them from now contending that the Amended TPC Agreement does not constitute part of GSMC's collateral.

> ### e. The relief sought by the Debtors would not benefit unsecured creditors

The Debtors would have this Court believe that if it were to reconsider and reduce the Resort valuation by eliminating the value assigned to the development opportunity associated with the TPC Memberships, that the Debtors will then be able to "unlock" the Amended TPC Agreement post-petition and secure the TPC Memberships, which they allege will inure to the benefit of the estates' unsecured creditors. This is simply not true. First, as set forth in detail above, the Debtors entered into the Amended TPC Agreement pre-petition and the suggestion that the amended agreement is not in existence and that they will only now enter into the amendment post-petition is inaccurate as a matter of law and is not supported by the facts. Even if the Amended TPC Agreement was somehow not a pre-petition agreement, however, any agreement stemming from the 1989 Agreement, which the Debtors admit is part of GSMC's collateral, is "proceeds" of GSMC's collateral on which GSMC's security interest continues to attach. Accordingly, under either formulation – whether the Amended

TPC Agreement was entered into pre-petition or whether it will be entered into post-petition – the agreement constitutes part of GSMC's collateral.

Notwithstanding the Debtors' poignant plea to enhance value for the unsecured creditors in these cases, a reduction in the Resort valuation and the proposed post-petition "creation" of the TPC Memberships will have no meaningful impact on unsecured creditors. To begin with, GSMC *is* the Debtors' largest unsecured creditor, and now has a deficiency claim in excess of $60 million (compared to other unsecured debt that probably will not exceed a couple of million dollars). By focusing on the purported "benefit" to unsecured creditors, the Debtors are inappropriately attempting to shift the focus away from the true beneficiary of these machinations, the Debtors' equity holders. The Debtors' true intention is to strip away a portion of GSMC's collateral, so that they can reduce their overall secured debt in an effort to entice potential investors to participate in an equity recapitalization in a manner that allows the equity to capture this future value for its own benefit. As noted above, both experts agreed that the development rights (which include the right to sell TPC Memberships along with development units) will not be realized for a number of years, with Mr. Gisclair estimating the time period to be between five and ten years. The TPC Memberships are not a separate asset that can be sold now, and it will be many years into the future until any value can be realized from that component of the development rights, long after any plan is confirmed in this case, and long after payment to creditors. Stated plainly, the only constituency that truly stands to gain from a reduction in the Resort valuation is equity, not the unsecured creditors.

WHEREFORE, GSMC respectfully requests the entry of an Order denying the Debtors'

Motion for Reconsideration and granting GSMC other relief as is just and proper.

Respectfully submitted this 22nd day of February, 2011.

> GREENBERG TRAURIG, P.A.
> *Attorneys for Goldman Sachs Mortgage Company*
> 333 Avenue of the Americas
> Suite 4400
> Miami, Florida 33131
> Telephone: (305) 579-0500
> Facsimile: (305) 579-0717
>
> By: _____
>   JOHN B. HUTTON
>   Florida Bar No. 902160
>   huttonj@gtlaw.com
>   SCOTT M. GROSSMAN
>   Florida Bar No. 0176702
>   grossmansm@gtlaw.com
>   ARI NEWMAN
>   Florida Bar No. 56575
>   newmanar@gtlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the Service List attached to the original hereof, either via transmission of Notices of Electronic Filing generated by CM/ECF or via U.S. mail, postage prepaid, for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

_____
JOHN B. HUTTON

**Service List**

**Electronic Mail Notice List**

The following is the list of **parties** who are currently on the list to receive e-mail notice/service for this case.

- Lindsey C. Brock    brock@rumrelllaw.com
- Betsy C Cox    bcox@rtlaw.com, aruff@rtlaw.com
- Gardner F. Davis    gdavis@foley.com,
  khall@foley.com;dpbarnes@foley.com;jwolfel@foley.com
- Joseph D Frank    jfrank@fgllp.com,
  ccarpenter@fgllp.com;jkleinman@fgllp.com;rheiligman@fgllp.com
- John B Hutton    huttonj@gtlaw.com,
  thompsonc@gtlaw.com;MiaLitDock@gtlaw.com;miaecfbky@gtlaw.com
- Cynthia C. Jackson    cjackson@smithhulsey.com,
  tcopeland@smithhulsey.com;kgammill@smithhulsey.com;zwarren@smithhulsey.com
- Ari Newman    newmanar@gtlaw.com, miaecfbky@gtlaw.com
- Miriam G Suarez    Miriam.G.Suarez@usdoj.gov
- United States Trustee - JAX 11    USTP.Region21.OR.ECF@usdoj.gov
- Alan M. Weiss    alan.weiss@hklaw.com

## Manual Notice List

The following is the list of **parties** who are **not** on the list to receive e-mail notice/service for this case (who therefore require manual noticing/service).

Jeffrey Gilbert
Greenberg Traurig, P.A.
401 East Las Olas Boulevard
Suite 2000
Ft. Lauderdale, FL 33301

Smith Hulsey & Busey
225 Water Street
Suite 1800
Jacksonville, FL 32202

Karen Lee Turner
Eckert Seamans Cherrin & Mellott, LLC
50 South 16th Street, 22nd Floor
.Philadelphia, PA 19102

John J. Wolfel
PO Box 240
Jacksonville, FL 32201-0240

*MIA 181,666,193v4 2-21-11*