# UNITED STATES BANKRUPTCY COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | : | CHAPTER 11 |
| | : | |
| RQB Resort, LP and | : | Case No. 03:10-bk-01596 |
| RQB Development, LP, | : | |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | |
| | : | |

## MARRIOTT'S MOTION TO TERMINATE THE DEBTORS' EXCLUSIVE PERIODS TO FILE A PLAN OF REORGANIZATION AND SOLICIT ACCEPTANCES AND MEMORANDUM OF LAW

Creditor Marriott International Inc. ("Marriott"), by and through its undersigned counsel, files this Motion to Terminate the Debtors' Exclusive Periods to File A Plan of Reorganization and Solicit Acceptances. In support of this Motion, Marriott respectfully states as follows:

## INTRODUCTION

This bankruptcy case has gone on too long and cost too much money. The prepetition equity owners of the Debtors have lost their entire investment. The Sawgrass Marriott Resort is too important to its employees and business partners and the greater Jacksonville economy to permit the prepetition equity owners to hold hostage the reorganization process in order to obtain personal economic advantage.

Marriott seeks permission to file a plan of reorganization which would be fair and reasonable to both Goldman Sachs, as first mortgage lender and the Debtors' other creditors and business partners and would protect the interests of the employees and the greater Jacksonville

economy. Marriott believes that such a plan provides the best opportunity for a fair, equitable and prompt exit from bankruptcy.

Marriott is uniquely positioned to sponsor a plan of reorganization. Marriott has been closely associated with the inn since it opened. The Debtors, and their prepetition equity investors by implication, agreed to grant Marriott a right of first refusal ("ROFR") upon termination of the Franchise Agreement, sale of the inn or change in the Debtors' controlling equity ownership. Debtors' plan will trigger Marriott's ROFR. Permitting Marriott to sponsor its own plan will equitably fulfill the purpose behind this ROFR and permit the Debtors to avoid a damage claim by Marriott for breach of the ROFR which Marriott estimates to exceed $10 million.

Marriott is filing a companion motion for entry of an order compelling Debtors to assume or reject the Franchise Agreement and for determination of whether the ROFR remains specifically enforceable and a companion motion to estimate Marriott's claim for voting and plan confirmation purposes.

## JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are §§ 1121(d) and 105(a) of the Bankruptcy Code and Rules 9006 and 9024 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND FACTS

2. The Debtors operate the inn at the Sawgrass Resort as a "Marriott" hotel pursuant to a Franchise Agreement with Marriott, as successor to Marriott Corporation, dated as of

November 8, 1989, as amended September 1, 1992, June 30, 1995 and December 8, 2000, and by letter dated June 15, 2006 and by "comfort letter" dated the June 30, 2006 from Marriott to Goldman Sachs Commercial Mortgage Capital, L.P. (collectively, the "Franchise Agreement") with Interconn Ponte Vedra Company, L.L.C. ("Interconn"), by assignment from Interstate Hotel, LLC (successor-in-interest and by merger to Interestate Hotels Corporation #115), as assigned to Debtors pursuant to a Consent to Assignment of Marriott Franchise Agreement among Marriott, as franchisor, Interconn and Debtors, as franchisee, dated June 30, 2006.

3. Marriott's intellectual property, business methods and trade secrets, including training, marketing support, customer lists, guest referrals, guest loyalty program, and associated goodwill have contributed substantially to the success of the inn over the past 20 years and the growth of its value as a resort property.

4. The Franchise Agreement terminates November 8, 2013, unless extended pursuant to the extension provisions in the Franchise Agreement.

5. The Debtors have not formally advised Marriott whether they intend to assume or reject the Franchise Agreement.

6. The Debtors owe Marriott $407,574 for prepetition payments due under the Franchise Agreement.

7. The Franchise Agreement provides that Marriott is entitled to recover certain amounts as liquidated damages in the event the Debtors terminate the Franchise Agreement with the intent to operate independently without a franchise or to obtain a franchise from another hotel chain. Specifically, Section 16.2 provides:

> 16.2 <u>Termination</u>.
>
> [I]n the event such termination is caused by a default of Franchisee with intent to operate independently without a franchise or to obtain a franchise from another hotel chain, which intention

