UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 3:10-bk-01596 |
| RQB Resort, LP, and RQB Development, LP,[1] | ) | Chapter 11 |
| | ) | Jointly Administered |
| Debtors. | | |
| | ) | |

## **DISCLOSURE STATEMENT**

SMITH HULSEY & BUSEY
225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)

Attorneys for Debtors

---

[1] RQB Resort, LP's tax identification number is 86-1161952. RQB Development, LP's tax identification number is 13-4322680. The principal address of each debtor is 1000 PGA Tour Boulevard, Ponte Vedra Beach, Florida 32082.

# TABLE OF CONTENTS

**Page**

INTRODUCTION..................................................................................................... 1

I.      BACKGROUND ......................................................................................... 4

        A.      Description of the Debtors' Business. ............................................... 4

        B.      Ownership Structure. ........................................................................ 5

        C.      Assets of Each Debtor....................................................................... 6

        D.      Summary of the Debtors' Prepetition Loan. ..................................... 6

        E.      Management Oversight...................................................................... 6

        F.      Events Leading to the Chapter 11 Cases............................................ 8

II.     THE CHAPTER 11 CASES ........................................................................ 8

        A.      First Day Relief................................................................................. 8

        B.      Retention of Professionals. ............................................................... 9

        C.      Postpetition Oversight....................................................................... 9

        D.      Claims Bar Date................................................................................ 9

        E.      The PGA Tour.................................................................................... 9

        F.      Valuation........................................................................................... 10

        G.      The Capital Raising Process. ............................................................ 11

        H.      Exclusivity. ....................................................................................... 11

III.    GENERAL INFORMATION CONCERNING THE PLAN...................... 12

        A.      Executory Contracts.......................................................................... 12

        B.      Administrative Claims. ...................................................................... 12

        C.      Class 1 - Secured Tax Claim.............................................................. 13

        D.      Class 2 - Goldman's Secured Claim. ................................................. 14

        E.      Class 3 – Unsecured Priority Tax Claims. ......................................... 14

        F.      Class 4 – Interstate's Unsecured Claim. ............................................ 14

        G.      Class 5 – Cabana Club Unsecured Claims......................................... 17

        H.      Class 6(a) – Golf Portal Unsecured Claims. ...................................... 18

| | I. | Class 6(b) – Other Executory Contracts Unsecured Claims. | 19 |
| | J. | Class 7 – SGR's Claims. | 19 |
| | K. | Class 8 – Unsecured Claims Against RQB Resort (Trade). | 20 |
| | L. | Class 9 - General Unsecured Claims against both Debtors. | 20 |
| | M. | Class 10 - Equity Interests. | 21 |
| IV. | | MEANS FOR IMPLEMENTATION OF THE PLAN | 21 |
| | A. | The Reorganization Transaction. | 21 |
| | B. | Unsecured Claims Fund and Trade Claims Fund. | 22 |
| | C. | Tax Reserve. | 22 |
| | D. | Corporate Action. | 23 |
| | E. | Sources of Cash For Plan Distribution. | 23 |
| | F. | Release of Liens. | 23 |
| | G. | Effectuating Documents; Further Transactions; Exemption From Certain Transfer Taxes. | 23 |
| | H. | Preservation of Rights of Action. | 23 |
| V. | | PROVISIONS GOVERNING DISTRIBUTIONS | 24 |
| | A. | Distributions for Claims Allowed as of the Effective Date. | 24 |
| | B. | Injunctions. | 24 |
| | C. | Effect of Non-Occurrence of Conditions to Consummation. | 24 |
| VI. | | PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS OR EQUITY INTERESTS | 24 |
| | A. | Resolution of Disputed Claims. | 24 |
| | B. | Claims Allowance. | 25 |
| VII. | | VOTING AND CONFIRMATION PROCEDURES | 25 |
| | A. | Voting Classes. | 26 |
| | B. | Voting Deadline. | 26 |
| | C. | Votes Necessary to Confirm Plan. | 26 |
| | D. | Nonconsensual Confirmation. | 26 |
| | E. | The Confirmation Hearing. | 27 |
| | F. | Section 1129 Requirements for Confirmation of the Plan. | 27 |

G.     Liquidation Analysis. .......................................................................... 27

H.     Feasibility. ......................................................................................... 27

I.      U. S. Trustee Fees. ........................................................................... 28

J.      Effect of Failure to Obtain Confirmation Order. ............................. 28

K.     Liquidation Under Chapter 7. .......................................................... 28

L.      U.S. Federal Income Tax Consequences. ........................................ 28

VIII.  EFFECT OF CONFIRMATION ................................................................. 28

A.     Releases by the Debtors. .................................................................. 28

B.     Releases by Holders of Claims. ....................................................... 29

C.     Discharge of the Debtors. ................................................................. 30

D.     Injunction. ......................................................................................... 30

E.      Exculpation and Limitation of Liability. ......................................... 31

IX.     RETENTION OF JURISDICTION ........................................................... 32

X.      DISCLAIMER ........................................................................................ 34

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

## INTRODUCTION

RQB Resort, LP and RQB Development, LP (collectively, the "Debtors"), each filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code on March 1, 2010. The Debtors own and operate the Sawgrass Marriott Golf Resort & Spa as well as the Cabana Beach Club (collectively, the "Resort") in Ponte Vedra Beach, Florida.

In connection with their proposed reorganization under Chapter 11, the Debtors have prepared a joint plan, a copy of which is attached as Exhibit A (the "Plan"). This Disclosure Statement, which describes the terms of the Plan, is being delivered to you because you have asserted a claim against the Debtors. As a creditor, you have the right to vote to accept or reject the Plan. This Disclosure Statement is intended to provide you with information you need to decide whether to accept or reject the Plan.

Goldman Sachs Mortgage Company ("Goldman") is the Debtors' largest creditor holding a claim secured by substantially all of the Debtors' assets and a large unsecured claim. Because of Goldman's security interest, the Debtors intend to satisfy Goldman's secured claim by transferring all of the equity interests in the Reorganized Debtors to Goldman. The claims of other creditors will be treated in the manner summarized in the chart on the next three pages.

The Debtors recommend that creditors timely submit a ballot voting to accept the Plan. The Plan is preferable for unsecured creditors because it provides for a distribution to unsecured creditors which they would not receive if the Debtors were forced to liquidate under Chapter 7 of the Bankruptcy Code. If forced to liquidate, all of the Debtors' monies would go to the Debtors' secured creditors and you would receive nothing.

All creditors must rely on their own evaluation of the Debtors and their own analysis of the Plan in deciding whether to vote to accept or reject the Plan. The contents of this Disclosure Statement should not be deemed to provide any legal, financial, securities, tax or business advice. The Bankruptcy Court's approval of the

adequacy of this Disclosure Statement does not constitute the Bankruptcy Court's approval or disapproval of the merits of the Plan.

The following chart summarizes the distributions, proposed treatment and expected recoveries under the Plan for the Debtors' creditors and equity interest holders.

| Class | Description | Estimated Amount of Allowed Claims or Equity Interests[2] | Proposed Treatment | Estimated Recovery |
|---|---|---|---|---|
| | Administrative Claims | Approximately $1.85 million | Payable in full on the Effective Date unless creditor agrees to different treatment | 100% |
| 1 | Secured Tax Claims | Approximately $1.8 Million | Payable monthly through 12/31/2012 with 4% interest | 100% |
| 2 | Goldman's Secured Claim | $132.0 Million | Transfer of all equity interests in the Reorganized Debtors | 100% |
| 3 | Unsecured Priority Tax Claims | Approximately $300,000 | Payable over 5 years with 4% interest | 100% over 5 years |
| 4 | Interstate's Unsecured Claim | $468,623.59 | The Debtors will assume the Interstate Management Agreement and pay Interstate a portion of the amount owed | 80% |
| 5 | Cabana Club Members' Unsecured | Approximately $7.5 Million | If the class accepts the Plan, members will retain their | N/A |

[2] Amounts set forth below are estimates only. The allowance of Claims may be subject to litigation, and actual Allowed Claim amounts may differ from these estimated amounts.

| | | | | |
|---|---|---|---|---|
| | Claims | | memberships in the Cabana Club with a reduction on a sliding scale from 90% to 50% of their right to receive their initiation fees in the event the Club closes. If the Class votes to reject the Plan the memberships will be terminated and a new agreement will be provided under which members will have no right to any return of their initial fee | |
| 6(a) | Unsecured Claims relating to Golf Portals | $35,815.29 | Debtors will assume the contracts and pay the creditors a portion of the amount owed | 90% |
| 6(b) | Unsecured Claims relating to other executory contracts | Approximately $4,500 | Debtors will assume the contracts and pay the creditors a portion of the amount owed | 90% |
| 7 | SGR's Claim | $856,000 | Debtors will assume the contracts, pay no portion of the prepetition amount owed, and pay postpetition amounts owed, less amounts paid to David O'Halloran since the Petition Date | 100% |

| 8 | Unsecured Claims against RQB Resort (Trade) | Approximately $200,000 | Payable on the later of the Effective Date or the date claim is allowed and for holders who accept the Plan, provide the holder with a two year supply agreement | 10% |
| 9 | General Unsecured Claims against both Debtors | Approximately $76.4 Million | Payable on the later of the Effective Date or the date the claim is allowed | 3% |
| 10 | Equity Interests | General and limited partnership interests | Will be cancelled with no distribution | 0% |

## I. BACKGROUND

### A. Description of the Debtors' Business.

The Debtors are the owners of the Sawgrass Marriott Golf Resort & Spa, a sixty-five acre resort destination located in Ponte Vedra Beach, Florida (the "Resort"). The Resort is operated by Interstate Hotels and Resorts, LLC ("Interstate"), pursuant to a Hotel Management Agreement dated June 30, 2006, between the Debtors and Interstate. Interstate provides all of the employees for the Resort. The Debtors have no employees. The Resort is franchised as a Marriott hotel pursuant to an agreement between the Debtors and Marriott International, Inc. dated November 8, 1989.

The Resort is the largest convention and resort property between Atlanta, Georgia and Orlando, Florida and is one of the largest private employers in St. Johns County. In 2009, the Debtors paid over $1.3 million in property taxes and $500,000 in bed taxes to St. Johns County.

The Resort includes the following:

> The Hotel. Approximately 26 acres are improved with a large hotel that includes 348 premium guest rooms; three restaurants: including The Augustine Grille, Café on the Green and V. Kelly's Irish Pub; and 56,000 square feet of conference space and meeting rooms.

> Golf Villas. Approximately 34 acres are improved with 83 golf villas (which have a total of 160 rooms) that are used primarily by families, golfers and groups.

> Cabana Club. The Resort has a 2.7 acre offsite beach club on the Atlantic Ocean that includes a junior-Olympic-sized pool, a baby pool and three restaurants. The Resort's guests share the Cabana Club with approximately 700 individuals and/or families that are members of the Cabana Club pursuant to a license agreement with RQB Resort (collectively, the "Cabana Club Agreements").

> The Spa at Sawgrass. The Spa at Sawgrass (the "Spa") is a 25,000 square foot facility on approximately 2.5 acres that offers an expansive list of services and has 19 private treatment rooms.

> Golf Portal. The Debtors have separate agreements with several area golf course owners which provide the Resort's guests with access to golf related opportunities (collectively, the golf course agreements are referred to as the Debtors' "Golf Portal"). The Debtors' most significant Golf Portal agreement is with the PGA Tour, Inc. (the "TPC Agreement"), which provides the Resort's guests with access to (i) THE PLAYERS Stadium Course at TPC Sawgrass, the home of the PGA Tour's Tournament Players Championship, and (ii) Dye's Valley Course. The Golf Portal also provides the Resort's guests with access to other private golf courses in the area, including Sawgrass Country Club, Marsh Landing Country Club and Ponte Vedra Country Club.

## B.    Ownership Structure.

Each of the Debtors, RQB Resort, LP ("RQB Resort"), and RQB Development, LP ("RQB Development"), is a Delaware limited partnership. RQB Resort Investors, LP, a Delaware limited partnership, is the sole limited partner of each Debtor and RQB Consolidated, LLC, a Delaware limited liability company, is the sole general partner of each Debtor.

## C. Assets of Each Debtor.

RQB Resort's assets consist of (i) the Hotel and the Cabana Club, including all real and personal property related thereto, (ii) the Golf Portal, (iii) the Cabana Club Agreements and (iv) certain other Executory Contracts to which it is a party. RQB Resort also owns licenses, trademarks and other intellectual property relating to its ownership and operation of the Resort. RQB Resort and RQB Development are parties to the Franchise Agreement with Marriott International, Inc.

RQB Development's assets consist of the Golf Villas and the Spa, including the real and personal property related thereto. RQB Development also owns licenses, trademarks and other intellectual property relating to its ownership and operation of the Golf Villas and Spa.

## D. Summary of the Debtors' Prepetition Loan.

In connection with the Debtors' purchase of the Resort in 2006, the Debtors entered into a loan agreement with Goldman's predecessor, dated as of June 30, 2006 (the "Loan Agreement") in the principal amount of approximately $193 million.

As of the Petition Date, the Debtors owed Goldman approximately $193 million secured by liens on substantially all of the Debtors' real and personal property.

## E. Management Oversight.

Prior to and after the Petition Date, SGR Asset Management, LLC ("SGR") provided management oversight of Interstate and the Resort, as well as management and development services, pursuant to agreements with the Debtors dated June 30, 2006 (collectively, the "SGR Management Agreements").

SGR is owned and operated by Mr. David O'Halloran and Mr. Niall McFadden. Mr. O'Halloran and Mr. McFadden are also the managers of RQB Consolidated, LLC, the general partner of each Debtor. Mr. O'Halloran is responsible for the day to day operations of each Debtor.

Interstate's senior staff report directly to SGR. SGR sets weekly strategic and operational goals for the Resort's operations. Since the Debtors' purchase of the Resort in 2006, SGR has been primarily responsible for operating the business, including increasing the revenue and net operating income at the Resort. From 2006 to 2008 revenue increased by approximately 10% (from $51.6 million to $56.7 million) and net operating income increased by approximately 15% (from $9.8 million to $11.3 million).

Because of the significant economic downturn in 2008, SGR recognized the need for, and was responsible for developing and executing a 2008 cost reduction plan at the Resort. These efforts resulted in reducing fixed costs by over $4.5 million, vendor costs by $1.4 million and staff productivity improvements in excess of 20%.

SGR is also principally responsible for the Resort's relationships with the PGA Tour, Inc. (the "Tour") and with the development of the Resort's Golf Portal. Following the Debtor's acquisition of the Resort, the Resort's ancillary revenues generated from guest play at the TPC Sawgrass golf course and other courses through the Resort's Golf Portal have increased from $179,000 in 2006 to $847,000 in 2009. Prior to the economic downturn in the third quarter of 2008, SGR was principally responsible for (i) increasing the Resort's occupancy (by 16% in 2007 versus 2006), (ii) increasing the Resort's average daily rates, and revenue per available room (from $109.62 in 2006 to $125.11 in 2008) (iii) hiring of new senior staff representing over 60% of the leadership team to assist in increasing revenues and reducing costs and (iv) improving the quality of service at the Resort as reflected by the Resort's guest services scores through the end of 2008.

SGR negotiated the revised TPC Courses Agreement with the Tour in 2008 which, when it becomes effective, will provide the Resort with the right to market 450 full memberships to the TPC at Sawgrass.

After the Debtors purchased the Resort, SGR increased the number of development rights that are vested in the Resort's land from 180 to 500, and developed rights to build a 166 room expansion to the hotel, a three story parking garage and over 25,000 square feet of retail.

Prior to the Petition Date, SGR was paid $62,500 a month for these services. SGR in turn compensated Mr. O'Halloran with a base salary of $16,667 a month for the services he provided to the Debtors. In addition, SGR reimbursed Messrs. O'Halloran, Murphy and McFadden for expenses incurred (up to $6,000 a month) in connection with services they provided to the Debtors. Through SGR was entitled to receive such fees prior to the Petition Date, in order to maintain the liquidity of the Debtors, SGR deferred its fees from the Debtors during the period from January 1, 2009 to July 31, 2009, in order to provide the Debtors with enough liquidity to remain in compliance under their Loan Agreement with Goldman. As a result, SGR has not been compensated since January 2009.[3] As of the Petition Date, SGR was owed approximately $606,000 under the SGR Management Agreements.

---

[3] As described in Article II.C. below, Mr. O'Halloran has received some compensation for his services postpetition.