3

shall be conclusively evidenced by taking such action following such termination, Marriott shall then be entitled to recover from Franchisee as liquidated damages and not as a penalty an additional amount equal to the average of the monthly fees under Section 2.2 theretofore paid to Marriott during the term hereof times the number of months which remain in the total term of this Franchise Agreement. In the event no previous fees under Section 2.2 have been paid, the average monthly fees which would have been forthcoming had the fees been paid, shall be estimated and based upon the average gross room sales and gross food and beverage sales for the preceding twelve (12) month period of all the Inns operated under the System or such greater amount of damages as Marriott may be able to show that it in fact has sustained by reason of such default by Franchisee and the termination of this Agreement. In addition to such damages, Marriott shall have the right to recover reasonable attorneys' fees and court costs incurred in collecting such sums. All remedies hereunder are construed to be cumulative in nature and in no way are they to be construed as being exclusive nor shall they preclude Marriott from any other remedies to which it may be entitled under applicable law.

8. In connection with the Debtor's acquisition of the inn, Marriott entered into a letter agreement dated June 15, 2006 with Interconn and Debtor which changed the measurement of liquidated damages to 150% of average monthly fees. The letter agreement provides, in part:

> Buyer further agrees that, from and after the date of the consummation of the Sale, the amount of liquidated damages to be paid to Marriott in the event of a termination of the Franchise Agreement will be one hundred fifty percent (150%) of the amount that would otherwise be due pursuant to Section 16.2 of the Franchise Agreement, if any, but only if such termination would otherwise obligate the franchisee to pay Marriott liquidated damages in accordance with the terms of Section 16.2 of the Franchise Agreement.

9. Assuming the Debtor terminated the Franchise Agreement as of October 1, 2011, the Debtor would owe Marriott approximately $3,650,000 of liquidated damages, based on average monthly room royalty and F&B royalty fees of $96,279 and 25.27 months remaining.

4

10. In addition, the Franchise Agreement imposes a covenant not to compete upon the Debtors upon termination of the Franchise Agreement (the "Non-Competition Covenant"). Section 15.2 of the Franchise Agreement provides:

> 15.2 Non-Competition.
>
> [I]n the event of termination of this Agreement for any reason other than the fault of Marriott, and in addition to and not as a limitation of any other restrictions upon Franchisee contained herein, Franchisee, and if Franchisee is a partnership or a corporation, then Franchisee and each of the aforesaid Partners or Controlling Stockholder and any authorized assignees thereof agree that they will not, for a period of twenty-four (24) months following the date this Agreement is terminated, directly or indirectly, for or on behalf of itself or himself or others, without first obtaining Marriott's written consent, engage in, operate, or be in any manner connected with or associated with any motel, hotel, or inn business, other than those in which the Franchisee may be engaged at the time of termination of this Agreement, within the trade area of this Inn, or within ten (10) miles of any Marriott Inn or Marriott Hotel. The parties acknowledge that this prohibition is based on the reason and understanding that Franchisee or its partners, or stockholders will be possessed of knowledge of business and operating methods and trade secrets, disclosure of which would prejudice the interests of Marriott and its other franchisees. Franchise, if an individual, partners, if a partnership, or Controlling Stockholder, if Franchisee is a corporation, acknowledge(s) that he or they have been previously gainfully employed in business other than motel or hotel business and the foregoing noncompetitive provisions will not in any way prevent him or them or any of them from earning a living. Marriott shall have the right to injunctive relief to enforce such non-competition covenant in addition to such other relief to which it may be entitled in law and equity.

11. Although the Debtors will argue that an absolute prohibition against using the inn as a hotel would constitute an unreasonable hardship, at a minimum, injunctive relief enforcing the Non-Competition Covenant is appropriate to prevent the Debtors from:

5

(i) soliciting business from any previous guest introduced through the Marriott reservation system or participating in any Marriott customer loyalty program;

(ii) using any marketing or pricing information provided by Marriott;

(iii) using any advertising or marketing materials provide by or developed in consultation with Marriott;

(iv) using any menus, recipes, training materials, business methods or other proprietary information provided by or developed in consultation with Marriott;

(v) using any software, websites, databases or other intellectual property provided by or developed in consultation with Marriott; and

(vi) engaging the Debtors' former partners and controlling shareholders in any type of continuing managerial or advisory capacity.

In addition, if the Debtors intend to operate independently, they should be required to prominently disclose in all advertising and marketing materials that the inn is no longer affiliated with Marriott and no longer participates in the Marriott loyalty programs.