**F.      Events Leading to the Chapter 11 Cases.**

The Debtors purchased the Resort on June 30, 2006 for $220,550,000.  After their acquisition of the Resort, but prior to the economic downturn, the Debtors invested approximately $30 million in service upgrades and capital improvements at the Resort.    With these improvements, the Debtors experienced growth of approximately 10% in both revenue and occupancy rates in the first full year of ownership.

The turmoil in the world financial markets in 2008 caused the Debtors to suffer a significant decrease in cash flow which has continued.  The Debtors rely heavily on convention related business (approximately 65% of their annual revenue).  The federal government's bailout and investment in financial firms created taxpayer and legislative enmity towards what was viewed as corporate and Wall Street excess.  This in turn led to a significant decline in the volume of  business conferences and retreats that were held at the Resort.  The Debtors' revenues in 2009 fell by more than 25%.  The Debtors kept Goldman informed of their financial status and tried to negotiate a restructuring of the Debtors' indebtedness.   The negotiations were unsuccessful and Goldman filed a foreclosure action in early 2010.  As a result of these events, the Debtors filed a petition for protection under Chapter 11 of the United States Bankruptcy Code on March 1, 2010.

## II.      THE CHAPTER 11 CASES

During the initial stages of the Chapter 11 Cases the Debtors devoted substantial efforts to stabilizing their operations and restoring relationships with guests, vendors, customers, employees and utilities that had been impacted by the commencement of the Chapter 11 Cases.

### A.      First Day Relief.

Shortly after the Petition Date, the Bankruptcy Court entered orders authorizing the Debtors to pay  prepetition Claims and continue prepetition programs.  These orders were designed to ease the strain on the Debtors' relationships with guests, employees, vendors, customers, and taxing authorities as a consequence of the commencement of the Chapter 11 Cases and to provide for an orderly transition into Chapter 11. The Bankruptcy Court entered orders authorizing the Debtors to use cash collateral, continue guest programs, pay substantially all of the Debtors' prepetition wages to Interstate's employees, pay prepetition taxes and government charges and honor group deposits and guest certificates.

## B.    Retention of Professionals.

To assist the Debtors in performing their duties as debtors in possession, the Debtors employed the following professionals with authorization from the Bankruptcy Court (the "Retained Professionals"): (a) Smith Hulsey & Busey, as counsel for the Debtors; (b) Adams & Reese, LLC, as special counsel for the Debtors; (c) Sentient Management Limited, as accountants and insolvency consultants for the Debtors; (d) Bennett Thrasher, P.C., as auditors for the Debtors; (e) CB Richard Ellis Group, Inc. and Colliers International, Inc. as appraisers for the Debtors; (f) Jones Lang LaSalle Americas, Inc. ("JLL"), as advisors for the Debtors; and (g) Fowler White Boggs, P.A., as special tax counsel for the Debtors.  The Bankruptcy Court entered orders approving the retention of each of the Retained Professionals.

## C.    Postpetition Oversight.

Despite not being paid during the bankruptcy proceedings, SGR (through Messrs. O'Halloran, Patrick Murphy and McFadden) continued to provide the services previously performed by SGR.  By motion dated October 19, 2010, the Debtors requested that the Court authorize the Debtors to pay Mr. O'Halloran his $16,667 monthly salary (retroactive to the Petition Date) and to reimburse Messrs. O'Halloran, Murphy and McFadden for their expenses.  The Court granted the motion on January 6, 2011.  Postpetition, through the date of this Disclosure Statement, SGR is owed approximately $856,000 under the Management and Development Agreements, net of fees paid to Mr. O'Halloran, pursuant to the Court's order of January 6, 2011.

## D.    Claims Bar Date.

By a notice filed by the Clerk of the Bankruptcy Court dated March 4, 2010 (the "Bar Date Notice"), and pursuant to Rule 3003(c)(3) of the Bankruptcy Rules, July 13, 2010 was established as the deadline by which proofs of Claim were required to be filed in these Chapter 11 Cases by entities other than governmental units and August 30, 2010 as the deadline for governmental units to file proofs of Claim (together the "Claims Bar Dates"). The Plan provides that administrative proofs of claim must be filed no later than thirty days after the Effective Date of the Plan.

## E.    The PGA Tour.

In connection with their acquisition of the Resort in 2006, the Debtors were assigned a 1989 agreement between the PGA Tour and the Debtors' predecessors.  By that agreement the Debtors have the right (until 2089) to control 85% of the tee times at THE PLAYERS Stadium and Dye's Valley golf courses owned by the PGA Tour and TPC at Sawgrass (the "Original Courses Agreement").  The Original Courses

Agreement permits the PGA Tour to close THE PLAYERS Stadium golf course each year for a week prior to THE PLAYERS Championship golf tournament.

On November 6, 2008, the Debtors entered into an amended and restated agreement with the PGA Tour and TPC at Sawgrass (the "Restated Courses Agreement"). The Restated Courses Agreement provides the Debtors the right to (i) charge Resort guests an additional amount for golf in addition to the amount due to be paid by the Resort to TPC at Sawgrass (the "Upcharge Income") and (ii) sell for the Resort's benefit up to 450 memberships in the TPC at Sawgrass Club (collectively, the "TPC Golf Memberships"). In exchange for these and other rights under the agreement, the Debtors agreed to allow the TPC at Sawgrass to close THE PLAYERS Stadium golf course for an additional two week period prior to THE PLAYERS Championship golf tournament each year.

Also on November 6, 2008, the Debtors entered into a separate agreement with the PGA Tour and TPC at Sawgrass which provided that the Restated Courses Agreement would not "become effective" until (i) Goldman consents to the Restated Courses Agreement or (ii) the termination of the lending relationship between Goldman and the Debtors (the "Letter Agreement").

Prior to and during the course of these bankruptcy proceedings, Goldman did not consent to the Restated Courses Agreement. On February 11, 2011, the Debtors filed a motion to assume the Restated Courses Agreement and reject the Letter Agreement so that the Debtors would not need Goldman's consent (the "Motion"). By order dated April 22, 2011, the Court denied the Motion, holding that one of the two agreements could not be assumed or rejected without the other. The Court also ordered the parties to attend a mediation in connection with the consent issue. At the conclusion of the mediation, Goldman indicated it is willing to consent to the Restated Courses Agreement, although it has not yet done so.

### F.      Valuation.

On June 14, 2010, Goldman filed a proof of claim asserting a claim against both Debtors in the amount of $195,783,259.48, secured by substantially all of the Debtors' assets. By its claim Goldman asserted that its claim was secured in the amount of $135,300,000 and unsecured in the amount of $60,483,259.48.

By motion dated June 17, 2010, the Debtors asked the Court to determine, pursuant to Section 506 of the Bankruptcy Code, the value of Goldman's secured claim. The Court held an evidentiary hearing on the Motion to Value on December 9 and 10, 2010 (the "Valuation Hearing"). At the Valuation Hearing the Debtors submitted evidence valuing Goldman's secured claim at $88.9 million. Goldman submitted an appraisal by HVS Consulting and Valuation Services, a Division of Hotel Appraisers, LLC ("HVS"), valuing Goldman's secured claim at $132 million.

By order dated January 6, 2011, the Court adopted the HVS appraisal in its entirety, valuing Goldman's' secured claim at $132 million.

## G.   The Capital Raising Process.

On May 17, 2010, the Debtors filed an application to retain JLL to find an investor that would make a significant investment in the Reorganized Debtors in exchange for the equity of the Debtors. Such an investment would provide additional working capital and permit a larger dividend to unsecured creditors. The Court approved JLL's retention. Since May of 2010, JLL has worked diligently to find an investor. JLL contacted approximately 65 potential investors, established a web-based virtual data room and assisted potential investors in their due diligence efforts.

Although JLL and the Debtors entered into confidentiality agreements and produced due diligence materials to approximately 35 potential investors, the Court's determination that Goldman is entitled to a $132 million secured claim proved to be an insurmountable hurdle. HVS' projections of economic recovery in the United States and in the hospitality industry have proven to be overly optimistic. The actual Gross Domestic Product growth in 2011 is significantly less than that projected for 2011 in late 2010. The HVS appraisal also did not foresee the European debt crisis in the spring of 2011 and the resulting volatility in the United States financial markets.

As a result the Debtors have been unable to locate an investor willing to recapitalize the Reorganized Debtors subject to a $132 million secured debt to Goldman. For these reasons, the Debtors have elected in their Plan to turn over the equity interests of the Debtors to Goldman, with modest payments to unsecured creditors and compensation to SGR for its postpetition services to the estates.

## H.   Exclusivity.

Pursuant to an order of the Bankruptcy Court dated May 27, 2011, the Debtors have the exclusive right until September 1, 2011 to file a Plan and the exclusive right to solicit acceptances of the Plan until November 1, 2011.

## III. GENERAL INFORMATION CONCERNING THE PLAN

### A.    Executory Contracts.

The Plan provides that as of the Plan's Effective Date, the Debtors will (i) assume the Interstate Management Agreement, (ii) reject the Marriott Franchise Agreement effective 180 days after the Effective Date or an earlier date upon thirty days notice to Marriott (iii) assume the SGR Management Agreement and (iv) assume the Restated Courses Agreement.    Interstate has agreed to and the Debtors will assume the agreement as modified and the cure amount will not be paid in full.    A complete description of the Interstate assumption is described in Article III.G. below. Similarly, the Plan amends the SGR management agreement and SGR will accept less than the full cure amount.    For a further description see Article III.K. below.    All remaining executory contracts are rejected as of the Effective Date.

### B.    Administrative Claims.

#### 1.    *Bar Date for Administrative Claims*

Except as otherwise provided in this Article II, unless previously filed, requests for payment of Administrative Claims must be filed and served on the Reorganized Debtors, pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than thirty days after the Effective Date.    Holders of Administrative Claims that are required to file and to serve a request for payment of such Administrative Claims and that do not file and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the Debtors or their respective Property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be filed and served on the Reorganized Debtors and the requesting party within sixty days after the Effective Date.

#### 2.    *Treatment of Administrative Claims*

Subject to the provisions of Sections 328, 330(a) and 331 of the Bankruptcy Code, each holder of an Allowed Administrative Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Administrative Claim the full unpaid amount of such holder's Claim in Cash by the Debtors (a) on or as soon as practicable after the Effective Date; or (b) if such Claim is Allowed after the Effective Date, on or as soon as practicable after the date such Claim is Allowed; or (c) upon such other terms as may be agreed upon by such holder and the Debtors, or otherwise upon an order of the Bankruptcy Court. Allowed Administrative Claims will be paid from the Plan Funds.

### 3. *Professional Compensation*

Retained Professionals or other entities asserting a Claim for services rendered before the Confirmation Date or to be rendered after the Confirmation Date must file and serve on the Debtors an application for final allowance of such claim no later than twenty days prior to the Confirmation Hearing, which application may be supplemented at any time prior to the Confirmation Hearing. Objections to any such Claim must be filed and served on the Debtors and the requesting party within ten days prior to the Confirmation Hearing. Applications for services rendered (or to be rendered before or after the Confirmation Date) will be heard at the Confirmation Hearing. To the extent necessary, the Confirmation Order will amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Retained Professionals.

### 4. *Ordinary Course Liabilities*

Holders of Administrative Claims based on liabilities incurred by the Debtors in the ordinary course of its business will not be required to file or serve any request for payment of such Administrative Claims, and such Claims will be paid when due in the ordinary course.

## C. **Class 1 - Secured Tax Claim.**

1. *Classification:* Class 1 consists of St. Johns County, Florida's secured claims against the Debtors for ad valorem taxes.

2. *Treatment:* The holder of the Allowed Class 1 Claims will receive, in full and final satisfaction, settlement, release and discharge of and in exchange for such Allowed Class 1 Claims, equal monthly payments on the last day of each month commencing in the first full month following the Effective Date with a final payment due on December 31, 2012, which monthly payments (in the aggregate) will be equal to such Allowed Class 1 Claim together with interest at a rate of (A) four percent (4.0%) per year or (B) an appropriate rate of interest determined by the Bankruptcy Court. Notwithstanding Section 1141(c) or any other provision of the Bankruptcy Code, all prepetition liens on Property of the Debtors held with respect to the Allowed Class 1 Claims will survive the Effective Date and continue until such Allowed Class 1 Claims are paid in full, at which time such liens will be released, will be deemed null and void and will be unenforceable for all reasons. Such payments will be funded by the Reorganized Debtors with Cash held in the Tax Reserve.

3. *Voting:* Class 1 is Impaired and the holder of the Allowed Class 1 Claim is entitled to and has agreed in principle to vote to accept the Plan.

**D.** **Class 2 - Goldman's Secured Claim.**

1. *Classification*: Class 2 consists of Goldman's secured claim against the Debtors in the amount of $132,000,000.

2. *Treatment*: Goldman and/or its designees will receive on the Effective Date, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Class 2 Secured Claim, newly issued Equity Interests in each Reorganized Debtor (both limited and general partnership interests) representing one hundred percent of the Equity Interests of each Reorganized Debtor.

3. *Voting*: Class 2 is Unimpaired and Goldman, as the holder of the Class 2 Secured Claim is deemed to accept the Plan.

**E.** **Class 3 – Unsecured Priority Tax Claims.**

1. *Classification*: Class 3 consists of the Florida Department of Revenue's unsecured priority claim against the Debtors for unpaid sales taxes.

2. *Treatment*: The holder of the Allowed Class 3 Claim will receive, in full and final satisfaction, settlement, release and discharge of and in exchange for such Allowed Class 3 Claim, as will have been determined by the Debtors in their discretion, either (i) on or as soon as practicable after the Effective Date, Cash equal to the unpaid portion of such Allowed Class 3 Claim, (ii) such different treatment as to which the applicable Debtor and such holder will have agreed in writing, or (iii) equal monthly payments on the last day of each month commencing in the first full month following the Effective Date with a final payment due on December 31, 2012, which monthly payments (in the aggregate) will be equal to such Allowed Class 3 Claim together with interest at a rate of (A) four percent (4.0%) per year or (B) an appropriate rate of interest determined by the Bankruptcy Court.

3. *Voting*: Class 3 is Impaired, and the holder of the Allowed Class 3 Claim is entitled to vote to accept or reject the Plan.

**F.** **Class 4 – Interstate's Unsecured Claim.**

1. *Classification*: Class 4 consists of Interstate's unsecured claim against the Debtors pursuant to the Debtors' obligations to Interstate under the Interstate Management Agreement.

2.    *Treatment*:

A.    If Interstate votes to accept the Plan, as of the Effective Date, in full and final satisfaction, settlement, release and discharge of and in exchange for the Allowed Class 4 Claim:

Interstate will receive Cash equal to eighty percent of the Allowed Cure Amount under the Interstate Management Agreement; and

The Interstate Management Agreement will be assumed by the Reorganized Debtors with the following modifications, which modifications will be deemed approved by Interstate if Interstate votes to accept the Plan.  All undefined, capitalized terms will have the meanings given to them in the Interstate Management Agreement.

Section 2.1.  Operating Term.  The following language shall replace the first sentence of Section 2.1 of the Interstate Management Agreement: "This Agreement is effective on the effective date the Owners' plan of reorganization (the "Effective Date"), and shall have a term (the "Operating Term" or "Term") commencing on the Effective Date and expiring on December 31st of the Fiscal Year in which the fifth (5th) anniversary of the Effective Date occurs (the "Initial Term"), unless sooner terminated in accordance with the provisions of this Agreement or unless extended as provided by the terms of this Agreement or as otherwise provided by the written agreement of Owners and Operator."

Section 9.1. Basic Fee. Interstate agrees to accept on an annual basis a Basic Fee of $400,000.

Section 9.2. Incentive Fee. Interstate agrees to accept on an annual basis an Incentive Fee equal to two percent (2.0%) of the Resort's Total Revenues in excess of $42,000,000, which Incentive Fee will in no event exceed $400,000 per year.

Section 17.1. Events of Default. In consideration of the Debtors' distribution to Interstate of eighty percent of the Allowed Cure Amount under the Interstate Management Agreement, Interstate waives all of the Debtors' defaults under the Interstate Management Agreement through the Effective Date. Further, Section 17.1(G) of the Interstate Management Agreement will be deleted in its entirety.