12. The Franchise Agreement also provides that Marriott is entitled to a right of first refusal to purchase the inn from the Debtors (the "<u>ROFR</u>") upon termination of the Franchise Agreement due to Franchisee's default or upon sale of the inn or change in controlling equity ownership of the Debtors. Sections 15.3 and 15.4 of the Franchise Agreement provide in part:

> 15.3  <u>Sale, Lease, Etc. of Inn or Stock</u>
>
> A.  If Franchisee shall have received a bona fide offer to purchase or lease the Inn (but for purposes of this section, not to include the Condominium Units) or to purchase Franchisee's stock, if Franchisee is a corporation, and Franchisee, pursuant to the terms of such offer, desires to sell or lease the Inn or sell said

6

stock, Franchisee shall give written notice thereof to Marriott, stating the name and full identity of the prospective purchaser or tenant, as the case may be, including the names and addresses of the owners of the capital stock, partnership interests or other proprietary interests of such prospective purchaser or tenant, the price or rental and all terms and conditions of such proposed sale or lease, together with all other information with respect thereto which is requested by Marriott and reasonably available to Franchisee. Within thirty (30) days after receipt by Marriott of such written notice from Franchisee, Marriott shall elect by written notice to Franchisee, one of the following alternatives:

> (1) To purchase or lease the Inn or to purchase the stock at the same price or rental and upon the same terms and conditions as those set forth in the written notice from Franchisee to Marriott. In such event Franchisee and Marriott shall promptly enter into an agreement for sale or lease at the price or rental and on terms consistent with such notice from Franchisee to Marriott.
>
> (2) To consent to such sale or lease and to the assignment of the Agreement to such purchaser or tenant, if such sale or lease is in fact consummated; provided, however, that concurrently with the consummation of such sale or lease, the purchaser or tenant, as the case may be, shall assume all obligations of Franchisee under this Agreement; provided, however, that the franchise royalty fees and other economic terms of such franchise agreement shall be the same as the unexpired portion of the then current term of this Agreement. It is expressly understood and agreed, however, that notwithstanding Marriott's consent to such sale or lease and assignment of this Agreement and the execution and delivery of said franchise agreement, Franchisee shall not be released from any of its obligations hereunder except as approved in writing by Marriott. Franchisee shall give to Marriott not less than thirty (30) days written notice of the date on which such sale or lease is to be consummated in order to give Marriott an opportunity to be present.
>
> (3) To refuse consent to such offer to purchase or lease, which consent shall not be unreasonably withheld.

. . .

C. The voluntary or involuntary sale, assignment, transfer or other disposition, or transfer by operation of law (other than by will or the laws of intestate succession) of a controlling interest in

7

> the Franchisee (i.e., the possession directly or indirectly of the power to direct or cause the direction of management and policies of Franchisee, whether through the ownership of voting securities or by contract or otherwise) shall be deemed a sale or lease of the Inn or a sale of the stock within the meaning of Sections 15.1 and 15.3 and shall be subject to the same rights of Marriott as set forth in such Sections with respect to the sale or lease of the Inn or sale of the stock. . . .
>
> D.     In the event Franchisee receives an offer for the purchase or lease of the Inn together with other property, Marriott may, at its option, acquire only the Inn from Franchisee pursuant to the provisions of this section. In such event, the price or rental of the Inn shall be determined by obtaining an independent appraisal of the Inn and the other property to be sold or leased together with the Inn. The purchase price or rental for the Inn alone shall be determined by multiplying the total purchase price or rental offered times a fraction, the numerator of which is the appraised value of the Inn and the denominator of which is the appraised value of all the property to be sold or leased.
>
> 15.4    Sale or Discontinuation of Business for Other Reasons.
>
> If this Agreement is terminated or cancelled by reason of default in the performance by Franchisee, or if Franchisee decides to discontinue business for any reason other than the lease, sale or transfer thereof to another, Franchisee shall give to Marriott sixty (60) days written notice thereof, accompanied by an offer to sell to Marriott, Franchisee's entire interest in the Inn premises and all the property used thereon. If upon such offer the parties are unable to agree as to a purchase price and terms, the fair market value of the Inn premises and related property shall be determined by appraisal . . . .

13.     The ROFR was an essential inducement for Marriott to invest its intellectual property and energy into the development of the inn over the past twenty years. The ROFR provides Marriott with the opportunity to assure that the inn remains a Marriott property.