Section 18.10. Termination. The following provisions shall replace Section 18.10 of the Interstate Management Agreement: "In the event Owners sell the Hotel to a bona fide third party (a "Sale"), Owners may terminate this Agreement upon not less than thirty (30) days prior written notice to Operator, such termination to be effective at Owners' election upon the conveyance of the Hotel to such buyer or shortly thereafter, so long as (i) Owners pay to Operator all amounts owed to Operator under the terms of this Agreement as of the effective date of such termination, and (ii) Owners escrow for the benefit of Operator the Termination Fee upon the closing of a Sale, with instructions to pay the Termination Fee upon the closing of a Sale to Operator immediately after Operator certifies in writing to the Owners and escrow holder at least ninety-one (91) days after the conveyance of the Hotel to such buyer that neither Operator nor any of its affiliates has been engaged to operate or manage the Hotel. Further, during the period commencing two (2) years after the Effective Date through the expiration of the Term of this Agreement, Owners may, in their sole discretion, elect to terminate this Agreement upon not less than ninety (90) days written notice to Operator, so long as Owners pay to Operator (i) all amounts owed to Operator under the terms of this Agreement as of the effective date of such termination and (ii) the Termination Fee upon Owners' Election to Terminate. For the purposes of this Agreement, the "Termination Fee upon Sale" shall mean $1,000,000 and the "Termination Fee upon Owners' Election to Terminate" shall mean $500,000."

B.      If Interstate votes to reject the Plan, the Debtors will be deemed to have rejected the Interstate Management Agreement, effective thirty days after the Effective Date, and as of such date the Interstate Management Agreement will be terminated and of no further force and effect. In that event, Interstate will be entitled to file with the Bankruptcy Court within thirty days following the Effective Date a proof of claim for its rejection damages and the Reorganized Debtors will have thirty days after the claim is filed to object to any such claim. Interstate will receive in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Class 4 Claim, its Pro Rata share of the Unsecured Claims Fund following allowance of its rejection damage claim by a Final Order of the Bankruptcy Court.

### G.   Class 5 – Cabana Club Unsecured Claims.

1.   *Classification:*  Class 5 consists of the contingent Unsecured Claims of the Cabana Club Members against RQB Resort pursuant to Article A, Section 22 of the Cabana Club Agreements. The Cabana Club Members' contingent Unsecured Claims will become non-contingent if and when, RQB Resort, in its sole and absolute discretion, terminates the Cabana Club Agreements in connection with the future sale or other disposition of the Cabana Club facilities, which disposition may include without limitation "a transfer of the facilities operated by the Club to a member owned club. Upon such termination of membership, members will be entitled to the return of the initiation fee paid to acquire their membership in the Club and a pro rata refund of the unused portion of the annual dues and charges for each full month of the membership year after the month of termination, without interest, less any amounts owed to the Club." Art. A, Sec. 22.

2.   *Treatment*:

A.   If the Plan is approved by the requisite vote of holders of Allowed Class 5 Claims, on or as soon as practicable after the Effective Date, each holder of an Allowed Class 5 Claim will receive, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Class 5 Claim, a continuing membership interest in the Cabana Club, the constituent documents of which will be amended to provide that in the event RQB Resort terminates the Cabana Club Agreements, then RQB Resort's obligation to return one hundred percent of the Cabana Club Members' initiation fees (the "Cabana Club Fees"), as referenced above, will be reduced pursuant to the following schedule:

- Ninety percent of the Cabana Club Fees will be returned if RQB Resort terminates the Cabana Club Agreement within one year following the Effective Date;

- Eighty percent of the Cabana Club Fees will be returned if RQB Resort terminates the Cabana Club Agreement within two years following the Effective Date;

- Seventy percent of the Cabana Club Fees will be returned if RQB Resort terminates the Cabana Club Agreement within three years following the Effective Date;

- Sixty percent of the Cabana Club Fees will be returned if RQB Resort terminates the Cabana Club Agreement within four years following the Effective Date; and

- Fifty percent of the Cabana Club Fees will be returned if RQB Resort terminates the Cabana Club Agreement at any time after the fourth anniversary of the Effective Date.

All other terms of the Cabana Club Agreement will remain the same, including RQB Resort's obligation to return the Pro Rata portion of the members' unused annual dues in the event RQB Resort terminates the Cabana Club Agreement.

C.  In the event Allowed Class 5 Claim holders do not accept the Plan, RQB Resort will be deemed to have rejected all Cabana Club Agreements, and each holder of an Allowed Class 5 Claim will receive, in full and final satisfaction of its Allowed Class 5 Claim, a membership interest in a new club on substantially similar terms as the existing Cabana Club Agreement except that RQB Resort's obligation to return the Cabana Club Fees to the Cabana Club Members in the event it terminates the Cabana Club Agreement after the Effective Date will be eliminated.

3.  *Voting:* Class 5 is Impaired, and holders of Allowed Class 5 Claims are entitled to vote to accept or reject the Plan.

**H.  Class 6(a) – Golf Portal Unsecured Claims.**

1.  *Classification:* Class 6(a) consists of the unsecured claims of Sawgrass and Marsh Landing against RQB Resort pursuant to RQB Resort's obligations to (i) Sawgrass under the Sawgrass Golf Portal Agreement and (ii) Marsh Landing under the Marsh Landing Golf Portal Agreement.

2.  *Treatment*: As of the Effective Date, in full and final satisfaction, settlement, release and discharge of and in exchange for the Allowed Class 6(a) Claims, the Sawgrass Golf Portal Agreement and the Marsh Landing Golf Portal Agreement will be deemed assumed by RQB Resort, as a Reorganized Debtor, on terms previously agreed to between RQB Resort and Sawgrass and RQB Resort and Marsh Landing. Further, in full and final satisfaction of the Allowed Class 6(a) Claims, RQB Resort, as a Reorganized Debtor, will pay (i) $19,539.91 to Sawgrass and (ii) $10,687.78 to Marsh Landing, which amounts are equal to ninety percent of

the Cure Amounts owed under the Sawgrass Golf Portal Agreement and the Marsh Landing Golf Portal Agreement, respectively.

3.    *Voting*: Class 6(a) is Impaired, and Sawgrass and Marsh Landing are entitled to vote to accept or reject the Plan.

**I.    Class 6(b) – Other Executory Contracts Unsecured Claims.**

1.    *Classification*: Class 6(b) consists of the unsecured claims of Starbucks and Certus against RQB Resort pursuant to RQB Resort's respective obligations under (i) the Certus Claims Administration Agreement and (ii) the Starbucks Licensing Agreement (collectively, the "Other Executory Contracts").

2.    *Treatment*: As of the Effective Date, in full and final satisfaction, settlement, release and discharge of and in exchange for the Allowed Class 6(b) Claims, the Certus Claims Administration Agreement and the Starbucks Licensing Agreement will be deemed assumed by RQB Resort, as a Reorganized Debtor, pursuant to their existing terms. Further, in full and final satisfaction of the Allowed Class 6(b) Claims, RQB Resort, as a Reorganized Debtor, will pay (i) $3,006.91 to Certus and (ii) $1,014.13 to Starbucks, which amounts are equal to ninety percent of the Cure Amounts owed under the Class 6(b) Executory Contracts, respectively.

3.    *Voting*: Class 6(b) is Impaired, and Certus and Starbucks are entitled to vote to accept or reject the Plan.

**J.    Class 7 – SGR's Claims.**

1.    Classification*:* Class 7 consists of SGR's Claims against the Debtors pursuant to the Debtors' obligations under the SGR Management Agreement for SGR's management services to the Debtors prior to the Petition Date and through the Effective Date.

2.    Treatment: As of the Effective Date, in full and final satisfaction, settlement, release and discharge of and in exchange for the Allowed Class 7 Claim, (i) the SGR Management Agreement will be deemed assumed by the Reorganized Debtors, (ii) the Reorganized Debtors will not pay SGR any portion of its prepetition claim, (iii) the Reorganized Debtors will pay $856,000 to SGR for its postpetition services, which is net of amounts paid to David O'Halloran by the Debtors pursuant to the Order Granting Motion for Order Authorizing the Debtors to Compensate Insiders (ECF No. 365), all in full and final satisfaction of the Allowed Class 7 Claims, and (iv) the SGR Management Agreement shall be amended to provide that the Reorganized Debtors may terminate the SGR Management Agreement without penalty (and with no obligation to pay a termination fee to SGR),

upon tendering five days written notice to SGR at any time following the Confirmation Date.

3.    Voting: Class 7 is Impaired, and SGR is entitled to vote to accept or reject the Plan.

### K.    Class 8 – Unsecured Claims Against RQB Resort (Trade).

1.    *Classification*: Class 8 consists of all unsecured claims for which only RQB Resort is liable. These are trade claims for the payment for goods or services provided to the Debtors prior to the Petition Date in the ordinary course of business.

2.    *Treatment*: On or as soon as practicable after the Effective Date, each holder of an Allowed Class 8 Claim will receive, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Class 8 Claim, either:

> A.    If the holder votes to accept the Plan, (A) the Reorganized Debtors will purchase from such holder for a period of at least two years following the Effective Date the goods or services that the holder provided to RQB Resort prior to the Petition Date (provided that the holder has continued to provide to RQB Resort during the pendency of the Bankruptcy Cases) on substantially the same terms and conditions that exist as of the Effective Date, including pricing, discounts and trade credit and (B) its Pro Rata share of the Trade Claims Fund; or

> B.    If the holder votes to reject the Plan, its Pro Rata share of the Unsecured Claims Fund.

3.    *Voting*: Class 8 is Impaired and holders of Allowed Class 8 Claims are entitled to vote to accept or reject the Plan.

### L.    Class 9 - General Unsecured Claims against both Debtors.

1.    Classification: Class 9 consists of all general unsecured claims for which both of the Debtors are jointly liable, including (i) the Debtors' obligation to Goldman Bank USA to repay the swap breakage fee, (ii) Goldman's unsecured deficiency claim and (iii) Marriott's unsecured claim.

2.    *Treatment*: On or as soon as practicable after the Effective Date, each holder of an Allowed Class 9 Claim will receive, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Class 9 Claim, its Pro Rata share of the Unsecured Claims Fund.

3. *Voting*: Class 9 is Impaired, and holders of Allowed Class 9 Claims are entitled to vote to accept or reject the Plan.

**M.** **Class 10 - Equity Interests.**

1. *Classification:* Class 10 consists of all Equity Interests in the Debtors including both limited and general partnership interests.

2. *Treatment:* The Equity Interests in the Debtors are deemed to have no value as of the Effective Date and the holders of such Equity Interests will not receive or retain under the Plan on account of their junior interest any property or distribution. On the Effective Date, the certificates and other instruments evidencing the Class 10 Equity Interests in the Debtors will be cancelled without further act or action under any applicable agreement, law, regulation, order or rule, and the Equity Interests in the Debtors evidenced thereby will be extinguished.

3. *Voting:* Class 10 is Impaired, and holders of Class 10 Equity Interests are deemed to reject the Plan.

## IV. MEANS FOR IMPLEMENTATION OF THE PLAN

**A.** **The Reorganization Transaction.**

On the Effective Date, the Debtors will consummate the Reorganization Transaction, which will be accomplished by:

1. *Cancelling the Debtors' Indebtedness to Goldman.* All indebtedness due and owing by the Debtors to Goldman shall be cancelled and extinguished. Further, all notes, instruments, agreements and other documents reflecting debt of the Debtors to Goldman or securing such debt will be cancelled, and all obligations of the Debtors under such notes, instruments, agreements and other documents or in any way related thereto will be discharged in exchange for the treatment afforded to Goldman in the Plan.

2. *Cancelling or Restructuring other Claims.* All other Claims against the Debtors will be cancelled and extinguished or restructured and the holders thereof will be entitled to receive their respective treatment under the terms of the Plan.

3. *Disbursing Plan Funds.* The Plan Funds will be disbursed pursuant to the terms of the Plan.

4. *Extinguishing Equity Interests and Issuing New Equity Interests*. The Reorganized Debtors' issuance of new Equity Interests to Goldman (in satisfaction of Goldman's Class 2 Secured Claim) shall occur as follows:

    (a)    all existing Equity Interests (both limited and general partnership interests) in the Debtors will be cancelled as of the Effective Date; and

    (b)    new Equity Interests in the Reorganized Debtors will be issued to Goldman or its designee, which Equity Interests will be free and clear of all Claims, interests and encumbrances pursuant to the Confirmation Order and Sections 105, 363, 365, 1123 and 1141(c) of the Bankruptcy Code and will constitute all of the issued and outstanding Equity Interests in the Reorganized Debtors as of the Effective Date.

5. *Rebranding of Property*. Within one hundred eighty days following the Effective Date, the Reorganized Debtors may, at their option and in accordance with the Restated Courses Agreement, rebrand the Property as a TPC Sawgrass Golf Resort and Spa or may replace the Franchise Agreement with a comparable brand.

## B. Unsecured Claims Fund and Trade Claims Fund.

On the Effective Date and as part of the financial restructuring contemplated by the Reorganization Transaction (Article IV.A(1)-IV.A(4) above), the Unsecured Claims Fund and the Trade Claims Fund will be established from the Plan Funds. The Reorganized Debtors will administer, and make distributions from, the Unsecured Claims Fund and the Trade Claims Fund in accordance with the provisions of this Plan and the Confirmation Order.

## C. Tax Reserve.

On the Effective Date and as part of the financial restructuring contemplated by the Reorganization Transaction (Article V.A(1)-V.A(4) above), the Tax Reserve will be established from the Plan Funds. The Reorganized Debtors will administer, and make distributions from, the Tax Reserve in accordance with the provisions of this Plan and the Confirmation Order.

### D.       Corporate Action.

Upon entry of the Confirmation Order, all matters provided for under the Plan involving the corporate structure of the Debtors will be deemed authorized and approved without any requirement of further action by the Debtors or the Debtors' limited and/or general partners.

### E.       Sources of Cash For Plan Distribution.

All Cash necessary for the Debtors to make payments under the Plan will be obtained from the Plan Funds.  The Plan Funds are based upon the Debtors' Cash projections as of November 4, 2011.  A schedule of sources and uses of the Plan Funds is attached as Exhibit B.

### F.       Release of Liens.

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and contemporaneously with the applicable distributions made pursuant to Article III, all encumbrances, interests, mortgages, liens or other security interests against the Property or the Estates will be fully released and discharged.

### G.       Effectuating Documents; Further Transactions; Exemption From Certain Transfer Taxes.

The manager of the general partner of the Debtors is authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan. Pursuant to Section 1146 of the Bankruptcy Code, the following will not be subject to any stamp tax, real estate transfer tax or similar tax: (i) the Reorganization Transaction; or (ii) the making or delivery of any transfer instrument under, in furtherance of or in connection with the Plan.

### H.       Preservation of Rights of Action.

Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the Reorganized Debtors shall have all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, in any court or other tribunal including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases. Furthermore, the Reorganized Debtors shall have the right to object to the allowance of any Claim pursuant to Section 502(d) of the Bankruptcy Code.

## V.    PROVISIONS GOVERNING DISTRIBUTIONS

### A.    Distributions for Claims Allowed as of the Effective Date.

Except as otherwise provided in the Plan or as may be ordered by the Bankruptcy Court, all distributions with respect to all Allowed Claims, which are not liabilities that will be assumed by the Reorganized Debtors, will be made by the Debtors or Reorganized Debtors as set forth in the Plan. The Debtors or the Reorganized Debtors will make distributions on the Effective Date or as soon as reasonably practicable thereafter to the respective holders of Allowed Claims, and will make further distributions to holders of Claims that subsequently are determined to be Allowed Claims, pursuant to the Plan.

### B.    Injunctions.

By accepting distributions pursuant to the Plan, each holder of an Allowed Claim receiving distributions pursuant to the Plan will be deemed to have consented to the injunctions set forth in the Plan.

### C.    Effect of Non-Occurrence of Conditions to Consummation.

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, or other parties in interest; or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtors or any other parties in interest in any respect.

## VI.    PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS OR EQUITY INTERESTS

### A.    Resolution of Disputed Claims.

#### 1.    Prosecution of Claims Objections.

The Debtors and the Reorganized Debtors will have the exclusive authority to file objections to settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether classified or otherwise. An objection is deemed to have been timely filed as to any Claim related to or arising from pending litigation, thus making each such Claim a Disputed Claim as of the Claims Objection Bar Date.

#### 2.    Payments and Distributions on Disputed Claims in General.

On or before the date or, if such date is not a Business Day, on the next successive Business Day, that is twenty calendar days after the end of the calendar quarter in which a Disputed Claim becomes an Allowed Claim, the holder of such Allowed Claim will receive all payments and distributions to which that holder is then entitled under the Plan.

### B.  Claims Allowance.

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim will be deemed Allowed unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) in the Chapter 11 Cases allowing such Claim. Except as expressly provided in the Plan or any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), the Debtors and the Reorganized Debtors will have and will retain after the Effective Date any and all rights and defenses that the Debtors had with respect to any Claim as of the Petition Date. Notwithstanding any Article contained in the Plan, all Claims of any Person or entity subject to Section 502(d) of the Bankruptcy Code will be deemed disallowed as of the Effective Date unless and until such Person or Entity pays in full the amount that it owes such Debtor.