14.     Marriott's proposed plan of reorganization would be fair and equitable to Goldman Sachs as well as the Debtors' trade creditors and business partners. The Marriott plan would also protect the employees, guests and greater Jacksonville economy. The Marriott plan would provide for a speedy exit from bankruptcy.

8

15. Exclusivity needs to be terminated so that Marriott's plan is presented at the same time as the Debtors' plan and therefore the creditors have a meaningful choice. Moreover, for the good of the creditors, the employees and the North Florida economy, the case needs to be moved forward to a successful conclusion.

16. If Marriott subsequently determines that the Marriott plan is not feasible, is unlikely to be confirmed or will impose unacceptable financial burden on Marriott, or if the Debtors sponsor a plan that Marriott considers fair and equitable, Marriott reserves the right not to actually file a Marriott plan or withdraw a Marriott plan after filing.

WHEREFORE, Marriott respectfully requests that this Court (a) terminate the Debtors' Exclusivity Periods, and (b) authorize Marriott to file a competing plan; and (c) grant such other relief as is just and proper under the circumstances.

## **LEGAL MEMORANDUM**

Section 1121 of the Bankruptcy Code provides the basis for determining the time period within which only the debtor in possession may file a plan and solicit acceptances of that plan. Pursuant to Section 1121(b) of the Bankruptcy Code, a debtor is given the exclusive right to file a plan until the expiration of 120 days following the date of the order for relief (the "Exclusivity Period"), unless the Exclusivity Period is reduced or enlarged by order of the bankruptcy court. In addition, Section 1121(c)(3) provides that a debtor in possession is given the exclusive right to solicit acceptances of its plan for 180 days following the date of the order for relief (the "Acceptance Period," and collectively with the Exclusivity Period, the "Exclusivity Periods"), unless the Acceptance Period is reduced or enlarged by order of the bankruptcy court.

Section 1121(d) of the Bankruptcy Code authorizes the termination of the Debtors' Exclusivity Periods for cause. Section 1121(d)(1) states in pertinent part:

9

> [O]n request of a party in interest . . . and after notice and a hearing, the court may for cause reduce ... the 120-day [Exclusivity] period or the 180-day [Acceptance] period referred to in this section.

The bankruptcy court possesses broad authority to terminate the Debtors' Exclusive Periods to promote a reorganization. Section 1121(d) of the Bankruptcy Code does not define the factors a court should consider when determining whether "cause" has been shown to terminate a debtor's exclusive periods. Rather, the Bankruptcy Code commits such decisions to the broad discretion of the court in order to maximize flexibility in the chapter 11 reorganization process. *In re Public Serv. Co. of New Hampshire*, 88 B.R. 521, 534 (Bankr. D.N.H. 1988) ("the legislative intent [behind § 1121(d)] has been construed to leave the question [of cause] to the reorganization court in the exercise of its discretion and to promote maximum flexibility to suit various types of reorganization proceedings"); *In re Sharon Steel Corp.*, 78 B.R. 762, 763 (Bankr. W.D. Pa. 1987) (court has "great latitude in the exercise of its discretion" under § 1121(d)).

The public policy underlying Section 1121 of the Bankruptcy Code is to prevent the debtor from obtaining undue bargaining leverage during the chapter 11 process. *In re Timbers of Inwood Forest Associates, Inc.*, 808 F.2d 363, 372 (5th Cir. 1987) (*en banc*), *aff'd* 484 U.S. 365 (1988); *In re All Seasons Industries, Inc.*, 121 B.R. 1002, 1003-1004 (Bankr. N.D. Ind. 1990). In fact, the limited exclusivity period was specifically designed to rectify an inequity created under the former Bankruptcy Act which gave a debtor the exclusive right, throughout the Chapter 11 proceedings, to propose a plan. The House Report accompanying H.R. 8200 highlighted the inequity created under the former Bankruptcy Act by noting that, "[t]he exclusive right [under older Chapter 11] gives the debtor undue bargaining leverage, because by delay [the debtor] can force a settlement out of otherwise unwilling creditors . . . ." In contrast, Section 1121 represented a congressional acknowledgment that parties in interest "whose money is invested in

10

the enterprise no less than the [d]ebtor's, have a right to a say in the future of the enterprise." *Id*. Similarly, Sections 1121(d)(1) and (2) evidence Congress' recognition that limits on a debtor's exclusive rights to file a plan reduce the likelihood of unfair bargaining leverage.