## VII.  VOTING AND CONFIRMATION PROCEDURES

To be confirmable, the Plan must meet the requirements listed in Sections 1129 (a) or (b) of the Bankruptcy Code.  Among other things, the requirements include that:

i.  the Plan must be proposed in good faith;

ii.  at least one impaired class of claims must accept the Plan, without counting votes of insiders;

iii  the Plan must distribute to each Creditor and Equity Interest Holder at least as much as the Creditor or Equity Interest Holder would receive in a Chapter 7 liquidation case, unless the Creditor or Equity Interest Holder votes to accept the Plan; and the Plan must be feasible.

### A.  Voting Classes.

Each holder of an Allowed Claim is entitled to vote to accept or reject the Plan. A ballot to be used to vote to accept or reject the Plan is enclosed.

### B.  Voting Deadline.

In order for your vote to be counted, your vote must be actually received by Cynthia C. Jackson, Esq., as the balloting agent, at the following address on or before _____ on _____ ___, 2011:

>Cynthia C. Jackson
>Smith Hulsey & Busey
>225 Water St., Ste. 1800
>Jacksonville, FL 32202

### C.  Votes Necessary to Confirm Plan.

A Class will have accepted the Plan if (a) the holders (other than any holder designated under Section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in that Class have voted to accept the Plan and (b) the holders (other than any holder designated under Section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in that Class have voted to accept the Plan.  Class 6(a) has agreed to vote in favor of the Plan and the Debtors believe other Classes will vote in favor of the Plan as well.

### D.  Nonconsensual Confirmation.

In the event any impaired Class of Claims does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan if at least one impaired Class has accepted the Plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired Classes. The Debtors believe that the Plan satisfies these requirements, and pursuant to the Plan, will request such nonconsensual confirmation in accordance with Section 1129(b) of the Bankruptcy Code if necessary in the event at least one qualified impaired Class has accepted the Plan.

### E.        The Confirmation Hearing.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold the Confirmation Hearing. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for _____ at _____ a.m./p.m. Eastern Time before the Honorable Paul Glenn, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to confirmation of the Plan must be filed with the Bankruptcy Court and served on or before _____ ____, 2011 at _____ a.m./p.m., in accordance with the Disclosure Statement Order that accompanies this Disclosure Statement. THE BANKRUPTCY COURT WILL NOT CONSIDER OBJECTIONS TO CONFIRMATION UNLESS THEY ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER.

### F.        Section 1129 Requirements for Confirmation of the Plan.

At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of Section 1129 of the Bankruptcy Code have been satisfied. If so, the Bankruptcy Court will enter the Confirmation Order. The Debtors believe that the Plan satisfies or will satisfy the applicable requirements of Section 1129.

### G.        Liquidation Analysis.

To confirm the Plan, the Court must find that all Creditors and Equity Interest holders who do not accept the Plan will receive at least as much under the Plan as such Creditor and Equity Interest holders would receive in a Chapter 7 liquidation. Attached to the Disclosure Statement as Exhibit C is a chart of the liquidation value of the material assets of the Debtors.

### H.        Feasibility.

To confirm a Plan, the Court must find that confirmation is not likely to be followed by the Debtors' liquidation or the need for further financial reorganization, unless that liquidation or reorganization is contemplated by the Plan. The Plan contemplates that all Allowed Claims will receive some distribution pursuant to the terms of the Plan. The Debtors believe that sufficient funds will exist to make all payments required by the Plan.

### I. U. S. Trustee Fees.

All fees payable under Section 1930 of Title 28 of the United States Code after the Effective Date, will be paid by the Reorganized Debtors prior to the closing of the Chapter 11 Cases on the date when due.

### J. Effect of Failure to Obtain Confirmation Order.

Except as expressly set forth in the Plan, the Plan will have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order. Neither the filing of the Plan, any statement or provision contained in the Plan, nor the taking of any action by a Debtor or any Person with respect to the Plan will be or will be deemed to be an admission or waiver of any rights of: (a) the Debtors with respect to the Holders of Claims or Equity Interests or other parties in interest; or (b) any Holder of a Claim or other party in interest prior to the Effective Date.

### K. Liquidation Under Chapter 7.

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.

### L. U.S. Federal Income Tax Consequences.

There may be a number of tax consequences to holders of Claims and Equity Interests as a result of their treatment under the Plan. The Debtors provide no advice with respect to any such tax consequences and urge each creditor and equity holder to discuss any consequences with their tax advisors.

## VIII. EFFECT OF CONFIRMATION

### A. Releases by the Debtors.

**As of the Effective Date, for good and valuable consideration, the adequacy of which is confirmed, the Debtors, the Reorganized Debtors and any Person or entity seeking to exercise the rights of the Debtors' Estates, including, without limitation, any successor to the Debtors or any estate representative appointed or selected pursuant to Section 1123(b)(3) of the Bankruptcy Code, will be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action (including claims or causes of action arising under Chapter 5 of the Bankruptcy Code), and liabilities whatsoever in connection with or related to the Debtors, the conduct of**

the Debtors' business, the Chapter 11 Cases, or the Plan (other than the rights of the Debtors and the Reorganized Debtors to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the conduct of the Debtors' business, the Reorganized Debtors, the Chapter 11 Cases, or the Plan and that may be asserted by or on behalf of the Debtors, the Estates, or the Reorganized Debtors against (i) either of the Debtors, (ii) any of the present or former limited or general partners of the Debtors or any of the officers, directors or employees of the general or limited partners of the Debtors or any of the Debtors' affiliates, and (iii) any professionals of the Debtors.

**B.      Releases by Holders of Claims.**

As of the Effective Date, for good and valuable consideration, the adequacy of which is confirmed, each holder of a Claim that affirmatively votes in favor of the Plan is deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever against the limited or general partners of the Debtors or any of the officers, directors or employees of the general or limited partners of the Debtors or any of the Debtors' affiliates (collectively, the "Debtor Releasees"), in connection with or related to the Debtors, the conduct of the Debtors' business, the Chapter 11 Cases, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures, and other instrument, agreement or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the conduct of the Debtors' business, the Chapter 11 Cases, or the Plan.

Each of the Debtor Releasees is deemed to forever release, waive, and discharge any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever arising on or prior to the Effective Date in any way relating to the Debtors, the conduct of the Debtors' business, the Chapter 11 Cases, or the Plan, that such Debtor Releasees may hold in their individual capacities against each holder of a Claim that affirmatively votes in favor of the Plan.

### C. Discharge of the Debtors.

Except as otherwise provided in the Plan or in the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtors or any of their assets or properties and, regardless of whether any property is abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to the Plan on account of such claims, upon the Effective Date, the Debtors, and each of them, will (i) be deemed discharged and released under Section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in Section 502 of the Bankruptcy Code. This is so whether or not (A) a Proof of Claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code, (B) a Claim based upon such debt is allowed under Section 502 of the Bankruptcy Code (C) a Claim based upon such debt is or has been disallowed by order of the Bankruptcy Court, or (D) the holder of a Claim based upon such debt accepted the Plan.

As of the Effective Date, except as provided in the Plan or the Confirmation Order, all Persons are precluded from asserting against the Debtors or the Reorganized Debtors, any other or further claims, debts, rights, causes of action, claims for relief, liabilities, or existing Equity Interests relating to the Debtors based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order is a judicial determination of the discharge of all such Claims and other debts and liabilities against the Debtors, pursuant to Sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim.

### D. Injunction.

Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim or other debt or liability that is discharged or an existing Equity Interest that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtors and the Reorganized Debtors, and their respective subsidiaries or their property on account of any such discharged Claims, debts, or liabilities or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any

judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors or the Reorganized Debtors; or (v) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

As of the Effective Date, all Persons that have held, currently hold, or may hold, a Claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, or liability that is released, or an interest that is terminated, are permanently enjoined from taking any of the following actions on account of such released Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities, or interests: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien or encumbrance; (iv) asserting a setoff against any debt, liability, or obligation due to any released Person; or (v) commencing or continuing any action, in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

Without limiting the effect of the foregoing provisions upon any Person, by accepting distributions pursuant to the Plan, each holder of an Allowed Claim receiving distributions pursuant to the Plan is deemed to have consented to the injunctions set forth above.

Nothing in this Article VII impairs (i) the rights of any holder of a Disputed Claim to establish its Claim in response to an objection filed by the Debtors or the Reorganized Debtors, (ii) the rights of any defendant in an avoidance action filed by the Reorganized Debtors to assert defenses in such action, or (iii) the rights of any party to an Executory Contract that has been assumed by the Debtors pursuant to an order of the Bankruptcy Court or the provisions of the Plan to enforce such assumed contract or lease.

E.     Exculpation and Limitation of Liability.

None of the Debtors, the Reorganized Debtors, or any of their respective present or former limited or general partners, or any of the directors, officers, employees, advisors, professionals, or agents of the Debtors, the Reorganized Debtors and any general or limited partners of the Debtors or any of the Debtors' affiliates, will have or incur any liability to any holder of a Claim or any interest, or any other party-in-interest, or any of their respective agents, employees, representatives, advisors, attorneys, or affiliates, or any of their

successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the Consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence, or willful misconduct. The foregoing is not intended to limit or otherwise impact any defense of qualified immunity that may be available under applicable law.

Notwithstanding any other provision of the Plan, no holder of a Claim or an existing Equity Interest, no other party-in-interest, none of their respective agents, employees, representatives, advisors, attorneys, or affiliates, and none of their respective successors or assigns have any right of action against any of the Debtors, the Reorganized Debtors, or their respective present or former, limited or general partners, or any of the officers, employees, advisors, professionals, or agents of the Debtors, the Reorganized Debtors and any general or limited partners of the Debtors or any of the Debtors' affiliates, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, negotiation, or implementation of the Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the Consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence, or willful misconduct.

## IX.    RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Persons and entities with respect to all matters related to the Chapter 11 Cases, the post-consummation estates, the Debtors, the Reorganized Debtors and the Plan as legally permissible, including, but not limited to, jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests;

2.      grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

3.      resolve any matters related to the assumption, assignment or rejection of any Executory Contract to which either of the Debtors is party or with respect to which either of the Debtors may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

4.      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving either of the Debtors that may be pending on the Effective Date or instituted after the Effective Date, provided, however, that the Debtors shall reserve the right to commence actions in all appropriate jurisdictions;

6.      enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan, and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Reorganization Transaction, the Plan or the Confirmation Order;

7.      resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Reorganization Transaction, the Plan or the Confirmation Order, the Plan, or any Person's or entity's obligations incurred in connection with the Plan;

8.      issue injunctions, enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or entity with consummation or enforcement of the Plan, except as otherwise provided in the Plan;

9.      enforce Article VII the Plan;

10.     resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in Article VII of the Plan, and enter such orders as may be necessary or

appropriate to implement or enforce all such releases, injunctions and other provisions;

11. enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

12. resolve any other matters that may arise in connection with or relate to the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan; and

13. enter an order and/or Final Decree closing the Chapter 11 Cases.

## X. DISCLAIMER

In formulating the Plan, the Debtors have relied on financial data derived from the books and records maintained by Interstate. The Debtors therefore represent that everything stated in the Disclosure Statement is true to the best of their knowledge. The Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.

The discussion in the Disclosure Statement regarding the Debtors may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analyses, distribution projections, and other information are estimates only, and the timing and amount of actual distributions to Creditors may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

SMITH HULSEY & BUSEY


By:___/s/ Cynthia C. Jackson_____
        Cynthia C. Jackson

Florida Bar Number 498882
225 Water Street, Suite 1800
Jacksonville, Florida  32202
(904) 359-7700
(904) 359-7708 (facsimile)
cjackson@smithhulsey.com

Attorneys for the Debtors

Dated August 18, 2011

RQB RESORT, LP

By: RQB Consolidated, LLC, a Delaware limited
liability company, its general partner

_David O'Halloran, its Manager_

David O'Halloran, its Manager

RQB DEVELOPMENT, LP

By: RQB Consolidated, LLC, a Delaware limited
liability company, its general partner

_David O'Halloran, its Manager_

David O'Halloran, its Manager

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 3:10-bk-01596 |
| RQB Resort, LP, and RQB Development, LP,[1] | ) | Chapter 11 |
| | ) | Jointly Administered |
| Debtors. | | |
| | ) | |

## DEBTORS' JOINT PLAN OF REORGANIZATION

SMITH HULSEY & BUSEY
225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)

Attorneys for Debtors

---

[1] RQB Resort, LP's tax identification number is 86-1161952. RQB Development, LP's tax identification number is 13-4322680. The principal address of each debtor is 1000 PGA Tour Boulevard, Ponte Vedra Beach, Florida 32082.

# Table of Contents

**Page**

**ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS** ............................................................. 1

A.     Rules of Interpretation, Computation of Time and Governing Law ................... 1

B.     Defined Terms ....................................................................................... 2

**ARTICLE II. ADMINISTRATIVE, PRIORITY TAX CLAIMS AND OTHER PRIORITY CLAIMS** ........................................................................................... 9

A.     Administrative Claims ............................................................................ 9

B.     Priority Tax Claims .............................................................................. 11

C.     Other Priority Claims ........................................................................... 11

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS** ...................................................................... 11

A.     Summary ............................................................................................ 11

B.     Classification and Treatment of Claims and Equity Interests ...................... 12

**ARTICLE IV. ACCEPTANCE OR REJECTION OF THE PLAN** ...................... 21

A.     Impaired Classes of Claims Entitled to Vote ............................................ 21

B.     Acceptance by Impaired Classes ............................................................ 21

C.     Confirmation Pursuant to Section 1129(b) .............................................. 21

**ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN** ................... 21

A.     The Reorganization Transaction ............................................................ 21

B.     Unsecured Claims Fund and Trade Claims Fund ...................................... 22

C.     Tax Reserve ........................................................................................ 22

D.     Corporate Action ................................................................................. 23

E.     Sources of Cash for Plan Distribution ..................................................... 23

F.     Release of Liens .................................................................................. 23

G.     Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes .......................................................................................... 23

H.     Preservation of Rights of Action........................................................................ 23

**ARTICLE VI.     TREATMENT OF EXECUTORY CONTRACTS ........................ 24**

A.     Assumption of Executory Contracts .................................................................. 24

B.     Rejection of Executory Contracts ...................................................................... 24

C.     Claims Based on Rejection of Executory Contracts .......................................... 25

D.     Cure of Defaults for Executory Contracts Assumed Pursuant to the Plan ........ 25

**ARTICLE VII.     PROVISIONS GOVERNING DISTRIBUTIONS......................... 26**

A.     Delivery and Distributions and Undeliverable or Unclaimed Distributions.................................................................................................... 26

B.     Timing and Calculation of Amounts to be Distributed...................................... 26

**ARTICLE VIII.     PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS OR EQUITY INTERESTS..... 27**

A.     Resolution of Disputed Claims .......................................................................... 27

B.     Claims Allowance.............................................................................................. 27

**ARTICLE IX.     CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN............................................................................. 28**

A.     Conditions Precedent to Confirmation............................................................... 28

B.     Conditions Precedent to the Effective Date ....................................................... 28

C.     Waiver of Conditions......................................................................................... 28

D.     Effect of Non-Occurrence of Conditions to Effective Date............................... 29

**ARTICLE X.     SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS     29**

A.     Compromise and Settlement .............................................................................. 29

B.     Releases by the Debtors ..................................................................................... 29

C.     Releases by Holders of Claims .......................................................................... 30

D.      Discharge of the Debtors ................................................................................. 30

E.      Injunction ........................................................................................................ 31

F.      Exculpation and Limitation of Liability .......................................................... 32

G.      Preservation of Rights of Action....................................................................... 33

**ARTICLE XI.      RETENTION OF JURISDICTION................................................. 34**

**ARTICLE XII.      MISCELLANEOUS PROVISIONS................................................. 35**

A.      Effectuating Documents, Further Transactions and Corporate Action.............. 35

B.      Payment of Statutory Fees ............................................................................... 36

C.      Modification of Plan ........................................................................................ 36

D.      Revocation of Plan........................................................................................... 36

E.      Successors and Assigns..................................................................................... 36

F.      Reservation of Rights....................................................................................... 37

G.      Further Assurances........................................................................................... 37

H.      Severability ...................................................................................................... 37

I.      Notices ............................................................................................................. 38

J.      Filing of Additional Documents ....................................................................... 38

# JOINT PLAN OF REORGANIZATION FOR
# RQB RESORT, LP AND RQB DEVELOPMENT, LP

## INTRODUCTION

RQB Resort, LP, and RQB Development, LP, the debtors and debtors-in-possession (collectively, the "Debtors"), under Chapter 11 of Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") propose this Joint Plan of Reorganization (the "Plan").