Congress designed § 1121 to strike a balance between a debtor's ability to control the process of proposing a plan of reorganization with a creditor's right to "limit the delay that makes creditors the hostage of Chapter 11 debtors." *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 808 F.2d 363, 372 (5th Cir. 1987), *aff'd*, 484 U.S. 265 (1988); *In re Friedman's Inc.*, 336 B.R. 884, 889 (Bankr. S.D. Ga. 2005).

Various examples of cause to terminate exclusivity include: (i) a debtor's use of exclusivity period to force creditors to accept an unsatisfactory or unconfirmable plan (*In re Situation Management Systems, Inc.*, 252 B.R. 859 (Bankr. D. Mass. 2000); *In re Standard Mill Limited Partnership*, 1996 Bankr. LEXIS 1120 (Bankr. D. Minn. 1996); *In re Texaco, Inc.*, 81 B.R. 806, 812-813 (Bankr. S.D. N.Y. 1988); (ii) a debtor's delay in filing a plan (*In re Eagle-Picher Industries, Inc.*, 176 B.R. 143, 147 (Bankr. S.D. Ohio 1994)); (iii) gross mismanagement of the debtor's operations (*In re Crescent Beach Inn, Inc.*, 22 B.R. 155, 159 (Bankr. D. Me. 1982); (iv) "acrimonious relations" between the debtor's principals (*In re Texas Extrusion Corp.*, 68 B.R. 712, 725 (N.D. Tex. 1986)); and (v) and where creditors have lost faith and confidence in the debtor's management (*In re All Seasons Indus., Inc.*, 121 B.R. 1002, 1006 (Bankr. N.D. Ind. 1990)).

Bankruptcy courts analyzing the "cause" standard under Section 1121(d) have held that the primary consideration in determining whether cause exists for terminating exclusivity is whether such termination "would facilitate moving the case forward." *In re Dow Corning Corp.*, 208 B.R. 661, 670 (Bankr. E.D. Mich. 1997).

Termination the Exclusivity Periods will afford Marriott the opportunity to propose the Marriott Plan that will undoubtedly "move this case forward." Confirmation of Marriott's Pan would avoid litigation of issues related to Marriott's right of first refusal and covenant not to compete. The Marriott Plan would almost by definition be superior to the Debtors' Plan because Marriott's Plan would avoid the more than $10 million damage claim arising from breach of Marriott's ROFR, which would reduce payments to other unsecured creditors. At a minimum, it is worth giving the creditors a choice.

The Debtors have stated to this Court on numerous occasions that it is seeking new equity investors, which, under United States Supreme Court precedent constitutes "cause" for terminating the Debtors' Exclusivity Periods. *See Bank of America National Trust and Savings Ass'n v. 203 North LaSalle Street Partnership*, 526 U.S. 434 (1999). In *LaSalle*, the Supreme Court held that a plan providing for equity holders to contribute new capital was not confirmable in the absence of competitive bidding for the equity interests to determine adequacy of the new value contribution. *Id*. at 457-58. The Court was particularly concerned by the fact that the debtor had retained the exclusive right to propose a plan, thereby precluding others (including objecting creditors) from proposing a plan "selling" equity to another. *Id*. at 456.

Explaining its concerns, the Supreme Court stated that "it is that the exclusiveness of the opportunity, with its protection against the market's scrutiny of the purchase price by means of competing bids or even competing plan proposals, that renders the partners' right a property interest extended on account of the old equity position and therefore subject to an unpaid senior creditor class's objection." *Id*. Under such circumstances, where the plan "mak[es] no provision for competing bids or competing plans, any determination that the price [a purchaser might be willing to pay for the equity] was top dollar would necessarily be made by a judge in the

12

bankruptcy court," whereas, according to the Supreme Court, bankruptcy policy and practice demonstrated that "the best way to determine value is exposure to a market." *Id*. at 457.

Subsequent precedent, construing *LaSalle*, has held that *LaSalle's* "market test" principles apply to *any* sale of equity to a third party by a chapter 11 debtor in possession. In *In re Global Ocean Carriers Ltd.*, 251 B.R. 31 (Bankr. D. Del. 2000), for example, the bankruptcy court rejected a proposed sale of equity to a party that was not a former shareholder on the ground that (although there was no direct participation by old equity) the plan left control of to whom and for what price the equity would be sold in the hands of the Debtors' controlling shareholder. 251 B.R. at 49 (quoting *LaSalle*, 526 U.S. at 456).