## ARTICLE I.

## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

A.    *Rules of Interpretation, Computation of Time and Governing Law*

1.    For purposes of the Plan: (a) in the appropriate context, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender will include the masculine, feminine and the neuter gender; (b) any reference in the Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document will be substantially in that form or substantially on those terms and conditions; (c) any reference in the Plan to an existing document or exhibit having been filed or to be filed will mean that document or exhibit, as it may thereafter he amended, modified or supplemented; (d) unless otherwise specified, all references in the Plan to "Articles" are references to Articles of the Plan; (e) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (f) the rules of construction set forth in Section 102 of the Bankruptcy Code will apply; and (g) any term used in capitalized form in the Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules will have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

2.    The provisions of Bankruptcy Rule 9006(a) will apply in computing any period of time prescribed or allowed in the Plan.

3.    Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan will be governed by, and construed and enforced in accordance with the laws of the State of Florida, without giving effect to the principles of conflict of laws.

B.    *Defined Terms*

1.    *"Accrued Professional Compensation"* means, at any given moment, all accrued and unpaid fees and expenses (including, but not limited to Allowed Professional Compensation) for legal, financial advisory, accounting and other services and reimbursement of expenses that are awardable and allowable under Sections 328, 330(a) and 331 of the Bankruptcy Code by all Retained Professionals in the Chapter 11 Cases that the Bankruptcy Court has not denied by a Final Order, but only to the extent that any such fees and expenses have not been previously paid regardless of whether a fee application has been filed for any such amount. To the extent that the Bankruptcy Court or any higher court denies or reduces by a Final Order any amount of a Retained Professional's fees or expenses, then those reduced or denied amounts will no longer constitute Accrued Professional Compensation (except in any reduced amount).

2.    *"Administrative Claim"* means a Claim for costs and expenses of administration of the Estates under Section 503 of the Bankruptcy Code (including Claims under Sections 503(b)(9), 507(b) or 1114(e)(2) of the Bankruptcy Code), including without limitation: (a) the actual and necessary costs and expenses incurred after the Petition Date to preserve the Estates and operate the Debtors' businesses; (b) Allowed Professional Compensation; (c) all Allowed Reclamation Claims; (d) all fees and charges assessed against the Estates under chapter 123 of title 28 United States Code, 28 U.S.C. §§ 1911-1930; and (e) cure payments for executory contracts (other than those described in Article III.B) that are assumed under Section 365 of the Bankruptcy Code.

3.    *"Allowed"* means, with respect to any Claim (except as otherwise provided in the Plan): (a) a Claim that has not been scheduled by the Debtors in their Schedules as disputed, contingent or unliquidated and for which the Claim amount has not been identified as unknown, and as to which the respective Debtor has not filed an objection by the Claims Objection Deadline; (b) a Claim for which a timely Proof of Claim has been filed that is not a Disputed Claim; (c) a Claim that is allowed by a Final Order of the Bankruptcy Court; (d) a Claim relating to a rejected Executory Contract that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order, in either case only if a Proof of Claim has been filed by the applicable Bar Date or has otherwise been deemed timely filed under applicable law; (e) a Claim that is allowed pursuant to the terms of this Plan; or (f) a Disputed Claim as to which a proof of Claim has been timely filed and as to which no objection has been filed by the Claims Objection Deadline.

4.    *"Allowed Professional Compensation"* means all Accrued Professional Compensation allowed or awarded by a Final Order of the Bankruptcy Court.

5.    *"Assumed Contracts"* has the meaning attributed to it in Article VI.A(1)-VI.A(2) and includes the Interstate Management Agreement, the SGR Management Agreement, the Cabana Club Agreements, the Restated Courses Agreement, the Sawgrass Golf Portal Agreement, the Marsh Landing Golf Portal Agreement, the Claims Administration Agreement, the Starbucks License Agreement and any other Executory

Contract as to which a motion to assume has been granted by order of the Bankruptcy Court.

6.      *"Bankruptcy Code"* means Sections 101 *et seq.* of title 11 of the United States Code, as in effect as of the Petition Date.

7.      *"Bankruptcy Court"* means the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division.

8.      *"Bankruptcy Rules"* means, collectively, the Federal Rules of Bankruptcy Procedure.

9.      *"Bar Date"* means the date(s) designated by the Bankruptcy Court as the last date(s) for filing Proofs of Claim against the Debtors.

10.      *"Business Day"* means any day other than a Saturday, Sunday or "legal holiday," as defined in Bankruptcy Rule 9006(a).

11.      *"Cabana Club"* means the beach club facility that is owned by RQB Resort and licensed for use by the Cabana Club Members pursuant to the Cabana Club Agreements.

12.      *"Cabana Club Agreements"* means each Executory Contract between RQB Resort and the Cabana Club Members pursuant to the Rules and Regulations of the Cabana Club that govern the Cabana Club Members' use of the Cabana Club and RQB Resort's operation and management of the Cabana Club.

13.      *"Cabana Club Fees"* has the meaning attributed to it in Article III.B(5)(b)(1).

14.      *"Cabana Club Members"* means the members of the Cabana Club, whose use of the Cabana Club is governed by the Cabana Club Agreements.

15.      *"Cash"* means legal tender of the United States of America or its equivalent.

16.      *"Causes of Action"* means all actions, causes of action, claims, liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, cross-claims, counterclaims, third party claims, indemnity claims, contribution claims or any other claims disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

17.     *"Certus"* means Certus Claims Administration, LLC, a Washington limited liability company.

18.     *"Certus Agreement"* means RQB Resort's Executory Contract with Certus regarding claim administration services relating to the Property for the Debtors and their insurance carrier, Tokio Marine & Nichido Fire Insurance Co., Ltd.

19.     *"Chapter 11 Cases"* means (i) when used with reference to RQB Resort or RQB Development, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (ii) when used with reference to both Debtors, the jointly administered Chapter 11 Cases pending for the Debtors in the Bankruptcy Court.

20.     *"Claim"* means a Claim as defined in Section 101(a)(5) of the Bankruptcy Code.

21.     *"Claims Objection Deadline"* means the last day for filing objections to Claims (other than Administrative Claims), which will be the later of (a) sixty (60) days after the Effective Date unless otherwise extended by order of the Bankruptcy Court and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to Claims. There will be no deadline for objecting to Administrative Claims unless established by a Final Order of the Bankruptcy Court.

22.     *"Class"* means a category of holders of Claims or Equity Interests as described in Article III of the Plan.

23.     *"Confirmation"* means approval of the Plan by the Bankruptcy Court pursuant to Section 1129 of the Bankruptcy Code.

24.     *"Confirmation Date"* means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

25.     *"Confirmation Hearing"* means the hearing held by the Bankruptcy Court on confirmation of the Plan pursuant to Section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

26.     *"Confirmation Order"* means the order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

27.     *"Consummation"* has the meaning set forth in Section 1101 of the Bankruptcy Code.

28.     *"Creditor"* means any holder of a Claim.

29.     *"Cure Amounts"* means amounts required to be paid in order to cure any pre-petition monetary or other defaults under any Executory Contracts assumed by the

Debtors in accordance with the provisions of Section 365 of the Bankruptcy Code by separate Final Order or by the Confirmation Order.

30.     *"Debtor"* means either RQB Resort or RQB Development, in its individual capacity as a debtor in these Chapter 11 Cases.

31.     *"Debtor Releasees"* has the meaning attributed to it in Article X.C.

32.     *"Debtors"* means, collectively, RQB Resort and RQB Development.

33.     *"Disclosure Statement"* means the disclosure statement for the Debtors' Plan, as amended, supplemented, or modified from time to time, including all exhibits and Schedules that relate to the Plan that is prepared and distributed by the Debtors in accordance with the Bankruptcy Code, Bankruptcy Rules, and any other applicable law.

34.     *"Disputed"* means (a) with respect to any Administrative Claim, other than an Administrative Claim that has been Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court or that was incurred by the Debtors in the ordinary course of business during the Chapter 11 Case, a Claim: that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding claims arising under workers' compensation law), secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity, or common law; or (b) with respect to any Claim that is not an Administrative Claim, other than a Claim that has been Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court, a Claim: (i) if no Proof of Claim has been filed or deemed to have been filed by the applicable Bar Date, that has been or hereafter is listed on the Schedules as unliquidated, contingent, or disputed; (ii) if a Proof of Claim has been filed or deemed to have been filed by the applicable Bar Date, as to which a Debtor has timely filed an objection or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, and any other orders of the Bankruptcy Court, or which is otherwise disputed by a Debtor in accordance with applicable law, which objection, request for estimation, or dispute has not been withdrawn or determined by a Final Order; (iii) for which a Proof of Claim was required to be filed by the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court, but as to which a Proof of Claim was not timely or properly filed; (iv) for damages based upon the rejection by a Debtor of an Executory Contract under Section 365 of the Bankruptcy Code and as to which the applicable Bar Date has not passed; (v) that is disputed under the provisions of the Plan; or (vi) if not otherwise Allowed, as to which the applicable Claims Objection Deadline has not expired.

35.     *"Effective Date"* means the first Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions specified in Article IX.B of this Plan have been either satisfied or waived pursuant to Article IX.C and is the date on which the Plan becomes effective.

36.    *"Estate"* means, as to each Debtor, the estate created for the Debtors in their Chapter 11 Cases pursuant to Section 541 of the Bankruptcy Code.

37.    *"Executory Contract"* means a contract between one or both Debtors and a third party entered into prior to the Petition Date that may be assumed or rejected pursuant to Section 365 of the Bankruptcy Code.

38.    *"Equity Interest"* means (i) any partnership interest in the Debtors, and any instrument evidencing any such partnership or other equity interest, whether or not transferable, and (ii) any option, warrant or right, contractual or otherwise, to acquire any such partnership interest in the Debtors.

39.    *"Final Order"* means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in either Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, or seek *certiorari* or move for a new trial, reargument or rehearing has expired and no appeal or petition for *certiorari* or other proceedings for a new trial, reargument or rehearing has been timely taken. Further, as to a final order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in either Chapter 11 Case or the docket of any court of competent jurisdiction, or as to which any appeal that has been taken or any petition for *certiorari* that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which *certiorari* was sought or the new trial, reargument or rehearing will have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice; provided, however, the possibility that a party may file a motion for reconsideration of an order or judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure or Rule 9024 of the Bankruptcy Rules will not preclude an order from being a Final Order.

40.    *"Franchise Agreement"* means the franchise agreement, as amended from time to time, between the Debtors and Marriott relating to the branding of the Debtors' Property.

41.    *"Goldman"* means Goldman Sachs Mortgage Company, a New York corporation.

42.    *"Interstate"* means Interstate Hotels and Resorts Management, LLC, a Delaware limited liability company.

43.    *"Interstate Management Agreement"* means the hotel management agreement between the Debtors and Interstate regarding Interstate's management of the Property.

44.	*"Impaired"* means, with respect to any Class of Claims or Equity Interests, that such Claims or Equity Interests are impaired within the meaning of Section 1124 of the Bankruptcy Code.

45.	*"Impaired Class"* means each of Classes 1, 3, 4, 5, 6(a), 6(b), 7, 8, 9 and 10, as set forth in Article III.

46.	*"Marriott"* means Marriott International, Inc., a Maryland corporation.

47.	*"Marsh Landing"* means ML Partnership, LLP, a Florida limited liability partnership.

48.	*"Marsh Landing Golf Portal Agreement"* means RQB Resort's Executory Contract with Marsh Landing regarding the sharing of revenues generated by RQB Resort's referral of its guests to play Marsh Landing's golf course.

49.	*"Other Executory Contracts"* means the Debtors' Executory Contracts that are described in Article III.B(6b)(a).

50.	*"Other Priority Claim"* means any and all Claims accorded priority in right of payment under Section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

51.	*"Person"* means a person as defined in Section 101(41) of the Bankruptcy Code.

52.	*"Petition Date"* means March 1, 2010, the date on which the Debtors commenced the Chapter 11 Cases.

53.	*"Plan"* means this joint plan of reorganization under chapter 11 of the Bankruptcy Code, either in its present form or as it may be altered, amended, modified or supplemented from time to time.

54.	*"Plan Funds"* means the Debtors' Cash on hand on the Effective Date, excluding amounts held in accounts at LaSalle Bank for taxes, insurance and furniture, fixture and equipment improvements.

55.	*"Priority Claims"* means any and all Claims of the kind specified in Section 507 of the Bankruptcy Code.

56.	*"Priority Tax Claim"* means any and all Claims of a governmental unit of the kind specified in Section 507(a)(8) of the Bankruptcy Code.

57.	*"Pro Rata"* means, at any time, the proportion that the amount of a Claim in a particular Class bears to the aggregate amount of all Claims in such Class.

58. *"Property"* means all assets and property included within "property of the estates" as set forth in and within the meaning of Section 541 of the Bankruptcy Code.

59. *"Reorganization Transaction"* means the cancellation and/or restructuring of the Debtors' indebtedness to their Creditors pursuant to the Plan and the issuance to Goldman of the Equity Interests of the Reorganized Debtors pursuant to the terms of the Plan.

60. *"Reorganized Debtors"* means the Debtors and their Estates after the occurrence of the Effective Date.

61. *"Restated Courses Agreement"* means the Amended and Restated TPC Courses Agreement dated as of November 6, 2008 among the Debtors, the TOUR and the TPC at Sawgrass.

62. *"Retained Professional"* means a Person or entity: (a) employed in these Chapter 11 Cases pursuant to a Final Order in accordance with Sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to Sections 327, 328, 329, 330 and 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code.

63. *"RQB Development"* means RQB Development, LP, a Delaware limited partnership.

64. *"RQB Resort"* means RQB Resort, LP, a Delaware limited partnership.

65. *"Sawgrass"* means Sawgrass Country Club, Inc., a Florida not-for-profit corporation.

66. *"Sawgrass Golf Portal Agreement"* means RQB Resort's Executory Contract with Sawgrass regarding the sharing of revenues generated by RQB Resort's referral of its guests to play Sawgrass's golf course.

67. *"Schedules"* mean the schedules of assets and liabilities, schedules of executory contracts and statements of financial affairs filed by the Debtors pursuant to Section 521 of the Bankruptcy Code and the Official Bankruptcy Forms, as the same may have been amended, modified or supplemented from time to time.

68. *"Secured Claims"* means: (a) Claims that are secured by a lien or liens on the Property, which liens are valid, perfected and enforceable under applicable law or by reason of a Final Order, or that are subject to setoff under Section 553 of the Bankruptcy Code, to the extent of the value of the Creditor's interest in the Estates' interest in such Property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Sections 506(a) and, if applicable, 1129(h) of the Bankruptcy Code; and (b) Claims that are Allowed under the Plan as a Secured Claim.

69.     *"Secured Tax Claims"* means a Secured Claim arising prior to the Petition Date against either of the Debtors for property taxes owed to a governmental unit.

70.     *"SGR"* means SGR Asset Management, LLC, a Delaware limited liability company.

71.     *"SGR Management Agreement"* means the asset management agreements between the Debtors and SGR regarding SGR's management of the Property.

72.     *"Starbucks"* means Starbucks Corporation, a Washington corporation.

73.     *"Starbucks License Agreement"* means RQB Resort's Executory Contract with Starbucks regarding RQB Resort's right to operate a Starbucks store within the Property.

74.     *"Tax Reserve"* means a reserve in the amount of $2.1 million established by the Debtors to fund deferred payments of the Class 1 Secured Tax Claim.

75.     *"TOUR"* means PGA Tour, Inc., a Maryland corporation.

76.     *"TPC at Sawgrass"* means Tournament Players Club at Sawgrass, Inc., a Florida corporation.

77.     *"Trade Claims"* means Claims against either of the Debtors arising from the provision of goods or services to either of the Debtors in the ordinary course of business.

78.     *"Trade Claims Fund"* means Cash in the amount of $20,000.

79.     *"Unimpaired Class"* means an unimpaired Class within the meaning of Section 1124 of the Bankruptcy Code.

80.     *"Unsecured Claim"* means a Claim arising prior to the Petition Date against any of the Debtors that is not a Secured Claim.

81.     *"Unsecured Claims Fund"* means Cash in the amount of $2,292,000.