In the years since *LaSalle*, a consensus has emerged that the best way to satisfy this standard is to terminate exclusivity and allow competing plans of reorganization to decide whether and at what price the equity interest of the reorganized company should be sold. *See, e.g.*, *In re Situation Mgmt. Sys., Inc.*, 252 B.R. 859 (Bankr. D. Mass. 2000) (termination of exclusivity and the opportunity for competing plans was the "preferable procedural mechanism" for satisfying *LaSalle's* "market test" standard); *In re Davis*, 262 B.R. 791, 799 (Bankr. D. Ariz. 2001) (declining to extend exclusivity where debtor's plan "fail[ed] to use a 'market' or 'non-exclusive' approach to the use of new value.")

A court in this Circuit has also suggested, in a case pre-dating 203 North LaSalle, that exclusivity should be terminated upon the debtor's filing of a new value plan – to enable the proposal of competing plans as the best way to ensure that the debtor's equity is fairly marketed. *In re SM 104 Ltd.*, 164 B.R. 202, 227 (Bankr. S.D. Fla. 1993) (Ginsberg, J., sitting by designation); *See also Davis*, 262 B.R. at 799 (declining to extend exclusivity on the basis that debtor filed new value plan without market testing contemplated by 203 North LaSalle).

13

Accordingly, terminating the Debtors' Exclusivity Periods in these cases will satisfy all the bankruptcy policy and other concerns raised by *LaSalle* and its progeny. Most importantly, terminating exclusivity will take the decision as to the sale of equity control out of the hands of the Debtors' prepetition equity owners, who no longer have a genuine economic stake in the outcome of this case, and put it back where it belongs, in the hands of the Debtors' creditors. Moreover, the termination of the Exclusivity Periods does not automatically terminate or otherwise jeopardize the outcome of this bankruptcy case.

Dated: August 10, 2011

        Respectfully submitted,

        FOLEY & LARDNER LLP

        /s/ Gardner F. Davis
        Gardner F. Davis
            Florida Bar No. 0471712
            gdavis@foley.com
        Danielle R. Whitley
            Florida Bar No. 0388920
            dwhitley@foley.com
        John J. Wolfel, Jr.
            Florida Bar No. 030664
            jwolfel@foley.com
        Joanna A. White
            Florida Bar No. 042899
            jawhite@foley.com
        One Independent Drive, Suite 1300
        Jacksonville, FL 32202-5017
        P. O. Box 240
        Jacksonville, FL 32201-0240
        904.359.2000

        Counsel for Marriott International Inc.

# CERTIFICATE OF SERVICE

I hereby certify that on August 10, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified below either via transmission of Notices of Electronic Filing generated by CM/ECF or via U.S. mail, postage prepaid, for those parties not authorized to received electronic Notices:

**Notice will be mailed electronically to:**

Cynthia C. Jackson
on behalf of Debtors
cjackson@smithhulsey.com; tcopeland@smithhulsey.com;
kstewart@smithhulsey.com; zwarren@smithhulsey.com;
adamsa@smithhulsey.com

John B. Hutton,
Scott M. Grossman and
Ari Newman
on behalf of Creditor Goldman Sachs Mortgage Company
huttonj@gtlaw.com; thompsonc@gtlaw.com;
grossmansm@gtlaw.com; jacksont@gtlaw.com;
newmanar@gtlaw.com; MiaLitDock@gtlaw.com;
miaecfbky@gtlaw.com

Alan M. Weiss
on behalf of Creditor Interstate Hotels & Resorts, Inc.
alan.weiss@hklaw.com

Joseph D. Frank
on behalf of Jones Lang LaSalle Americas, Inc.
jfrank@fgllp.com; ccarpenter@fgllp.com;
jkleinman@fgllp.com; rheiligman@fgllp.com

Jacob A. Brown
on behalf of Creditor Ellen Pan, M.D.
jacob.brown@akerman.com; Jennifer.meehan@akerman.com;
kayla.gothier@akerman.com; katie.coxe@akerman.com;
adina.pollan@akerman.com