## ARTICLE II.

## ADMINISTRATIVE, PRIORITY TAX CLAIMS AND OTHER PRIORITY CLAIMS

A.     *Administrative Claims*

Subject to the provisions of Sections 328, 330(a) and 331 of the Bankruptcy Code, each holder of an Allowed Administrative Claim will receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Administrative

Claim the full unpaid amount of such holder's Claim in Cash (a) on or as soon as practicable after the Effective Date; (b) or if such Claim is Allowed after the Effective Date, on or as soon as practicable after the date such Claim is Allowed; or (c) upon such other terms as may be agreed upon by such holder and the Debtors, or otherwise upon an order of the Bankruptcy Court. Administrative Claims will be paid from the Plan Funds.

1.    Bar Date for Administrative Claims

Except as otherwise provided in this Article II, unless previously filed, requests for payment of Administrative Claims must be filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than thirty (30) days after the Effective Date. Holders of Administrative Claims that are required to file and to serve a request for payment of such Administrative Claims and that do not file and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the Debtors or their respective Property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be filed and served on the Reorganized Debtors and the requesting party within sixty (60) days after the Effective Date. Notwithstanding the foregoing, holders of Administrative Claims based on liabilities incurred by the Debtors in the ordinary course of its business are not required to file or serve any request for payment of such Administrative Claims, and such Claims will be paid when due in the ordinary course.

2.    Professional Compensation

Retained Professionals or other entities asserting a Claim for services rendered before the Confirmation Date or to be rendered after the Confirmation Date must file and serve on the Debtors an application for final allowance of such Claim no later than twenty days prior to the Confirmation Hearing, which application may be supplemented at any time prior to the Confirmation Hearing. Objections to any such Claim must be filed and served on the Debtors and the requesting party within ten days prior to the Confirmation Hearing. Applications for services rendered (or to be rendered before or after the Confirmation Date) will be heard at the Confirmation Hearing. To the extent necessary, the Confirmation Order will amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Retained Professionals.

3.    Ordinary Course Liabilities

Holders of Administrative Claims based on liabilities incurred by the Debtors in the ordinary course of its business will not be required to file or serve any request for payment of such Administrative Claims, and such Claims will be paid when due in the ordinary course.

4.     <u>Payment Under a Final Order of the Bankruptcy Court</u>

Notwithstanding any provision in the Plan to the contrary, the Debtors may pay any Claims authorized pursuant to any Final Order entered by the Bankruptcy Court prior to the Confirmation Date.

B.     *Priority Tax Claims*

Each holder of an Allowed Priority Tax Claim, other than the Class 3 Unsecured Priority Tax Claims, will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, as will have been determined by the Debtors in their sole discretion, either (i) on or as soon as practicable after the Effective Date, Cash equal to the unpaid portion of such Allowed Priority Tax Claim, (ii) such different treatment as to which the applicable Debtor and such holder will have agreed in writing, or (iii) equal monthly payments on the last day of each month commencing in the first full month following the later of the Effective Date or the date on which such Priority Tax Claim becomes an Allowed Claim with a final payment due on December 31, 2012, which monthly payments (in the aggregate) will be equal to such Allowed Priority Tax Claim together with interest at a rate of (A) four percent (4.0%) per year or (B) an appropriate rate of interest determined by the Bankruptcy Court.

C.     *Other Priority Claims*

On the later of the Effective Date or the date on which an Other Priority Claim becomes an Allowed Other Priority Claim, or, in each such case, as soon as practicable thereafter, each holder of an Allowed Other Priority Claim will receive on account of such Claim, Cash in an amount equal to the amount of such Allowed Other Priority Claim, which amounts will be payable by the Debtors from the Plan Funds, or, such different treatment as to which the Debtors and such holder will have agreed in writing, or otherwise upon an order of the Bankruptcy Court.

**ARTICLE III.**

**CLASSIFICATION AND TREATMENT OF
CLASSIFIED CLAIMS AND EQUITY INTERESTS**

A.     *Summary*

1.     The Classes of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, confirmation and distribution pursuant to the Plan and to Sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or

Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

2.     Summary of Claims and Equity Interests, all of which are impaired and are either entitled to vote on the Plan or deemed to have rejected the Plan.

| Class | Claim |
|---|---|
| 1 | Secured Tax Claims |
| 2 | Goldman's Secured Claim |
| 3 | Unsecured Priority Tax Claims |
| 4 | Interstate's Unsecured Claim |
| 5 | Cabana Club Members' Unsecured Claims |
| 6(a) | Unsecured Claims relating to Golf Portals |
| 6(b) | Unsecured Claims relating to Other Executory Contracts |
| 7 | SGR's Claims |
| 8 | Unsecured Claims against RQB Resort (Trade) |
| 9 | General Unsecured Claims against both Debtors |
| 10 | Equity Interests |

B.     *Classification and Treatment of Claims and Equity Interests*

1.     **<u>Class 1 - Secured Tax Claims</u>**

(a)     *Classification:* Class 1 consists of St. Johns County, Florida's Secured Claims against the Debtors for ad valorem taxes.

*Treatment:* The holder of the Allowed Class 1 Claims will receive, in full and final satisfaction, settlement, release and discharge of and in exchange for such Allowed Class 1 Claims, equal monthly payments on the last day of each month commencing in the first full month following the Effective Date with a final payment due on December 31, 2012, which monthly payments (in the aggregate) will be equal to such Allowed Class 1 Claim together with interest at a rate of (A) four percent (4.0%) per year or (B) an appropriate rate of interest determined by the Bankruptcy Court. Notwithstanding Section 1141(c) or any other provision of the Bankruptcy Code, all prepetition liens on Property of the Debtors held with respect to the Allowed Class 1 Claims will survive the Effective Date and continue until such Allowed Class 1 Claims are paid in full, at which time such liens will be released, will be deemed null and void and will be

unenforceable for all reasons. Such payments will be funded by the Reorganized Debtors with Cash held in the Tax Reserve.

(b)    *Voting:* Class 1 is Impaired, and the holder of the Allowed Class 1 Claim is entitled to and has agreed in principle to vote to accept or reject the Plan.

2.    **Class 2 - Goldman's Secured Claim**

(a)    *Classification*:  Class 2 consists of Goldman's Secured Claim against the Debtors in the amount of $132,000,000.

(b)    *Treatment:* Goldman and/or its designees will receive on the Effective Date, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Class 2 Secured Claim, newly issued Equity Interests in each Reorganized Debtor (both limited and general partnership interests) representing one hundred percent of the Equity Interests of each Reorganized Debtor.

(c)    *Voting:* Class 2 is Unimpaired, and Goldman as the holder of the Class 2 Secured Claim is deemed to accept the Plan.

3.    **Class 3 – Unsecured Priority Tax Claims**

(a)    *Classification:* Class 3 consists of the Florida Department of Revenue's Unsecured Priority Claim against the Debtors for unpaid sales taxes.

(b)    *Treatment:* The holder of the Allowed Class 3 Claim will receive, in full and final satisfaction, settlement, release and discharge of and in exchange for such Allowed Class 3 Claim, as will have been determined by the Debtors in their discretion, either (i) on or as soon as practicable after the Effective Date, Cash equal to the unpaid portion of such Allowed Class 3 Claim, (ii) such different treatment as to which the applicable Debtor and such holder will have agreed in writing, or (iii) equal monthly payments on the last day of each month commencing in the first full month following the Effective Date with a final payment due on December 31, 2012, which monthly payments (in the aggregate) will be equal to such Allowed Class 3 Claim together with interest at a rate of (A) four percent (4.0%) per year or (B) an appropriate rate of interest determined by the Bankruptcy Court. Such payments will be funded by the Reorganized Debtors from the Tax Reserve.

(c)    *Voting:* Class 3 is Impaired, and holder of the Allowed Class 3 Claim is entitled to vote to accept or reject the Plan.

4.    **<u>Class 4 – Interstate's Unsecured Claim</u>**

(a)    *Classification:*  Class 4 consists of Interstate's Unsecured Claim against the Debtors pursuant to the Debtors' obligations to Interstate under the Interstate Management Agreement.

(b)    *Treatment:*

(1)    If Interstate votes to accept the Plan, as of the Effective Date, in full and final satisfaction, settlement, release and discharge of and in exchange for the Allowed Class 4 Claim:

o  Interstate will receive Cash equal to eighty percent of the Allowed Cure Amount under the Interstate Management Agreement; and

o  The Interstate Management Agreement will be assumed by the Reorganized Debtors with the following modifications, which modifications will be deemed approved by Interstate if Interstate votes to accept the Plan. All undefined, capitalized terms will have the meanings given to them in the Interstate Management Agreement.

▪  Section 2.1. Operating Term. The following language shall replace the first sentence of Section 2.1 of the Interstate Management Agreement: "This Agreement is effective on the effective date the Owners' plan of reorganization (the "Effective Date"), and shall have a term (the "Operating Term" or "Term") commencing on the Effective Date and expiring on December 31st of the Fiscal Year in which the fifth (5th) anniversary of the Effective Date occurs (the "Initial Term"), unless sooner terminated in accordance with the provisions of this Agreement or unless extended as provided by the terms of this Agreement or as otherwise provided by the written agreement of Owners and Operator."

▪  Section 9.1. Basic Fee. Interstate agrees to accept on an annual basis a Basic Fee of $400,000.

▪  Section 9.2. Incentive Fee. Interstate agrees to accept on an annual basis an Incentive Fee equal to two

percent (2.0%) of the Resort's Total Revenues in excess of $42,000,000, which Incentive Fee will in no event exceed $400,000 per year.

- Section 17.1. Events of Default. In consideration of the Debtors' distribution to Interstate of eighty percent of the Allowed Cure Amount under the Interstate Management Agreement, Interstate waives all of the Debtors' defaults under the Interstate Management Agreement through the Effective Date. Further, Section 17.1(G) of the Interstate Management Agreement will be deleted in its entirety.

- Section 18.10. Termination. The following provisions shall replace Section 18.10 of the Interstate Management Agreement: "In the event Owners sell the Hotel to a *bona fide* third party (a "Sale"), Owners may terminate this Agreement upon not less than thirty (30) days prior written notice to Operator, such termination to be effective at Owners' election upon the conveyance of the Hotel to such buyer or shortly thereafter, so long as (i) Owners pay to Operator all amounts owed to Operator under the terms of this Agreement as of the effective date of such termination, and (ii) Owners escrow for the benefit of Operator the Termination Fee upon the closing of a Sale, with instructions to pay the Termination Fee upon the closing of a Sale to Operator immediately after Operator certifies in writing to the Owners and escrow holder at least ninety-one (91) days after the conveyance of the Hotel to such buyer that neither Operator nor any of its affiliates has been engaged to operate or manage the Hotel. Further, during the period commencing two (2) years after the Effective Date through the expiration of the Term of this Agreement, Owners may, in their sole discretion, elect to terminate this Agreement upon not less than ninety (90) days written notice to Operator, so long as Owners pay to Operator (i) all amounts owed to Operator under the terms of this Agreement as of the effective date of such termination and (ii) the Termination Fee upon Owners' Election to Terminate. For the purposes of this Agreement, the "Termination Fee upon Sale" shall mean $1,000,000 and the

"Termination Fee upon Owners' Election to Terminate" shall mean $500,000."

(2) If Interstate votes to reject the Plan, the Debtors will be deemed to have rejected the Interstate Management Agreement, effective thirty (30) days after the Effective Date, and as of such date the Interstate Management Agreement will be terminated and of no further force and effect. In that event, Interstate will be entitled to file with the Bankruptcy Court within thirty (30) days following the Effective Date a Proof of Claim for its rejection damages and the Reorganized Debtors will have thirty (30) days after the Claim is filed to object to any such Claim. Interstate will receive in full and final satisfaction, settlement, release and discharge of its Allowed Class 4 Claim, its Pro Rata share of the Unsecured Claims Fund following allowance of its rejection damage Claim by a Final Order of the Bankruptcy Court.

(c) *Voting:* Class 4 is Impaired, and Interstate is entitled to vote to accept or reject the Plan.

5. **Class 5 – Cabana Club Unsecured Claims**

(a) *Classification:* Class 5 consists of the contingent Unsecured Claims of the Cabana Club Members against RQB Resort pursuant to Article A, Section 22 of the Cabana Club Agreements. The Cabana Club Members' contingent Unsecured Claims will become non-contingent if and when, RQB Resort, in its sole and absolute discretion, terminates the Cabana Club Agreements in connection with the future sale or other disposition of the Cabana Club facilities, which disposition may include without limitation "a transfer of the facilities operated by the Club to a member owned club. Upon such termination of membership, members will be entitled to the return of the initiation fee paid to acquire their membership in the Club and a pro rata refund of the unused portion of the annual dues and charges for each full month of the membership year after the month of termination, without interest, less any amounts owed to the Club." Art. A, Sec. 22.

(b) *Treatment:*

(1) If the Plan is approved by the requisite vote of holders of Allowed Class 5 Claims, on or as soon as practicable after the Effective Date, each holder of an Allowed Class 5 Claim will receive, in full and final satisfaction, settlement, release and

discharge of and in exchange for its Allowed Class 5 Claim, a continuing membership interest in the Cabana Club, the constituent documents of which will be amended to provide that in the event RQB Resort terminates the Cabana Club Agreements, then RQB Resort's obligation to return one hundred percent of the Cabana Club Members' initiation fees (the "Cabana Club Fees"), as referenced above, will be reduced pursuant to the following schedule:

- o Ninety percent of the Cabana Club Fees will be returned if RQB Resort terminates the Cabana Club Agreement within one year following the Effective Date;

- o Eighty percent of the Cabana Club Fees will be returned if RQB Resort terminates the Cabana Club Agreement within two years following the Effective Date;

- o Seventy percent of the Cabana Club Fees will be returned if RQB Resort terminates the Cabana Club Agreement within three years following the Effective Date;

- o Sixty percent of the Cabana Club Fees will be returned if RQB Resort terminates the Cabana Club Agreement within four years following the Effective Date; and

- o Fifty percent of the Cabana Club Fees will be returned if RQB Resort terminates the Cabana Club Agreement at any time after the fourth anniversary of the Effective Date.

All other terms of the Cabana Club Agreement will remain the same, including RQB Resort's obligation to return the Pro Rata portion of the members' unused annual dues in the event RQB Resort terminates the Cabana Club Agreement.

(2) In the event Allowed Class 5 Claim holders do not accept the Plan, RQB Resort will be deemed to have rejected all Cabana Club Agreements, and each holder of an Allowed Class 5 Claim will receive, in full and final satisfaction of its Allowed Class 5 Claim, a membership interest in a new club on substantially similar terms as the existing Cabana Club Agreement except that RQB Resort's obligation to return the Cabana Club Fees to the Cabana Club Members in the event it terminates the Cabana Club Agreement after the Effective Date will be eliminated.

(c) *Voting:* Class 5 is Impaired, and holders of Allowed Class 5 Claims are entitled to vote to accept or reject the Plan.

6a. **Class 6(a) – Golf Portal Unsecured Claims**

    (a) *Classification:* Class 6(a) consists of Sawgrass' and Marsh Landing's Unsecured Claims against RQB Resort pursuant to RQB Resort's obligations to (i) Sawgrass under the Sawgrass Golf Portal Agreement and (ii) Marsh Landing under the Marsh Landing Golf Portal Agreement.

    (b) *Treatment:* As of the Effective Date, in full and final satisfaction, settlement, release and discharge of and in exchange for the Allowed Class 6(a) Claims, the Sawgrass Golf Portal Agreement and the Marsh Landing Golf Portal Agreement will be deemed assumed by RQB Resort, as a Reorganized Debtor, on terms previously agreed to between (i) RQB Resort and Sawgrass and (ii) RQB Resort and Marsh Landing. Further, in full and final satisfaction of the Allowed Class 6(a) Claims, RQB Resort, as a Reorganized Debtor, will pay (i) $19,539.91 to Sawgrass and (ii) $10,687.78 to Marsh Landing, which amounts are equal to ninety percent (90%) of the Cure Amounts owed under the Sawgrass Golf Portal Agreement and the Marsh Landing Golf Portal Agreements, respectively.

    (c) *Voting:* Class 6(a) is Impaired, and Sawgrass and Marsh Landing are entitled to vote to accept or reject the Plan.

6b. **Class 6(b) – Other Executory Contracts Unsecured Claims**

    (a) *Classification:* Class 6(b) consists of Certus' and Starbucks' Unsecured Claims against RQB Resort pursuant to RQB Resort's respective obligations to such creditors under (i) the Certus Agreement and (ii) the Starbucks Licensing Agreement (collectively, the "Other Executory Contracts").