Ben J. Weaver
on behalf of Creditor Ellen Pan, M.D.
bweaver@weaverandweaverlaw.com

Betsy C. Cox
on behalf of Creditor PGA Tour, Inc.
bcox@rtlaw.com; aruff@rtlaw.com

Lindsey C. Brock
on behalf of creditor Monique Rigby
brock@rumrelllaw.com

Miriam G. Suarez
on behalf of U.S. Trustee – JAX 11
Miriam.G.Suarez@usdoj.gov

United States Trustee – JAX 11
USTP.Region21.OR.ECF@usdoj.gov


**Notice will be mailed via U.S. Mail to:**

AVI Rental Services Division
P.O. Box 62257
Baltimore, MD 21264

Beaches Energy Services
11 North 3rd Street
Jacksonville Beach, FL 32250

Carey Jax – A#852011
5320 Springfield Blvd.
Jacksonville, FL 32208

Cendyn
1515 North Federal Hwy, Suite 419
Boca Raton, FL 33432

Chase Merchant Services
c/o First Data services
P.O. Box 407172
Ft. Lauderdale, FL 33340

Chase Merchant Services
3975 NW 120th Avenue
Coral Springs, FL 33065

Chase Merchant Services
4000 Coral Ridge Drive
Coral Springs, FL 33065

Copytronics, Inc.
2461 Rolac Road
Jacksonville, FL 32207

Edward Don & Company
2562 Paysphere Circle
Chicago, IL 60674

Florida Dept. of Labor and Security
Harman Building, Suite 307
2012 Capital Circle, SE
Tallahassee, FL 32399-6583

Florida Dept. of Revenue
P.O. Box 6668
Tallahassee, FL 32314-6668

Goldman Sachs Bank USA
c/o Malka S. Resnicoff, Esq.
White & Case
701 Thirteenth Street, NW
Washington, DC 20005

IBAHN
P.O. Box 51259
Los Angeles, CA 90051

Internal Revenue Services
Attn: Special Procedures
P.O. Box 34045, Stop 572
Jacksonville, FL 32202

| | |
|---|---|
| IRS<br>Centralized Insolvency Operations<br>P.O. Box 7346<br>Philadelphia, PA 19101-7346 | Secretary of the Treasury<br>15th & Pennsylvania Ave., NW<br>Washington, DC 20220-0001 |
| J C Stanford & Son, Inc.<br>5666 Summerall Road<br>Jacksonville, FL 32216 | United States Attorney<br>300 N. Hogan St., Suite 700<br>Jacksonville, FL 32202-4204 |
| Jones Lang LaSalle Americas<br>153 East 53rd Street, 33rd Floor<br>New York, NY 10022 | U.S. Securities & Exchange Commission<br>Reorganization Branch, Atlanta<br>3475 Lenox Rd., NE, Suite 1000<br>Atlanta, GA 30326-3235 |
| Lodge Net<br>3900 W. Innovations Street<br>Sioux Falls, SD 57107 | Office of United States Trustee<br>135 W. Central Blvd., Suite 620<br>Orlando, FL 32802 |
| Marsh Landing Country Club<br>25655 Marsh Landing Pkwy<br>Ponte Vedra Beach, FL 32082 | RQB Resort, LP<br>RQB Development, LP<br>1000 PGA Tour Blvd.<br>Ponte Vedra Beach, FL 32082 |
| Produce Distribution Center<br>2280 West 21st Street<br>Jacksonville, FL 32209 | Miriam G. Suarez<br>United States Trustee<br>135 West Central Blvd., Suite 620<br>Orlando, FL 32801 |
| St. Johns County Utility Dept.<br>P.O. Box 1988<br>St. Augustine, FL 32085 | Cynthia C. Jackson<br>Smith Hulsey & Busey<br>225 Water Street, Suite 1800<br>Jacksonville, FL 32201 |
| Sawgrass Country Club<br>10034 Golf Club Drive<br>Ponte Vedra Beach, FL 32082 | John B. Hutton III<br>333 SE 2nd Avenue, Suite 4400<br>Miami, FL 33131 |
| Sawyer Mobile Gas<br>98 S. Penman Road<br>Jacksonville Beach, FL 32250 | |
| Seaboard Waste System<br>P.O. Box 9001099<br>Louisville, KY 42090 | |

/s/ Gardner F. Davis
Gardner F. Davis