    (b) *Treatment:* As of the Effective Date, in full and final satisfaction, settlement, release and discharge of and in exchange for the Allowed Class 6(b) Claim, the Certus Agreement and the Starbucks License Agreement will be deemed assumed by RQB Resort, as a Reorganized Debtor, pursuant to their existing terms. Further, in full and final satisfaction of the Allowed Class 6(b) Claims, RQB Resort, as a Reorganized Debtor, will pay (i) $3,006.91 to Certus and (ii) $1,014.13 to Starbucks, which amounts are equal to ninety percent (90%) of the Cure Amounts owed under the Class 6(b) Executory Contracts, respectively.

    (c) *Voting:* Class 6(b) is Impaired, and Certus and Starbucks are entitled to vote to accept or reject the Plan.

7. **Class 7 – SGR's Claims**

   (a) *Classification:* Class 7 consists of SGR's Claims against the Debtors pursuant to the Debtors' obligations under the SGR Management Agreement for SGR's unpaid management and other fees to the Debtors (i) prior to the Petition Date and (ii) from the Petition Date through the Effective Date.

   (b) *Treatment*: As of the Effective Date, in full and final satisfaction, settlement, release and discharge of and in exchange for the Allowed Class 7 Claims, (i) the SGR Management Agreement will be deemed assumed by the Reorganized Debtors, (ii) the Reorganized Debtors will not pay SGR any portion of its prepetition claim, (iii) the Reorganized Debtors will pay $856,000 to SGR for its postpetition services, which is net of amounts paid to David O'Halloran by the Debtors pursuant to the Order Granting Motion for Order Authorizing the Debtors to Compensate Insiders (ECF No. 365), all in full and final satisfaction of the Allowed Class 7 Claims, and (iv) the SGR Management Agreement shall be amended to provide that the Reorganized Debtors may terminate the SGR Management Agreement without penalty (and with no obligation to pay a termination fee to SGR), upon tendering five days written notice to SGR at any time following the Confirmation Date.

   (c) *Voting*: Class 7 is impaired, and SGR is entitled to vote to accept or reject the Plan.

8. **Class 8 – Unsecured Claims Against RQB Resort (Trade)**

   (a) *Classification*: Class 8 consists of all unsecured claims for which only RQB Resort is liable. These are trade claims for the payment for goods or services provided to the Debtors prior to the Petition Date in the ordinary course of business.

   (b) *Treatment*: As of or as soon as practicable after the Effective Date, each holder of an Allowed Class 8 Claim will receive, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Class 8 Claim, either:

      (1) If the holder votes to accept the Plan, (A) the Reorganized Debtors will purchase from such holder for a period of at least two years following the Effective Date the goods or services that the holder was providing to RQB Resort prior to the Petition Date (provided that the holder has continued to

provide to RQB Resort during the pendency of the Bankruptcy Cases) on substantially the same terms and conditions that exist as of the Effective Date, including terms relating to pricing, discounts and trade credit and (B) its Pro Rate share of the Trade Claims Fund; or

(2) If the holder votes to reject the Plan, its Pro Rata share of the Unsecured Claims Fund.

(c) *Voting:* Class 8 is impaired and holders of Allowed Class 8 Claims are entitled to vote to accept or reject the Plan.

9. **Class 9 - General Unsecured Claims**

(a) *Classification*: Class 9 consists of all general unsecured claims for which both of the Debtors are jointly liable, including (i) the Debtors' obligation to Goldman Bank USA to repay the swap breakage fee, (ii) Goldman's unsecured deficiency claim and (iii) Marriott's Unsecured Claim.

(b) *Treatment*: On or as soon as practicable after the Effective Date, each holder of an Allowed Class 9 Claim will receive, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Class 9 Claim, its Pro Rata share of the Unsecured Claims Fund.

(c) *Voting*: Class 9 is Impaired, and holders of Allowed Class 9 Claims are entitled to vote to accept or reject the Plan.

10. **Class 10 – Equity Interests**

(a) *Classification:* Class 10 consists of all existing Equity Interests in the Debtors, including both limited and general partnership interests.

(b) *Treatment:* The Equity Interests in the Debtors are deemed to have no value as of the Effective Date and the holders of such Equity Interests will not receive or retain under the Plan on account of their junior interest any property or distribution. On the Effective Date, the certificates and other instruments evidencing the Class 10 Equity Interests in the Debtors will be cancelled without further act or action under any applicable agreement, law, regulation, order or rule, and the Equity Interests in the Debtors evidenced thereby will be extinguished.

(c) *Voting:* Class 10 is Impaired, and holders of Class 10 Equity Interests are deemed to reject the Plan.

# ARTICLE IV.

## ACCEPTANCE OR REJECTION OF THE PLAN

A.   *Impaired Classes of Claims Entitled to Vote*

Each holder of a Claim in each Impaired Class is entitled to vote to accept or reject the Plan. No holder of a Disputed Claim is entitled to vote to accept or reject the Plan until and unless the holder of such Disputed Claim obtains a Final Order from the Bankruptcy Court estimating and allowing the Claim for voting purposes only.

B.   *Acceptance by Impaired Classe*s

The Impaired Classes will have accepted the Plan if: (a) the holders (other than any holder designated under Section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in that Class have voted to accept the Plan; and (b) the holders (other than any holder designated under Section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in that Class have voted to accept the Plan.

C.   *Confirmation Pursuant to Section 1129(b)*

To the extent any Impaired Class rejects the Plan or is deemed to reject the Plan, the Debtors will request that the Bankruptcy Court confirm the Plan pursuant to Section 1129(b) of the Bankruptcy Code.

## ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.   *The Reorganization Transaction*

On the Effective Date, the Debtors will consummate the Reorganization Transaction, which will be accomplished by:

1.   Cancelling the Debtors' Indebtedness to Goldman.  All indebtedness due and owing by the Debtors to Goldman shall be cancelled and extinguished. Further, to the extent provided in this Plan, all notes, instruments, agreements and other documents reflecting debt of the Debtors to Goldman will be cancelled, and all obligations of the Debtors under such notes, instruments, agreements and other documents or in any way related thereto will be discharged in exchange for the treatment afforded to Goldman in the Plan.

2. **Cancelling or Restructuring Other Claims.** All other Claims against the Debtors will be cancelled and extinguished or restructured and the holders thereof will be entitled to receive their respective treatment under the terms of the Plan.

3. **Disbursing Plan Funds.** The Plan Funds will be disbursed pursuant to the terms of the Plan.

4. **Extinguishing Equity Interests and Issuing New Equity Interests.** The issuance of new Equity Interests in the Reorganized Debtors to Goldman (in satisfaction of Goldman's Class 2 Secured Claim) shall occur as follows:

    (a) all existing Equity Interests (both limited and general partnership interests) in the Debtors will be cancelled as of the Effective Date; and

    (b) the new Equity Interests in the Reorganized Debtors will be issued to Goldman or its designee, which new Equity Interests will be free and clear of all Claims, interests and encumbrances pursuant to the Confirmation Order and Sections 105, 363, 365, 1123 and 1141(c) of the Bankruptcy Code and will constitute all of the issued and outstanding Equity Interests in the Reorganized Debtors as of the Effective Date

5. **Rebranding of Property.** Within one hundred eighty (180) days following the Effective Date, the Reorganized Debtors may, at their option and in accordance with the Restated Courses Agreement, rebrand the Property the "TPC Sawgrass Golf Resort and Spa" and/or may replace the Franchise Agreement with a comparable brand.

B. *Unsecured Claims Fund and Trade Claims Fund*

On the Effective Date and as part of the financial restructuring contemplated by the Reorganization Transaction (Article V.A(1)-V.A(4) above), the Unsecured Claims Fund and the Trade Claims Fund will be established from the Plan Funds. The Reorganized Debtors will administer, and make distributions from, the Unsecured Claims Fund and the Trade Claims Fund in accordance with the provisions of this Plan and the Confirmation Order.

C. *Tax Reserve*

On the Effective Date and as part of the financial restructuring contemplated by the Reorganization Transaction (Article V.A(1)–V.A(4) above), the Tax Reserve will be established from the Plan Funds. The Reorganized Debtors will administer,

and make distributions from, the Tax Reserve in accordance with the provisions of this Plan and the Confirmation Order.

D. *Corporate Action*

Upon entry of the Confirmation Order, all matters provided for under the Plan involving the corporate structure of the Debtors will be deemed authorized and approved without any requirement of further action by the Debtors or the Debtors' limited and/or general partners.

E. *Sources of Cash for Plan Distribution*

All Cash necessary for the Debtors to make payments under the Plan will be obtained from the Plan Funds.

F. *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and contemporaneously with the applicable distributions made pursuant to Article III, all encumbrances, interests, mortgages, liens or other security interests against the Property or the Estates will be fully released and discharged.

G. *Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes*

The managers of the general partner of the Debtors are authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan. Pursuant to Section 1146 of the Bankruptcy Code, the following will not be subject to any stamp tax, real estate transfer tax or similar tax: (i) the Reorganization Transaction and any instruments executed and delivered in connection therewith or (ii) the making or delivery of any transfer instrument under, in furtherance of or in connection with the Plan.

H. *Preservation of Rights of Action*

Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the Reorganized Debtors shall have all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, in any court or other tribunal including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases. Furthermore, the Reorganized Debtors shall have the right to object to the allowance of any Claim pursuant to Section 502(d) of the Bankruptcy Code.

# ARTICLE VI.

## TREATMENT OF EXECUTORY CONTRACTS

A.    *Assumption of Executory Contracts*

    1.    <u>Assumption of Assumed Contracts</u>

The Debtors reserve the right, at any time prior to the Effective Date, to assume any Executory Contracts to which either Debtor is a party or to file a motion requesting authority for such assumption on the Effective Date (collectively with the Executory Contracts that are being assumed pursuant to Article III of this Plan, the "Assumed Contracts").  To the extent required to effectuate the Plan, the Debtors will assign and the Reorganized Debtors will assume the Assumed Contracts pursuant to the terms of this Plan, including contracts that are assumed by the Reorganized Debtors on modified terms under Article III of this Plan. The designation of a contract or lease as an Assumed Contract will not be deemed an admission that such contract or lease constitutes an Executory Contract.  The Debtors may amend any Assumed Contract, with the consent of the counterparty to such Assumed Contract (if required pursuant to the terms of such Assumed Contract), between the Confirmation Date and the Effective Date without application to or approval of the Bankruptcy Court, and each such agreement, as amended, will be an Assumed Contract.

    2.    <u>Assumption of Restated Courses Agreement</u>

In addition to the Executory Contracts that are being assumed pursuant to Article III of this Plan, as of the Effective Date, the Restated Courses Agreement shall be assumed; and  the Reorganized Debtors shall tender to the TOUR a transfer fee (from the Plan Funds) in an amount equal to $1 million pursuant to the terms of the Restated Courses Agreement.

    3.    <u>Approval of Assumptions</u>

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumptions described in Article III and this Article VI.A pursuant to Sections 365 and 1123 of the Bankruptcy Code, as of the Effective Date.

B.    *Rejection of Executory Contracts*

    1.    <u>Executory Contracts to be Rejected on the Effective Date</u>

With the exception of (i) Executory Contracts that are assumed or rejected pursuant to an order entered by the Bankruptcy Court and (ii) Executory Contracts that are assumed pursuant to Article III or Article VI.A of this Plan, on the

Effective Date, each Executory Contract entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms will be rejected pursuant to Section 365 of the Bankruptcy Code. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections (as well as the Reorganized Debtors' rejection of the Franchise Agreement as described below) pursuant to Section 365 of the Bankruptcy Code as of the Effective Date.

2.      Rejection of Franchise Agreement after the Effective Date

The Franchise Agreement, which is an Executory Contract, shall be rejected by the Reorganized Debtors effective one hundred eighty (180) days following the Effective Date or earlier upon thirty (30) days written notice by the Reorganized Debtors to Marriott.  On the effective date of such rejection, the Franchise Agreement shall be deemed to be terminated and Marriott will be entitled to file a Claim for rejection damages, if any, under the Franchise Agreement.  Until the effective date of such rejection of the Franchise Agreement, Marriott shall be entitled to be paid the fees required under the Franchise Agreement and shall have such other rights and obligations provided therein.

C.      *Claims Based on Rejection of Executory Contracts*

All proofs of Claim arising from the rejection of Executory Contracts must be filed with the Bankruptcy Court on or before the later of: (a) the applicable Bar Date; (b) thirty (30) days after the date of entry of any order authorizing the rejection of an Executory Contract; or (c) in the case of the Franchise Agreement, thirty (30) days after the effective date of the rejection of such Executory Contract. Any Claims arising from the rejection of an Executory Contract for which proofs of Claim were or are not timely filed within that time period will be forever barred from assertion against the Debtors, the Reorganized Debtors or their Property and Estates, unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan. All such Claims will, as of the Effective Date or the effective date of rejection in the case of the Franchise Agreement, be subject to the permanent injunction set forth in Article X.E.

D.      *Cure of Defaults for Executory Contracts Assumed Pursuant to the Plan*

All cures, including the payment of Cure Amounts for Assumed Contracts, will be satisfied pursuant to Section 365(b)(l) of the Bankruptcy Code by: (a) payment of such Cure Amount in Cash on or promptly after the Effective Date or on such other terms as the parties to each such Assumed Contract may otherwise agree, with all such amounts to be payable by the Debtors from the Plan Funds, and (b) curing such non-monetary defaults as is required by the Bankruptcy Code.

# ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

Except as otherwise provided in the Plan or as may be ordered by the Bankruptcy Court, all distributions to all holders of Allowed Claims that are not liabilities assumed by the Reorganized Debtors will be made by the Reorganized Debtors. The Reorganized Debtors will make distributions on the Effective Date or as soon as reasonably practicable thereafter to the respective holders of Allowed Claims, and will make further distributions to holders of Claims that subsequently are determined to be Allowed Claims, pursuant to the Plan.

A.     *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.     Delivery of Distributions in General

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims will be made to the address of the holder of such claim, as indicated on the holder's proof of claim. If the holder's proof of claim does not include an address, then distributions will be made according to Debtors' records, as of the date such distribution is made. Except as otherwise provided in the Plan, the Reorganized Debtors will make distributions to holders of Allowed Claims at the address for each such holder indicated on the Debtors' records on the date of any such distribution; provided, however, that the manner of such distributions will be determined at the discretion of the Debtors, and provided further that the address for each holder of an Allowed Claim will be deemed to be the address set forth in any proof of Claim filed by that Allowed Claim holder.

2.     Compliance with Tax Requirements/Allocations

In connection with the Plan, to the extent applicable, the Reorganized Debtors will comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan will be subject to such withholding and reporting requirements. For tax purposes, distributions received by holders in full or partial satisfaction of Allowed Claims will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

B.     *Timing and Calculation of Amounts to be Distributed*

On the Effective Date or as soon as practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim or as soon as practicable thereafter), each holder of an Allowed Claim against the Debtors will receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class. If and to the extent that

there are Disputed Claims, distributions on account of any such Disputed Claims will be made pursuant to the provisions set forth in Article VIII. Except as otherwise provided in the Plan, or as required under applicable law, holders of Claims will not be entitled to interest on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

## ARTICLE VIII.

## PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS OR EQUITY INTERESTS

A.    *Resolution of Disputed Claims*

The Debtors may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of such Claim and objection estimation and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

B.    *Claims Allowance*

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim will be deemed Allowed unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) in the Chapter 11 Cases allowing such Claim. Notwithstanding Article X.G in the Plan, all Claims of any Person or entity subject to Section 502(d) of the Bankruptcy Code will be deemed disallowed as of the Effective Date unless and until such Person or entity pays in full the amount that it owes the Debtors.

# ARTICLE IX.

## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.    *Conditions Precedent to Confirmation*

It is a condition precedent to Confirmation of the Plan that all provisions, terms and conditions in the Plan are approved in the Confirmation Order.

It is also a condition precedent to the Confirmation of the Plan that the Plan and the proposed Confirmation Order are in a form and substance reasonably acceptable to the Debtors; provided that the Debtors may seek an expedited hearing before the Bankruptcy Court to address any objection to any of the foregoing.

B.    *Conditions Precedent to the Effective Date*

It is a condition to the Effective Date that the following conditions occur or be satisfied or waived pursuant to the provisions of Article IX.C:

1.    The Confirmation Order confirming the Plan, as the Plan may have been modified, has been entered and become a Final Order in a form and substance reasonably satisfactory to the Debtors.

2.    All documents and agreements necessary to implement the Plan have been, as applicable to each such document and agreement: (a) tendered for delivery; (b) all conditions precedent in such documents and agreements have been satisfied; and (c) will have been effected or executed (or deemed executed).

3.    All actions, documents, certificates and agreements necessary to implement this Plan have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental authorities in accordance with applicable laws.

4.    All conditions precedent to the obligations of the Debtors have been satisfied or waived in accordance with the terms of this Plan.

C.    *Waiver of Conditions*

The Debtors, in their discretion, may, at any time, waive any of the conditions to the Effective Date set forth in this Article IX without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

D. *Effect of Non-Occurrence of Conditions to Effective Date*

If the Effective Date does not occur, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will: (a) constitute a waiver or release of any Claims by or Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any holders of Claims or Equity Interests or any other parties in interest; or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any holders of any claims or any other parties in interest in any respect.

## ARTICLE X.

## SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

A. *Compromise and Settlement*

From and after the Effective Date, the Reorganized Debtors may compromise and settle Claims without further Bankruptcy Court approval.

B. *Releases by the Debtors*

As of the Effective Date, for good and valuable consideration, the adequacy of which is confirmed, the Debtors, the Reorganized Debtors and any Person or entity seeking to exercise the rights of the Debtors' Estates, including, without limitation, any successor to the Debtors or any estate representative appointed or selected pursuant to Section 1123(b)(3) of the Bankruptcy Code, will be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action (including claims or causes of action arising under Chapter 5 of the Bankruptcy Code), and liabilities whatsoever in connection with or related to the Debtors, the conduct of the Debtors' business, the Chapter 11 Cases, or the Plan (other than the rights of the Debtors and the Reorganized Debtors to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the conduct of the Debtors' business, the Reorganized Debtors, the Chapter 11 Cases, or the Plan and that may be asserted by or on behalf of the Debtors, the Estates, or the Reorganized Debtors against (i) either of the Debtors, (ii) any of the present or former limited or general partners of the Debtors or any of the officers, directors or employees of the general or limited partners of the Debtors or any of the Debtors' affiliates, and (iii) any professionals of the Debtors.

C.    *Releases by Holders of Claims*

As of the Effective Date, for good and valuable consideration, the adequacy of which is confirmed, each holder of a Claim that affirmatively votes in favor of the Plan is deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever against the limited or general partners of the Debtors or any of the officers, directors or employees of any of the general or limited partners of the Debtors or any of the Debtors' affiliates (collectively, the "Debtor Releasees"), in connection with or related to the Debtors, the conduct of the Debtors' business, the Chapter 11 Cases, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures, and other instrument, agreement or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the conduct of the Debtors' business, the Chapter 11 Cases, or the Plan.

Each of the Debtor Releasees is deemed to forever release, waive, and discharge any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever arising on or prior to the Effective Date in any way relating to the Debtors, the conduct of the Debtors' business, the Chapter 11 Cases, or the Plan, that such Debtor Releasees may hold in their individual capacities against each holder of a Claim that affirmatively votes in favor of the Plan.

D.    *Discharge of the Debtors*

1.    Except as otherwise provided in the Plan or in the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtors or any of their assets or properties and, regardless of whether any property is abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to the Plan on account of such claims, upon the Effective Date, the Debtors, and each of them, will (i) be deemed discharged and released under Section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in Section 502 of the Bankruptcy Code. This is so whether or not (A) a Proof of Claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code, (B) a Claim based upon such debt is allowed under Section 502 of the

Bankruptcy Code (C) a Claim based upon such debt is or has been disallowed by order of the Bankruptcy Court, or (D) the holder of a Claim based upon such debt accepted the Plan.

2.      As of the Effective Date, except as provided in the Plan or the Confirmation Order, all Persons are precluded from asserting against the Debtors or the Reorganized Debtors, any other or further claims, debts, rights, causes of action, claims for relief, liabilities, or Equity Interests relating to the Debtors based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order is a judicial determination of the discharge of all such Claims and other debts and liabilities against the Debtors, pursuant to Sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim.

E.      *Injunction*

1.      Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim or other debt or liability that is discharged or an Equity Interest that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtors and the Reorganized Debtors, and their respective subsidiaries or their property on account of any such discharged Claims, debts, or liabilities or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors or the Reorganized Debtors; or (v) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

2.      As of the Effective Date, all Persons that have held, currently hold, or may hold, a Claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, or liability that is released, or an interest that is terminated, are permanently enjoined from taking any of the following actions on account of such released Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities, or interests: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or

enforcing any lien or encumbrance; (iv) asserting a setoff against any debt, liability, or obligation due to any released Person; or (v) commencing or continuing any action, in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

3. Without limiting the effect of the foregoing provisions upon any Person, by accepting distributions pursuant to the Plan, each holder of an Allowed Claim receiving distributions pursuant to the Plan is deemed to have consented to the injunctions set forth above.

4. Nothing in this Article X impairs (i) the rights of any holder of a Disputed Claim to establish its Claim in response to an objection filed by the Debtors or the Reorganized Debtors, (ii) the rights of any defendant in an avoidance action filed by the Reorganized Debtors to assert defenses in such action, or (iii) the rights of any party to an Executory Contract that has been assumed by the Debtors pursuant to an order of the Bankruptcy Court or the provisions of the Plan to enforce such assumed contract or lease.

F.  *Exculpation and Limitation of Liability*

1. None of the Debtors, the Reorganized Debtors, or any of their respective present or former limited or general partners, or any of the directors, officers, employees, advisors, professionals, or agents of the Debtors, the Reorganized Debtors and any general or limited partners of the Debtors or any of the Debtors' affiliates, will have or incur any liability to any holder of a Claim or any interest, or any other party-in-interest, or any of their respective agents, employees, representatives, advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the Consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence, or willful misconduct.  The foregoing is not intended to limit or otherwise impact any defense of qualified immunity that may be available under applicable law.

2. Notwithstanding any other provision of the Plan, no holder of a Claim or an Equity Interest, no other party-in-interest, none of their respective agents, employees, representatives, advisors, attorneys, or affiliates, and none of their respective successors or assigns have any right of action against any of the Debtors, the Reorganized Debtors, or their respective present or former, limited or general partners, or any of the officers, employees, advisors, professionals, or agents of the Debtors, the Reorganized Debtors and any

general or limited partners of the Debtors or any of the Debtors' affiliates, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, negotiation, or implementation of the Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the Consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence, or willful misconduct.

G.    *Preservation of Rights of Action*

1.    <u>Maintenance of Causes of Action</u>

Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the Reorganized Debtors shall have all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, in any court or other tribunal including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases. Furthermore, the Reorganized Debtors shall have the right to object to the allowance of any Claim pursuant to Section 502(d) of the Bankruptcy Code.

2.    <u>Preservation of All Causes of Action Not Expressly Settled or Released</u>

With the exception of the Claims and Causes of Action released pursuant to this Plan, the Debtors reserve all Claims or Causes of Action for later adjudication by the Debtors, the Reorganized Debtors (including, without limitation, Claims and Causes of Action not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances which may change or be different from those the Debtors now believe to exist). No preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, Claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Claims or Causes of Action upon or after the Confirmation or Consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such Claims or Causes of Action have been released in the Plan (including, without limitation, and for the avoidance of doubt, the releases by Debtors contained in Article X.B) or any other Final Order (including the Confirmation Order). In addition, the Debtors expressly reserve the right to pursue or adopt any Claims alleged in any lawsuit in which any of the Debtors are a defendant or an interested party, against any Person or entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, until such Claims are acquired by the Reorganized Debtors pursuant to the Reorganization Transaction.

# ARTICLE XI.

## RETENTION OF JURISDICTION

Notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, after the Effective Date, the Bankruptcy Court will retain such jurisdiction over the Chapter 11 Cases, the post-Consummation Estates, and all Persons and Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and the Plan as legally permissible, including, but not limited to, jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests;

2. grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

3. resolve any matters related to the assumption or rejection of any Executory Contract to which either of the Debtors is party or with respect to which either of the Debtors may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

4. ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5. decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date or instituted by the Reorganized Debtors after the Effective Date; provided, however, that the Reorganized Debtors will reserve the right to commence actions in all appropriate jurisdictions;

6. enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan, and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Reorganization Transaction, the Plan, the Confirmation Order or the Disclosure Statement;

7. resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Reorganization Transaction, the Plan, the Confirmation Order, or any Person's or entity's obligations incurred in connection with the Plan;

8.  issue injunctions, enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or entity with Consummation or enforcement of the Plan, except as otherwise provided in the Plan;

9.  enforce Article X of the Plan;

10. resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in Article X, and enter such orders as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

11. enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

12. resolve any other matters that may arise in connection with or relate to the Reorganization Transaction, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

13. enter an order and/or final decree closing the Chapter 11 Cases.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

A.  *Effectuating Documents, Further Transactions and Corporate Action*

The Debtors, the Debtors' general partners on behalf of the Debtors and the president of the Debtors' general partners (as well as any Person or entity duly authorized to act on behalf of the Debtors), are authorized to execute, deliver, file or record such contracts, instruments, releases, security agreements, mortgages, collateral assignments, conveyance documents, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan.

Prior to, on or after the Effective Date (as appropriate), all matters provided for in the Plan that would otherwise require approval of the general or limited partners of the Debtors (or any Person or entity required to and authorized to act on behalf of the Debtors) are deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to the applicable state law without any requirement of further action by the general or limited partners of the Debtors (or any Person or entity required to and authorized to act on behalf of the Debtors).

B.    *Payment of Statutory Fees*

All fees payable pursuant to Section 1930 of title 28 of the United States Code after the Effective Date, as determined by the Bankruptcy Court at a hearing pursuant to Section 1128 of the Bankruptcy Code, will be paid prior to the closing of the Chapter 11 Cases on the earlier of when due or the Effective Date, or as soon thereafter as practicable.

C.    *Modification of Plan*

Effective as of the date this Plan is filed, and subject to the limitations contained in the Plan: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with Section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan. Any such modification will be made subject to the reasonable consent of the Debtors, provided that if any party objects to such modification, the Debtors may seek an expedited hearing before the Bankruptcy Court to address such objection.

D.    *Revocation of Plan*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent Chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan, any assumption of an Executory Contract, and any document or agreement executed pursuant to the Plan will be deemed null and void; and (c) nothing contained in the Plan will: (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Person; (ii) prejudice in any manner the rights of the Debtors or any other Person; or (iii) constitute an admission of any sort by the Debtors or any other Person.

E.    *Successors and Assigns*

The rights, benefits and obligations of any Person or entity named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or assign of such Person or entity.

F.      *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan will have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order. Neither the filing of the Plan, any statement or provision contained in the Plan, nor the taking of any action by the Debtors or any Person with respect to the Plan will be or will be deemed to be an admission or waiver of any rights of: (a) the Debtors with respect to the holders of Claims or Equity Interests or other parties in interest; or (b) any holder of a Claim or other party in interest prior to the Effective Date.

G.      *Further Assurances*

The Debtors, all holders of Claims receiving distributions under the Plan and all other parties in interest will, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

H.      *Severability*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision then will be applicable as altered or interpreted; provided, however, that any such alteration or interpretation must be in form and substance reasonably acceptable to the Debtors, provided that the Debtors may seek an expedited hearing before the Bankruptcy Court to address any objection to any of the foregoing. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

I. *Notices*

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtors will be sent by first class U.S. mail, postage prepaid to:

| | |
|---|---|
| Smith Hulsey & Busey | RQB Resort, LP |
| Attention: Cynthia C. Jackson, Esq. | RQB Development, LP |
| 225 Water Street, Suite 1800 | Attn: David O'Halloran |
| Jacksonville, Florida 32202 | 1000 PGA Tour Blvd. |
| | Ponte Vedra Beach, Florida 32082 |

J. *Filing of Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

SMITH HULSEY & BUSEY


By:   */s/ Cynthia C. Jackson*
      Cynthia C. Jackson


Florida Bar Number 498882
225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)
cjackson@smithhulsey.com

Attorneys for the Debtors

Dated August 18, 2011

RQB RESORT, LP

By: RQB Consolidated, LLC, a Delaware limited
liability company, its general partner

_____

David O'Halloran, its Manager


RQB DEVELOPMENT, LP

By: RQB Consolidated, LLC, a Delaware limited
liability company, its general partner

_____

David O'Halloran, its Manager

# EXHIBIT B

# Sources and Uses of Plan Funds ❶

| USES | | Estimated Claim | Plan Distribution | % Recovery |
|---|---|---|---|---|
| **Secured Claims:** | | | | |
| Class 2 - Goldman's Secured Claim | $ 196.00 | $ 132.0000 | | 67% |
|    Issuance of Equity Interests | | $ 132.0000 | | |
| **Unsecured Claims:** | | | | |
| Class 4 - IHR | $ 0.468 | $ 0.3744 | | 80.0% |
| Class 5 - Cabana Club | $ 7.500 | $ - | | N/A |
| Class 6 - Golf Portal / Executory | $ 0.040 | $ 0.0360 | | 90.0% |
| Class 7 - SGR Asset Management | $ 1.462 | $ 0.8560 | | 58.5% |
| Class 8 - Trade Claims | $ 0.200 | $ 0.0200 | | 10.0% |
| Class 9 - General Unsecureds | $ 76.400 | $ 2.2920 | | 3.0% |
| Subtotal of Distributions to Unsecured Creditors | | $ 3.5784 | | |
| **Other:** | | | | |
| Legal/Professionals | | $ 0.6476 | | 100% |
| Class 3 - Florida DOR (Tax Reserve) | | $ 0.3000 | | 100% |
| JLL | | $ 0.1500 | | 100% |
| Contingency | | $ 0.0250 | | 100% |
| Subtotal of Other Expenses | | $ 1.1226 | | 100% |
| Total Distributions and Expenses | | $ 4.7010 | | |
| **Cash:** | | | | |
| Encumbered Cash including Reserves | | $ 4.5606 | | 100% |
| Excess Unencumbered Cash | | $ 0.5794 | | 100% |
| Total Liquidity | | $ 5.1400 | | 100% |
| **Protective Expenses/Other:** | | | | |
| Class 1 - St. Johns County -2009 and 2010 Taxes (Tax Reserve) | | $ 1.8000 | | 100% |
| PGA Tour Transfer Fee | | $ 1.0000 | | 100% |
| Reserves (Including 2011 Taxes) | | $ 2.3400 | | 100% |
| Total Protective Expenses/Other | | $ 5.1400 | | 100% |
| **Total Cash Usage --------------------------------------------->** | | $ 9.8410 | | |
| **Total Uses** | | $ 137.2804 | | |

| SOURCES | $ mm |
|---|---|
| Value of Resort including Encumbered Cash | $ 132.0 |
| | |
| | |
| | |
| | |
| | |
| **Est. Cash on Balance Sheet** | $ 7.5310 |
| **Est. Reserves** | $ 2.3400 |
| **Total Cash Sources -------->** | $ 9.8710 |
| | |
| Encumbered Cash | $ 4.5906 |
| Unencumbered Cash | $ 5.2804 |
| **Total** | $ 9.8710 |
| **Total Sources** | $ 137.2804 |

Notes    ❶ Based upon the Debtors' projected cash as of November 4, 2011

# EXHIBIT C

## Sawgrass Resort Liquidation Analysis ❶

| Assets | Estimated Proceeds |
|---|---|
| Unencumbered Cash ❷ | $ 5,280,390 |
| Marriott Sawgrass Resort (including Encumbered Cash) ❸ | $ 132,000,000 |
| **Total** | **$ 137,280,390** |

| Costs of Liquidation | Low | High |
|---|---|---|
| Wind down expenses including US Trustee | $ 500,000 | $ 1,000,000 |
| Liquidating Trustee (3%) | $ 4,118,412 | $ 4,118,412 |
| **Total Liquidation Costs** | **$ 4,618,412** | **$ 5,118,412** |
| **Net Unencumbered Cash Available to Distribute** | **$ 661,978** | **$ 161,978** |

| Distributions to Administrative Expenses and Priority Claimants | Low | High |
|---|---|---|
| Unsecured Priority Tax Claims | $ 300,000 | $ 300,000 |
| Legal Fees and Administrative Expenses | $ 1,150,000 | $ 1,350,000 |
| **Total Distributions with Unencumbered Cash** | **$ 1,450,000** | **$ 1,650,000** |
| **Net Unencumbered Cash Available to Distribute to Unsecured Creditors** | **$ (788,022)** | **$ (1,488,022)** |

| Secured Creditor | |
|---|---|
| Goldman Sachs' Secured Claim ❹ | $ 132,000,000 |

No Recovery Available for Unsecured Claims, including Trade Claims

❶ Based upon the Debtors' projected cash as of November 4, 2011

❷ Unencumbered Cash is projected to be $5,280,390 as of November 4, 2011

❸ Encumbered Cash is projected to be $4,590,610 as of November 4, 2011

❹ Assumes the Debtors abandon Encumbered Assets (including Encumbered Cash) to Goldman Sachs in satisfaction of its Secured Claim