UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


In re:                                    )    Case No. 3:10-bk-01596

RQB Resort, LP, and RQB                   )    Chapter 11
Development, LP,[1]
                                          )    Jointly Administered
                Debtors.
                                          )
_____


## DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION




                        SMITH HULSEY & BUSEY
                        225 Water Street, Suite 1800
                        Jacksonville, Florida 32202
                        (904) 359-7700
                        (904) 359-7708 (facsimile)

                        Attorneys for Debtors

---

[1] RQB Resort, LP's tax identification number is 86-1161952. RQB Development, LP's tax identification number is 13-4322680. The principal address of each debtor is 1000 PGA Tour Boulevard, Ponte Vedra Beach, Florida 32082.

# Table of Contents

**Page**

ARTICLE I.   RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS ...................................................... 1

A.      Rules of Interpretation, Computation of Time and Governing Law .......... 1

B.      Defined Terms ............................................................................................. 2

ARTICLE II.      ADMINISTRATIVE, PRIORITY TAX CLAIMS AND OTHER PRIORITY CLAIMS ........................................................................................... 11

A.      Administrative Claims ............................................................................... 11

B.      Priority Tax Claims ................................................................................... 12

C.      Other Priority Claims ................................................................................ 12

ARTICLE III.    CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS ................................................................. 13

A.      Summary .................................................................................................... 13

B.      Classification and Treatment of Claims and Equity Interests ................... 13

ARTICLE IV.    ACCEPTANCE OR REJECTION OF THE PLAN ................... 15

A.      Impaired Classes of Claims Entitled to Vote ........................................... 15

B.      Acceptance by Impaired Classes ............................................................... 16

C.      Confirmation Pursuant to Section 1129(b) ............................................... 16

ARTICLE V.     MEANS FOR IMPLEMENTATION OF THE PLAN .............. 16

A.      The Reorganization Transaction ............................................................... 16

B.      Unsecured Claims Fund and Trade Claims Fund ..................................... 17

D.      Corporate Action ....................................................................................... 17

E.      Sources of Cash for Plan Distribution....................................................... 17

F.      Release of Liens ........................................................................................ 18

i

G.       Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes .............................................................. 18

H.       Preservation of Rights of Action ............................................... 19

ARTICLE VI.    TREATMENT OF EXECUTORY CONTRACTS .................... 20

A.       Assumption of Executory Contracts ......................................... 20

B.       Rejection of Executory Contracts ............................................. 21

C.       Claims Based on Rejection of Executory Contracts ................. 22

D.       Cure of Defaults for Executory Contracts Assumed Pursuant to the Plan ...................................................................................... 23

ARTICLE VII.    PROVISIONS GOVERNING DISTRIBUTIONS .................... 23

A.       Delivery and Distributions and Undeliverable or Unclaimed Distributions ............................................................................. 23

B.       Timing and Calculation of Amounts to be Distributed ............ 24

ARTICLE VIII.   PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS OR EQUITY INTERESTS 24

A.       Resolution of Disputed Claims ................................................. 24

B.       Claims Allowance ..................................................................... 25

ARTICLE IX.    CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN ........................................................................ 25

A.       Conditions Precedent to Confirmation...................................... 25

B.       Conditions Precedent to the Effective Date ............................. 25

C.       Waiver of Conditions ................................................................ 26

D.       Effect of Non-Occurrence of Conditions to Effective Date ..... 26

ARTICLE X.     SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS   26

A.       Compromise and Settlement ..................................................... 26

B.       Releases by the Debtors ............................................................ 27

C.      Releases by Holders of Claims ............................................................... 27

D.      Discharge of the Debtors.......................................................................... 28

E.      Injunction ................................................................................................. 29

F.      Exculpation and Limitation of Liability.................................................... 30

G.      Preservation of Rights of Action.............................................................. 31

ARTICLE XI.    RETENTION OF JURISDICTION........................................... 32

ARTICLE XII.   MISCELLANEOUS PROVISIONS.......................................... 34

A.      Effectuating Documents, Further Transactions and Corporate
        Action ...................................................................................................... 34

B.      Payment of Statutory Fees ....................................................................... 34

C.      Modification of Plan ................................................................................ 34

E.      Successors and Assigns............................................................................ 35

F.      Reservation of Rights............................................................................... 35

G.      Further Assurances................................................................................... 35

H.      Severability .............................................................................................. 35

I.      Notices...................................................................................................... 36

J.      Filing of Additional Documents .............................................................. 36

# SECOND AMENDED JOINT PLAN OF REORGANIZATION FOR RQB RESORT, LP AND RQB DEVELOPMENT, LP

## INTRODUCTION

RQB Resort, LP, and RQB Development, LP, the debtors and debtors-in-possession (collectively, the "Debtors"), under Chapter 11 of Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") propose this Joint Plan of Reorganization (the "Plan").

## ARTICLE I.

## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

A.     *Rules of Interpretation, Computation of Time and Governing Law*

1.     For purposes of the Plan: (a) in the appropriate context, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender will include the masculine, feminine and the neuter gender; (b) any reference in the Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document will be substantially in that form or substantially on those terms and conditions; (c) any reference in the Plan to an existing document or exhibit having been filed or to be filed will mean that document or exhibit, as it may thereafter he amended, modified or supplemented; (d) unless otherwise specified, all references in the Plan to "Articles" are references to Articles of the Plan; (e) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (f) the rules of construction set forth in Section 102 of the Bankruptcy Code will apply; and (g) any term used in capitalized form in the Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules will have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

2.     The provisions of Bankruptcy Rule 9006(a) will apply in computing any period of time prescribed or allowed in the Plan.

3.     Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan will be governed by, and construed and enforced in accordance with the laws of the State of Florida, without giving effect to the principles of conflict of laws.

B. *Defined Terms*

1.    *"Accrued Professional Compensation"* means, at any given moment, all accrued and unpaid fees and expenses (including, but not limited to Allowed Professional Compensation) for legal, financial advisory, accounting and other services and reimbursement of expenses that are awardable and allowable under Sections 328, 330(a) and 331 of the Bankruptcy Code by all Retained Professionals in the Chapter 11 Cases that the Bankruptcy Court has not denied by a Final Order, but only to the extent that any such fees and expenses have not been previously paid regardless of whether a fee application has been filed for any such amount. To the extent that the Bankruptcy Court or any higher court denies or reduces by a Final Order any amount of a Retained Professional's fees or expenses, then those reduced or denied amounts will no longer constitute Accrued Professional Compensation (except in any reduced amount).

2.    *"Administrative Claim"* means a Claim for costs and expenses of administration of the Estates under Section 503 of the Bankruptcy Code (including Claims under Sections 503(b)(9), 507(b) or 1114(e)(2) of the Bankruptcy Code), including without limitation: (a) the actual and necessary costs and expenses incurred after the Petition Date to preserve the Estates and operate the Debtors' businesses; (b) Allowed Professional Compensation; (c) all Allowed Reclamation Claims; (d) all fees and charges assessed against the Estates under chapter 123 of title 28 United States Code, 28 U.S.C. §§ 1911-1930; and (e) cure payments for executory contracts (other than those described in Article III.B) that are assumed under Section 365 of the Bankruptcy Code.

3.    *"Allowed"* means, with respect to any Claim (except as otherwise provided in the Plan): (a) a Claim that has not been scheduled by the Debtors in their Schedules as disputed, contingent or unliquidated and for which the Claim amount has not been identified as unknown, and as to which the respective Debtor has not filed an objection by the Claims Objection Deadline; (b) a Claim for which a timely Proof of Claim has been filed that is not a Disputed Claim; (c) a Claim that is allowed by a Final Order of the Bankruptcy Court; (d) a Claim relating to a rejected Executory Contract that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order, in either case only if a Proof of Claim has been filed by the applicable Bar Date or has otherwise been deemed timely filed under applicable law; (e) a Claim that is allowed pursuant to the terms of this Plan; or (f) a Disputed Claim as to which a proof of Claim has been timely filed and as to which no objection has been filed by the Claims Objection Deadline.

4.    *"Allowed Professional Compensation"* means all Accrued Professional Compensation allowed or awarded by a Final Order of the Bankruptcy Court.

5.    *"Assumed Contracts"* means the following Executory Contracts: (i) the Franchise Agreement, (ii) the Cabana Club Agreements, (iii) the Spa Club Agreements, (iv) the Original Courses Agreement, (v) the Restated Courses Agreement, (vi) the Sawgrass Golf Portal Agreement, and (vii) the Marsh Landing Golf Portal Agreement.

6. *"AVI Communication Agreement"* means that certain agreement dated as of February 28, 1997 between the Debtors' predecessor in interest and O-Video Systems, Inc.

7. *"Bankruptcy Code"* means Sections 101 *et seq.* of title 11 of the United States Code, as in effect as of the Petition Date.

8. *"Bankruptcy Court"* means the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division.

9. *"Bankruptcy Rules"* means, collectively, the Federal Rules of Bankruptcy Procedure.

10. *"Bar Date"* means the date(s) designated by the Bankruptcy Court as the last date(s) for filing Proofs of Claim against the Debtors.

11. *"Business Day"* means any day other than a Saturday, Sunday or "legal holiday," as defined in Bankruptcy Rule 9006(a).

12. *"Cabana Club"* means the beach club facility that is owned by RQB Resort and licensed for use by the Cabana Club Members pursuant to the Cabana Club Agreements.

13. *"Cabana Club Agreements"* means each Executory Contract between RQB Resort and the Cabana Club Members pursuant to the Rules and Regulations of the Cabana Club that govern the Cabana Club Members' use of the Cabana Club and RQB Resort's operation and management of the Cabana Club.

14. *"Cash"* means legal tender of the United States of America or its equivalent.

15. *"Causes of Action"* means all actions, causes of action, claims, liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, cross-claims, counterclaims, third party claims, indemnity claims, contribution claims or any other claims disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

16. *"Certus"* means Certus Claims Administration, LLC, a Washington limited liability company.

17. *"Certus Agreement"* means RQB Resort's Executory Contract with Certus regarding claim administration services relating to the Property for the Debtors and their insurance carrier, Tokio Marine & Nichido Fire Insurance Co., Ltd.

18.     *"Chapter 11 Cases"* means (i) when used with reference to RQB Resort or RQB Development, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (ii) when used with reference to both Debtors, the jointly administered Chapter 11 Cases pending for the Debtors in the Bankruptcy Court.

19.     *"Claim"* means a Claim as defined in Section 101(a)(5) of the Bankruptcy Code.

20.     *"Claims Objection Deadline"* means the last day for filing objections to Claims (other than Administrative Claims), which will be the later of (a) forty-five (45) days after the Effective Date unless otherwise extended by order of the Bankruptcy Court and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to Claims. There will be no deadline for objecting to Administrative Claims unless established by a Final Order of the Bankruptcy Court.

21.     *"Class"* means a category of holders of Claims or Equity Interests as described in Article III of the Plan.

22.     *"Condominium Leases"* means the condominium unit leases described in Schedule I-22 attached to this Plan.

23.     *"Confirmation"* means approval of the Plan by the Bankruptcy Court pursuant to Section 1129 of the Bankruptcy Code.

24.     *"Confirmation Date"* means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

25.     *"Confirmation Hearing"* means the hearing held by the Bankruptcy Court on confirmation of the Plan pursuant to Section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

26.     *"Confirmation Order"* means the order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

27.     *"Consummation"* has the meaning set forth in Section 1101 of the Bankruptcy Code.

28.     *"Creditor"* means any holder of a Claim.

29.     *"Cure Amounts"* means amounts required to be paid in order to cure any pre-petition monetary or other defaults under any Executory Contracts assumed by the Debtors in accordance with the provisions of Section 365 of the Bankruptcy Code by separate Final Order or by the Confirmation Order.

30.     *"Debtor"* means either RQB Resort or RQB Development, in its individual capacity as a debtor in these Chapter 11 Cases.

31.     *"Debtor Releasees"* has the meaning attributed to it in Article X.C.

32.     *"Debtor Releasors"* has the meaning attributed to it in Article X.B.

33.     *"Debtors"* means, collectively, RQB Resort and RQB Development.

34.     *"Disclosure Statement"* means the disclosure statement for the Debtors' Plan, as amended, supplemented, or modified from time to time, including all exhibits and Schedules that relate to the Plan that is prepared and distributed by the Debtors in accordance with the Bankruptcy Code, Bankruptcy Rules, and any other applicable law.

35.     *"Disputed"* means (a) with respect to any Administrative Claim, other than an Administrative Claim that has been Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court or that was incurred by the Debtors in the ordinary course of business during the Chapter 11 Case, a Claim: that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding claims arising under workers' compensation law), secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity, or common law; or (b) with respect to any Claim that is not an Administrative Claim, other than a Claim that has been Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court, a Claim: (i) if no Proof of Claim has been filed or deemed to have been filed by the applicable Bar Date, that has been or hereafter is listed on the Schedules as unliquidated, contingent, or disputed; (ii) if a Proof of Claim has been filed or deemed to have been filed by the applicable Bar Date, as to which a Debtor has timely filed an objection or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, and any other orders of the Bankruptcy Court, or which is otherwise disputed by a Debtor in accordance with applicable law, which objection, request for estimation, or dispute has not been withdrawn or determined by a Final Order; (iii) for which a Proof of Claim was required to be filed by the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court, but as to which a Proof of Claim was not timely or properly filed; (iv) for damages based upon the rejection by a Debtor of an Executory Contract under Section 365 of the Bankruptcy Code and as to which the applicable Bar Date has not passed; (v) that is disputed under the provisions of the Plan; or (vi) if not otherwise Allowed, as to which the applicable Claims Objection Deadline has not expired.

36.     *"Distribution Agent"* means either Mark Healy or Philip J. von Kahle, each a representative of Moecker and Associates, who shall serve and be obligated to perform the duties and functions set forth in Article V.G of this Plan.

37.     *"East Coast Transportation Agreement"* means the Transportation Agreement dated effective as of October 1, 2011, between RQB Resort and East Coast Transportation Company of North Florida, LLC, a Florida limited liability company.

38.     *"Effective Date"* means the first Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions specified in Article IX.B of this Plan have been either satisfied or waived pursuant to Article IX.C and is the date on which this Plan becomes effective.

39.     *"Encumbered Property"* means all assets and property, including Cash, that are subject to the valid and enforceable lien of Goldman pursuant to the Loan Documents (as such term is defined in paragraph 12 of the Objection to Cash Collateral filed by Goldman in the Chapter 11 Cases on March 3, 2010, D.E. 18).

40.     *"Estate"* means, as to each Debtor, the estate created for the Debtors in their Chapter 11 Cases pursuant to Section 541 of the Bankruptcy Code.

41.     *"Estimated Schedule of Sources and Uses"* means the Debtors' good faith estimate of Plan Funds shown on and described in Schedule I-41 attached to this Plan.

42.     *"Executory Contract"* means a contract, which for the purpose of this Plan shall include an unexpired lease, between one or both Debtors and a third party entered into prior to the Petition Date that may be assumed or rejected pursuant to Section 365 of the Bankruptcy Code.

43.     *"Equipment Leases"* means the equipment leases described in Schedule I-43 attached to this Plan.

44.     *"Equity Interest"* means (i) any partnership interest in the Debtors, and any instrument evidencing any such partnership or other equity interest, whether or not transferable, and (ii) any option, warrant or right, contractual or otherwise, to acquire any such partnership interest in the Debtors.

45.     *"Expense Reserve Fund"* means Cash in an amount to be agreed upon between the Debtors and Goldman prior to the Effective Date that is necessary for the Distribution Agent to carry out his duties under this Plan.

46.     *"Final Order"* means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in either Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, or seek *certiorari* or move for a new trial, reargument or rehearing has expired and no appeal or petition for *certiorari* or other proceedings for a new trial, reargument or rehearing has been timely taken. Further, as to a final order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in either Chapter 11 Case or the docket of any court of

competent jurisdiction, or as to which any appeal that has been taken or any petition for *certiorari* that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which *certiorari* was sought or the new trial, reargument or rehearing will have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice; provided, however, the possibility that a party may file a motion for reconsideration of an order or judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure or Rule 9024 of the Bankruptcy Rules will not preclude an order from being a Final Order.

47.     *"Franchise Agreement"* means the franchise agreement, as amended from time to time, between the Debtors and Marriott relating to the branding of the Debtors' Property.

48.     *"Goldman"* means Goldman Sachs Mortgage Company, a New York corporation, as well as its predecessor in interest under the Loan Documents, Goldman Sachs Commercial Mortgage Capital, L.P., as the context requires.

49.     *"Goldman Transferee(s)"* has the meaning attributed to it in Article V.A.5.

50.     *"Interstate"* means Interstate Hotels and Resorts Management, LLC, a Delaware limited liability company.

51.     *"Interstate Management Agreement"* means the hotel management agreement between the Debtors and Interstate regarding Interstate's management of the Property.

52.     *"Interstate Parties"* has the meaning attributed to it in Article X.G.6.

53.     *"Interstate Subordination Agreement"* shall have the meaning attributed to it in Article VI.B.2.

54.     *"Impaired"* means, with respect to any Class of Claims or Equity Interests, that such Claims or Equity Interests are impaired within the meaning of Section 1124 of the Bankruptcy Code.

55.     *"Impaired Class"* means each of Classes 1, 2, 3, 4 and 5, as set forth in Article III.

56.     *"Lender Releasees"* has the meaning attributed to it in Article X.B.

57.     *"Marriott"* means Marriott International, Inc., a Maryland corporation.

58.     *"Marsh Landing"* means ML Partnership, LLP, a Florida limited liability partnership.

59. *"Marsh Landing Golf Portal Agreement"* means RQB Resort's Executory Contract with Marsh Landing regarding the sharing of revenues generated by RQB Resort's referral of its guests to play Marsh Landing's golf course.

60. *"Mutual Release"* shall have the meaning attributed to it in Article IX.B.4.

61. *"Net Available Cash"* means the Plan Funds less (A) amounts required to (i) pay all Allowed Administrative Expenses, (ii) pay all Allowed Priority Tax Claims, (iii) pay all Allowed Other Priority Claims, if any, (iv) pay all Cure Amounts with respect to Assumed Contracts, (v) pay the Allowed Class 1 Secured Claim and (vi) fund the Trade Claims Fund, the Expense Reserve Fund, the contingency reserve, and the U.S. Trustee fee reserve (all as shown on and described in the Estimated Schedule of Sources and Uses), (vii) fund the hotel working capital reserve and make true-up payments to the Debtors' existing reserves for (a) furniture, fixtures and equipment (both before Plan expenses and after Plan expenses with respect to subsequent partial catch-up payments), (b) taxes, and (c) insurance (all as shown on and described in the Estimated Schedule of Sources and Uses) (the *"Hotel Cash"*), and (B) the Debtors' Cash in accounts at LaSalle Bank for taxes, insurance and furniture, fixture and equipment improvements (the *"Reserve Cash"*).

62. *"Original Courses Agreement"* means the TPC Courses Agreement dated as of August 14, 1989 among the Debtors, the TOUR and the TPC at Sawgrass.

63. *"Other Executory Contracts"* means the following Executory Contracts: (i) the AVI Communication Agreement, (ii) the Certus Agreement, (iii) the Starbucks Licensing Agreement, (iv) the Equipment Leases, (v) the Condominium Leases and (vi) the East Coast Transportation Agreement.

64. *"Other Priority Claim"* means any and all Claims accorded priority in right of payment under Section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

65. *"Person"* means a person as defined in Section 101(41) of the Bankruptcy Code.

66. *"Petition Date"* means March 1, 2010, the date on which the Debtors commenced the Chapter 11 Cases.

67. *"Plan"* means this joint plan of reorganization under chapter 11 of the Bankruptcy Code, either in its present form or as it may be altered, amended, modified or supplemented from time to time.

68. *"Plan Funds"* means the Debtors' Cash on hand on the Effective Date, excluding amounts held in accounts at LaSalle Bank for taxes, insurance and furniture, fixture and equipment improvements.

69.  *"Post-Confirmation Debtors"* means the Debtors and their Estates after the occurrence of the Effective Date.

70.  *"Priority Claims"* means any and all Claims of the kind specified in Section 507 of the Bankruptcy Code.

71.  *"Priority Tax Claim"* means any and all Claims of a governmental unit of the kind specified in Section 507(a)(8) of the Bankruptcy Code.

72.  *"Pro Rata"* means, at any time, the proportion that the amount of a Claim in a particular Class bears to the aggregate amount of all Claims in such Class.

73.  *"Property"* means all assets and property included within "property of the estates" as set forth in and within the meaning of Section 541 of the Bankruptcy Code.

74.  *"Reorganization Transaction"* means the payment, satisfaction and cancellation of the Debtors' indebtedness to their Creditors pursuant to the Plan, including the transfer of the Encumbered Property to Goldman or the Goldman Transferee(s) by the Post-Confirmation Debtors pursuant to the terms of the Plan.

75.  *"Restated Courses Agreement"* means the Amended and Restated TPC Courses Agreement dated as of November 6, 2008 among the Debtors, the TOUR and the TPC at Sawgrass, together with a side agreement dated as of November 6, 2008 among the Debtors, the TOUR and TPC at Sawgrass, which is inseparable from the Restated Courses Agreement.

76.  *"Retained Professional"* means a Person or entity: (a) employed in these Chapter 11 Cases pursuant to a Final Order in accordance with Sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to Sections 327, 328, 329, 330 and 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code.

77.  *"RQB Development"* means RQB Development, LP, a Delaware limited partnership.

78.  *"RQB Resort"* means RQB Resort, LP, a Delaware limited partnership.

79.  *"Sawgrass"* means Sawgrass Country Club, Inc., a Florida not-for-profit corporation.

80.  *"Sawgrass Golf Portal Agreement"* means RQB Resort's Executory Contract with Sawgrass regarding the sharing of revenues generated by RQB Resort's referral of its guests to play Sawgrass's golf course.

81.     *"Schedules"* mean the schedules of assets and liabilities, schedules of executory contracts and statements of financial affairs filed by the Debtors pursuant to Section 521 of the Bankruptcy Code and the Official Bankruptcy Forms, as the same may have been amended, modified or supplemented from time to time.

82.     *"Secured Claims"* means: (a) Claims that are secured by a lien or liens on the Property, which liens are valid, perfected and enforceable under applicable law or by reason of a Final Order, or that are subject to setoff under Section 553 of the Bankruptcy Code, to the extent of the value of the Creditor's interest in the Estates' interest in such Property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Sections 506(a) and, if applicable, 1129(h) of the Bankruptcy Code; and (b) Claims that are Allowed under the Plan as a Secured Claim.

83.     *"Secured Tax Claims"* means a Secured Claim arising prior to the Petition Date against either of the Debtors for property taxes owed to a governmental unit.

84.     *"SGR"* means SGR Asset Management LLC, a Delaware limited liability company.

85.     *"Spa Club"* means the spa facility that is owned by RQB Development and licensed for use by the Spa Club Members pursuant to the Spa Club Agreements.

86.     *"Spa Club Agreements"* means each Executory Contract between RQB Development and the Spa Club Members pursuant to The Spa at Sawgrass' Rules and Regulations, Terms & Conditions that govern the Spa Club Members' use of the Spa Club and RQB Development's operation and management of the Spa Club.

87.     *"Starbucks"* means Starbucks Corporation, a Washington corporation.

88.     *"Starbucks License Agreement"* means RQB Resort's Executory Contract with Starbucks regarding RQB Resort's right to operate a Starbucks store within the Property.

89.     *"TOUR"* means PGA Tour, Inc., a Maryland corporation.

90.     *"TPC at Sawgrass"* means Tournament Players Club at Sawgrass, Inc., a Florida corporation.

91.     *"Trade Claims"* means Claims by vendors against RQB Resort arising from the provision of goods or services to RQB Resort in the ordinary course of business, to the extent such vendors have continued to provide such goods or services to RQB Resort in the ordinary course of business, all as particularly identified on Schedule I-91 attached to this Plan.

92.     *"Trade Claims Fund"* means Cash in the amount of $95,901.14.

93.    *"Unimpaired Class"* means an unimpaired Class within the meaning of Section 1124 of the Bankruptcy Code.

94.    *"Unsecured Claim"* means a Claim arising prior to the Petition Date against any of the Debtors that is not a Secured Claim.

95.    *"Unsecured Claims Fund"* means Net Available Cash in the estimated amount of $2,134,000.00, which is based upon the Debtors' estimate of their projected Net Available Cash as of the anticipated Effective Date of this Plan. As such, the Unsecured Claims Fund is subject to change based upon the Debtors' actual financial performance between the date this Plan is filed with the Bankruptcy Court and the Effective Date.

## ARTICLE II.

## ADMINISTRATIVE, PRIORITY TAX CLAIMS AND OTHER PRIORITY CLAIMS

A.    *Administrative Claims*

Subject to the provisions of Sections 328, 330(a) and 331 of the Bankruptcy Code, each holder of an Allowed Administrative Claim will receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Administrative Claim the full unpaid amount of such holder's Claim in Cash (a) on or as soon as practicable after the Effective Date; (b) or if such Claim is Allowed after the Effective Date, on or as soon as practicable after the date such Claim is Allowed; or (c) upon such other terms as may be agreed upon by such holder and the Debtors, or otherwise upon an order of the Bankruptcy Court. Administrative Claims will be paid from the Plan Funds.

1.    Bar Date for Administrative Claims

Except as otherwise provided in this Article II, unless previously filed, requests for payment of Administrative Claims must be filed and served on the Post-Confirmation Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than thirty (30) days after the Effective Date. Holders of Administrative Claims that are required to file and to serve a request for payment of such Administrative Claims and that do not file and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the Debtors or their respective Property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be filed and served on the Post-Confirmation Debtors and the requesting party within sixty (60) days after the Effective Date. Notwithstanding the foregoing, holders of Administrative Claims based on liabilities incurred by the Debtors in the ordinary course of its business are not required to file or serve any request for payment of

such Administrative Claims, and such Claims will be paid when due in the ordinary course.

2.      Professional Compensation

Retained Professionals or other entities asserting a Claim for services rendered before the Confirmation Date or to be rendered after the Confirmation Date must file and serve on the Debtors an application for final allowance of such Claim no later than twenty days prior to the Confirmation Hearing, which application may be supplemented at any time prior to the Confirmation Hearing. Objections to any such Claim must be filed and served on the Debtors and the requesting party within ten (10) days prior to the Confirmation Hearing. Applications for services rendered (or to be rendered before or after the Confirmation Date) will be heard at the Confirmation Hearing.  To the extent necessary, the Confirmation Order will amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Retained Professionals.

3.      Ordinary Course Liabilities

Holders of Administrative Claims based on liabilities incurred by the Debtors in the ordinary course of its business will not be required to file or serve any request for payment of such Administrative Claims, and such Claims will be paid when due in the ordinary course.

4.      Payment Under a Final Order of the Bankruptcy Court

Notwithstanding any provision in the Plan to the contrary, the Debtors may pay any Claims authorized pursuant to any Final Order entered by the Bankruptcy Court prior to the Confirmation Date.

B.      *Priority Tax Claims*

Each holder of an Allowed Priority Tax Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, as will have been determined by the Debtors and Goldman in their sole discretion, either (i) on or as soon as practicable after the Effective Date, Cash equal to the unpaid portion of such Allowed Priority Tax Claim, or (ii) such different treatment as to which the applicable Debtor and such holder will have agreed in writing, with the consent and approval of Goldman.

C.      *Other Priority Claims*

On the later of the Effective Date or the date on which an Other Priority Claim becomes an Allowed Other Priority Claim, or, in each such case, as soon as practicable

thereafter, each holder of an Allowed Other Priority Claim will receive on account of such Claim, Cash in an amount equal to the amount of such Allowed Other Priority Claim, which amounts will be payable by the Debtors from the Plan Funds, or, such different treatment as to which the Debtors and such holder will have agreed in writing, or otherwise upon an order of the Bankruptcy Court, with the consent and approval of Goldman

## ARTICLE III.

## CLASSIFICATION AND TREATMENT OF
## CLASSIFIED CLAIMS AND EQUITY INTERESTS

A.    *Summary*

1.    The Classes of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, confirmation and distribution pursuant to the Plan and to Sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

2.    Summary of Claims and Equity Interests, all of which are impaired and are either entitled to vote on the Plan or deemed to have rejected the Plan.

| Class | Claim |
|---|---|
| 1 | Secured Tax Claims |
| 2 | Goldman's Secured Claim |
| 3 | Unsecured Claims against RQB Resort (Trade) |
| 4 | General Unsecured Claims |
| 5 | Equity Interests |

B.    *Classification and Treatment of Claims and Equity Interests*

1.    **<u>Class 1 - Secured Tax Claims</u>**

(a)    *Classification:* Class 1 consists of St. Johns County, Florida's Secured Claims against the Debtors for ad valorem taxes.

(b)    *Treatment:* The holder of the Allowed Class 1 Secured Claims will receive, in full and final satisfaction, settlement, release and

discharge of and in exchange for such Allowed Class 1 Secured Claims: (i) on or as soon as practicable after the Effective Date, Cash equal to the unpaid portion of such Allowed Class 1 Secured Claims, which shall include interest on the Debtors' unpaid 2009 and 2010 ad valorem taxes in an amount equal to four percent (4.0%) per year, or (ii) such different treatment as to which the applicable Debtor and such holder will have agreed in writing.

(c)     *Voting:* Class 1 is Impaired, and St. Johns County, Florida, as the holder of the Allowed Class 1 Secured Claims is entitled to and has agreed in principle to vote to accept or reject the Plan.

2.     **Class 2 - Goldman's Secured Claim**

(a)     *Classification*:   Class 2 consists of Goldman's Secured Claim against the Debtors in the amount of $132,000,000.

(b)     *Treatment:* Goldman and/or the Goldman Transferee(s) will receive on the Effective Date, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Class 2 Secured Claim as against the Debtors, the Encumbered Property, free and clear of all liens, Claims, interests and encumbrances (other than liens in favor of St. Johns County, Florida for 2011 ad valorem taxes), pursuant to Sections 363(k), 1123(a)(5) and 1129(b)(2)(A)(ii).

(c)     *Voting:* Class 2 is Impaired, and Goldman as the holder of the Class 2 Secured Claim is entitled to and has agreed to accept the Plan.

3.     **Class 3 – Unsecured Claims Against RQB Resort (Trade)**

(a)     *Classification*:  Class 3 consists of all Trade Claims.

(b)     *Treatment*:  As of or as soon as practicable after the Effective Date, each holder of an Allowed Class 3 Claim will receive, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Class 3 Claim, its Pro Rata share of the Trade Claims Fund.

(c)     *Voting:*  Class 3 is Impaired and holders of Allowed Class 3 Claims are entitled to vote to accept or reject the Plan.

4.     **Class 4 – General Unsecured Claims**

(a)     *Classification*: Class 4 consists of all general unsecured claims for which either or both of the Debtors are liable, including (i) the

14

Debtors' obligation to pay $8,263,241.80 under the swap agreement to Goldman Sachs Lending Partners, LLC (as transferee of claim 72-1), (ii) Goldman's unsecured deficiency claim in the amount of $63,783,259.48 and (iii) Interstate's Unsecured Claim.

(b)     *Treatment*: On or as soon as practicable after the Effective Date, each holder of an Allowed Class 4 Claim will receive, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Class 4 Claim as against the Debtors, its Pro Rata share of the Unsecured Claims Fund.

(c)     *Voting*: Class 4 is Impaired, and holders of Allowed Class 4 Claims are entitled to vote to accept or reject the Plan. Goldman and Goldman Sachs Lending Partners, LLC, as holders of Allowed Class 4 Claims, have agreed to vote to accept the Plan.

5.     **Class 5 – Equity Interests**

(a)     *Classification:* Class 5 consists of all existing Equity Interests in the Debtors, including both limited and general partnership interests.

(b)     *Treatment:* The Equity Interests in the Debtors are deemed to have no value as of the Effective Date and the holders of such Equity Interests will not receive or retain under the Plan on account of their junior interest any property or distribution. On the Effective Date, the certificates and other instruments evidencing the Class 5 Equity Interests in the Debtors will be cancelled without further act or action under any applicable agreement, law, regulation, order or rule, and the Equity Interests in the Debtors evidenced thereby will be extinguished.

(c)     *Voting:* Class 5 is Impaired, and holders of Class 5 Equity Interests are deemed to reject the Plan.

## ARTICLE IV.

## ACCEPTANCE OR REJECTION OF THE PLAN

A.     *Impaired Classes of Claims Entitled to Vote*

Each holder of a Claim in each Impaired Class is entitled to vote to accept or reject the Plan. No holder of a Disputed Claim is entitled to vote to accept or reject the Plan until and unless the holder of such Disputed Claim obtains a Final Order from the Bankruptcy Court estimating and allowing the Claim for voting purposes only.

B.    *Acceptance by Impaired Classes*

The Impaired Classes will have accepted the Plan if: (a) the holders (other than any holder designated under Section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in that Class have voted to accept the Plan; and (b) the holders (other than any holder designated under Section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in that Class have voted to accept the Plan.

C.    *Confirmation Pursuant to Section 1129(b)*

To the extent any Impaired Class rejects the Plan or is deemed to reject the Plan, the Debtors will request that the Bankruptcy Court confirm the Plan pursuant to Section 1129(b) of the Bankruptcy Code.

## ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

i.    *The Reorganization Transaction*

On the Effective Date, the Debtors will consummate the Reorganization Transaction, which will be accomplished by:

1.    Discharging the Debtors' Indebtedness to Goldman.  All indebtedness due and owing by the Debtors to Goldman with respect to the Secured Class 2 Claim shall be discharged. In addition, all indebtedness due and owing by the Debtors to Goldman with respect to the unsecured Class 4 deficiency claim shall be discharged as to the Debtors.  Further, to the extent provided in this Plan, all notes, instruments, agreements and other documents reflecting debt of the Debtors to Goldman will be deemed discharged as to the Debtors, and all obligations of the Debtors under such notes, instruments, agreements and other documents or in any way related thereto will be discharged in exchange for the treatment afforded to Goldman in the Plan.

2.    Cancelling or Restructuring Other Claims.  All other Claims against the Debtors will be cancelled and extinguished or restructured and the holders thereof will be entitled to receive their respective treatment under the terms of the Plan.

3.    Disbursing Plan Funds.  The Plan Funds will be disbursed pursuant to the terms of the Plan.

4.    Extinguishing Equity Interests.  All existing Equity Interests (both limited and general partnership interests) in the Debtors will be cancelled as of the Effective Date.

5.    Transferring Encumbered Property to Goldman. The Post-Confirmation Debtors shall tender the following instruments and documents to Goldman or Goldman's designee or designees (the "Goldman Transferee(s)") to effectuate the transfer of the Encumbered Property, free and clear of all liens, Claims, interests and encumbrances (but subject to liens in favor of St. Johns County, Florida securing 2011 ad valorem taxes): (i) special warranty deeds and quitclaim bills of sale to all of the Encumbered Property, (ii) assignments of the Assumed Contracts that are included within the Encumbered Property, (iii) assignments of the Debtors' accounts, deposit accounts and other personal property, including deposit accounts containing the Hotel Cash and Reserve Cash, (iv) assignments of the Debtors' licenses, permits, agreements, warranties and approvals that are included within the Encumbered Property to the extent such items are assignable, (v) customary no-lien and title affidavits, as customarily required in similar transactions, and (vi) FIRPTA affidavits.

B.    *Unsecured Claims Fund, Trade Claims Fund and Expense Reserve Fund*

On the Effective Date and as part of the financial restructuring contemplated by the Reorganization Transaction (Article V.A(1)-V.A(5) above), the Unsecured Claims Fund, the Trade Claims Fund and the Expense Reserve Fund will be established from the Plan Funds. The Post-Confirmation Debtors will administer, and make distributions from, the Unsecured Claims Fund, the Trade Claims Fund and the Expense Reserve Fund in accordance with the provisions of this Plan and the Confirmation Order.

C.    *Corporate Action*

Upon entry of the Confirmation Order, all matters provided for under the Plan involving the corporate structure of the Debtors will be deemed authorized and approved without any requirement of further action by the Debtors or the Debtors' limited and/or general partners.

D.    *Sources of Cash for Plan Distribution*

All Cash necessary for the Debtors to make payments under the Plan will be obtained from the Plan Funds.

E.    *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and contemporaneously with the applicable distributions made pursuant to Article III, all encumbrances, interests, mortgages, liens or other security interests against the Property or the Estates will be fully released and discharged.

F.    *Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes*

The president of the general partner of the Debtors is authorized to execute, deliver, file or record contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan. Pursuant to Section 1146 of the Bankruptcy Code, the following will not be subject to any stamp tax, real estate transfer tax or similar tax: (i) the Reorganization Transaction and any instruments executed and delivered in connection therewith, including without limitation any deeds, or (ii) the making or delivery of any transfer instrument under, in furtherance of or in connection with the Plan.

G.    *Duties and Responsibilities of the Distribution Agent*

Except as otherwise set forth in this Plan, on the Effective Date, the Distribution Agent shall be appointed by the Confirmation Order and:

1.    shall succeed to all of the Debtors' and Post-Confirmation Debtors' rights and privileges;

2.    shall have the full authority, subject to Goldman's consent and approval, to review and object to Claims against the Post-Confirmation Debtors' Estates on or before the Claim objection deadline;

3.    shall have the full and exclusive authority (as representative of the Post-Confirmation Debtors' Estates) to prosecute and defend, as appropriate and subject to Goldman's consent and approval, any action constituting property of either of the Post-Confirmation Debtors' Estates, through final judgment, any appeals deemed necessary and appropriate by the Distribution Agent and collection; provided, however, that the Distribution Agent shall be authorized at any point in any litigation (i) to enter into such settlements, subject to Goldman's consent and approval, as the Distribution Agent deems to be in the best interest of creditors, subject to Bankruptcy Court approval after notice and a hearing in accordance with Bankruptcy Rule 9019; or (ii) to dismiss and/or decide not to prosecute any such

litigation, subject to Goldman's consent and approval, if the Distribution Agent deems such action to be in the best interest of creditors;

4.     shall have all the power and authority of a debtor-in-possession under the Bankruptcy Code including, without limitation, the power to abandon or administer property of the Debtors' Estates and to take discovery of any entity (including Rule 2004 exams);

5.     may consult with professionals and shall not be liable for any action taken or omitted to be taken by him in accordance with the advice of his professions.

6.     shall, with Goldman's consent and approval, be authorized to prosecute any pending litigation claims, and to file any appropriate litigation claims. As of the Effective Date, the Distribution Agent shall be authorized to prosecute any litigation claim in either Debtors' names or in his own name for the benefit of holders of Allowed Claims under the Plan;

7.     shall have the right to retain Smith Hulsey & Busey and be entitled to recover his reasonable fees and costs (as well as those of his professionals) without the necessity of Bankruptcy Court approval. The Distribution Agent and his professionals shall send their respective fee statements to Goldman and the United States Trustee at the end of each month reflecting the services rendered and costs incurred by the Distribution Agent (and his professionals) to carry out their duties under this Plan. If neither Goldman nor the United States Trustee serves a written objection to such fees statements on the Distribution Agent within ten (10) days after their receipt, the Distribution Agent, on behalf of the Post-Confirmation Debtors, may pay such fee statements in full without any Bankruptcy Court approval. In the event Goldman or the United States Trustee serve a written objection to such fee statements on the Distribution Agent, the Bankruptcy Court shall have jurisdiction to determine the reasonable fees and costs payable to the Distribution Agent and/or his professionals;

8.     shall, at such time as final distributions have been made, be authorized and directed to file a final accounting with the Bankruptcy Court, together with a final report; and

9.     shall, with Interstate's support and assistance, file or cause to be filed all federal, state and local tax returns due in respect of the 2010 and 2011 fiscal years and any fiscal year thereafter. The Distribution Agent is further authorized to amend any tax returned filed prior to 2010.

H.    *Preservation of Rights of Action and Claim Objections*

Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the Post-Confirmation Debtors, with Goldman's consent and approval, shall have all rights to commence and pursue, as appropriate, any and all

Causes of Action, whether arising before or after the Petition Date, in any court or other tribunal including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases. Furthermore, Goldman, or the Post-Confirmation Debtors, with Goldman's consent and approval, shall have the right to object to the allowance of any Claim on any ground, including pursuant to Section 502(d) of the Bankruptcy Code; provided, however, that Goldman shall have the exclusive authority to object to any Claim asserted by an insider of the Debtors (including without limitation any Claim asserted by SGR or Interstate).

# ARTICLE VI.

## TREATMENT OF EXECUTORY CONTRACTS

A.   *Assumption and Assignment of Executory Contracts*

1.   Assumption and Assignment of Assumed Contracts

The Post-Confirmation Debtors will assume and assign to Goldman or the Goldman Transferee(s) the Assumed Contracts pursuant to the terms of a separate motion to be filed by the Debtors with the consent and approval of Goldman, except as otherwise expressly provided in the Plan as to the Original Courses Agreement, the Amended Courses Agreement and the Franchise Agreement. The Debtors may amend any Assumed Contract with the consent of (i) the counterparty to such Assumed Contract (if required pursuant to the terms of such Assumed Contract) and (ii) Goldman (and the Goldman Transferee(s)), between the Confirmation Date and the Effective Date without application to or approval of the Bankruptcy Court, and each such agreement, as amended, will be an Assumed Contract.

2.   Assumption and Assignment of Original Courses Agreement and Restated Courses Agreement

As of the Effective Date, the Original Courses Agreement and the Restated Courses Agreement shall be assumed by the Post-Confirmation Debtors and assigned to Goldman or the Goldman Transferee(s) with no Cure Amounts payable to the TOUR. In connection with such assumption and assignment to Goldman or the Goldman Transferee(s) (and Goldman's "succession to ownership [of the Encumbered Property] by virtue of its remedies" as a secured creditor), the TOUR is not entitled to a transfer fee pursuant to Article X of the Original Courses Agreement and Article X of the Restated Courses Agreement.

3.   Assumption and Assignment of Franchise Agreement

As of the Effective Date, the Franchise Agreement shall be assumed by the Post-Confirmation Debtors and assigned to Goldman or the Goldman Transferee(s) and

the Post-Confirmation Debtors will pay a Cure Amount of $407,000 to Marriott. The Post-Confirmation Debtors' assumption and assignment of the Franchise Agreement to Goldman or the Goldman Transferee(s) (and Goldman's "acquisition [of the Encumbered Property] through foreclosure, a deed in lieu of foreclosure, or through any other exercise of its rights as a secured lender") is subject to and shall not impair Goldman's or Marriott's rights under that certain comfort letter entered into among Goldman, Marriott and the Debtors in connection with the Debtors' acquisition of the Property on June 30, 2006.

4.      Assumption and Assignment of Other Executory Contracts.

Within thirty (30) days following the Effective Date, the Post-Confirmation Debtors, with the consent and approval of Goldman, may file a motion to assume any of the Other Executory Contracts.

5.      Approval of Assumptions and Assignments

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumptions described in this Article VI.A pursuant to Sections 365 and 1123 of the Bankruptcy Code, as of the Effective Date.

B.      *Rejection of Executory Contracts*

1.      Executory Contracts to be Rejected on the Effective Date

With the exception of (i) Executory Contracts that are assumed or rejected pursuant to an order entered by the Bankruptcy Court, (ii) Executory Contracts that are assumed pursuant to Article VI.A of this Plan and (iii) the Other Executory Contracts, on the Effective Date, each Other Executory Contract entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms will be rejected pursuant to Section 365 of the Bankruptcy Code. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections (as well as the Post-Confirmation Debtors' rejection of the Interstate Management Agreement as described below) pursuant to Section 365 of the Bankruptcy Code as of the Effective Date.

2.      Rejection of Interstate Management Agreement after the Effective Date

The Interstate Management Agreement, which is an Executory Contract, shall be rejected by the Post-Confirmation Debtors effective on the earlier to occur of (i) one hundred and eighty (180) days following the Effective Date or (ii) thirty (30) days following written notice by the Post-Confirmation Debtors and Goldman to Interstate.  On the effective date of such rejection, the Interstate Management Agreement shall be deemed to be terminated and Interstate will be entitled to file a Claim against the Estates for rejection damages, if any, under the Interstate

Management Agreement. The Goldman Transferee(s) shall be required to perform the obligations of the Debtors to Interstate under the Interstate Management Agreement accruing or arising from and after the Effective Date, and with respect to the period commencing on the Effective Date through the effective date of rejection of the Interstate Management Agreement, all as set forth in more detail in that certain Manager's Consent and Subordination of Management Agreement, entered into between Goldman and Interstate in connection with the Debtors' acquisition of the Property on June 30, 2006 (the "Interstate Subordination Agreement"). In no event shall Goldman or the Goldman Transferee(s) be (i) liable for any act or omission of the Debtors, (ii) liable for payment of any cancellation or termination fees under the Interstate Management Agreement or payment of any accrued but unpaid base or incentive management fees, (iii) bound by any amendment or modification of the Interstate Management Agreement made without Goldman's prior written consent or (iv) subject to any counterclaim or claim which Interstate may assert or is entitled to assert against the Estates. Nothing herein shall impair Goldman's or Interstate's rights under the Interstate Subordination Agreement. The occurrence of the Effective Date shall constitute notice by Goldman and the Goldman Transferee(s) to Interstate under Section 3(g) of the Interstate Subordination Agreement to undertake those obligations set forth in parts (i) and (ii) of that section, to the extent set forth above and in Section 3(d)(i) of the Interstate Subordination Agreement.

3.      Rejection of the Other Executory Contracts that are not Assumed

In the event the Post-Confirmation Debtors, with Goldman's consent and approval, do not file a motion with the Bankruptcy Court under Section 365 of the Bankruptcy Code to assume an Other Executory Contract within thirty (30) days following the Effective Date, such Other Executory Contract shall be deemed rejected as of the date that is thirty (30) days following the Effective Date. On the effective date of such rejection(s), each third party to an Other Executory Contract that is not assumed and assigned by the Post-Confirmation Debtors will be entitled to file a Claim for rejection damages, if any, under its Other Executory Contract. Until the effective date of such rejection of an Other Executory Contract, each third party to each Other Executory Contract shall continue to be entitled to the fees (if any) required under its Other Executory Contract and shall continue to have such other rights and obligations provided therein.

C.      *Claims Based on Rejection of Executory Contracts*

All proofs of Claim arising from the rejection of Executory Contracts must be filed with the Bankruptcy Court on or before the later of: (a) the applicable Bar Date; (b) thirty (30) days after the date of entry of any order authorizing the rejection of an Executory Contract; or (c) in the case of (i) the Interstate Management Agreement and (ii) any rejected Other Executory Contract, thirty (30) days after the effective date of the rejection of such Executory Contract. Any

Claims arising from the rejection of an Executory Contract for which proofs of Claim were or are not timely filed within that time period will be forever barred from assertion against the Debtors, the Post-Confirmation Debtors, Goldman, the Goldman Transferee(s), the Encumbered Property, or the Debtors' Property and Estates, unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan. All such Claims will, as of the Effective Date or the effective dates of rejection in the case of the Interstate Management Agreement and any of the Other Executory Contracts that are rejected, be subject to the permanent injunction set forth in Article X.E.

D.    *Cure of Defaults for Executory Contracts Assumed Pursuant to the Plan*

All cures, including the payment of Cure Amounts for Assumed Contracts, will be satisfied pursuant to Section 365(b)(l) of the Bankruptcy Code by: (a) payment of such Cure Amount in Cash on or promptly after the Effective Date or on such other terms as the parties to each such Assumed Contract may otherwise agree, with all such amounts to be payable by the Debtors from the Plan Funds, and (b) curing such non-monetary defaults as is required by the Bankruptcy Code.

# ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

Except as otherwise provided in the Plan or as may be ordered by the Bankruptcy Court, all distributions to all holders of Allowed Claims will be made by the Post-Confirmation Debtors. The Post-Confirmation Debtors will make distributions on the Effective Date or as soon as reasonably practicable thereafter to the respective holders of Allowed Claims, and will make further distributions to holders of Claims that subsequently are determined to be Allowed Claims, pursuant to the Plan. All such distributions will be made by or at the direction of the Distribution Agent on behalf of the Post-Confirmation Debtors.

A.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.    <u>Delivery of Distributions in General</u>

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims will be made to the address of the holder of such claim, as indicated on the holder's proof of claim.  If the holder's proof of claim does not include an address, then distributions will be made according to Debtors' records, as of the date such distribution is made.  Except as otherwise provided in the Plan, the Post-Confirmation Debtors will make distributions to holders of Allowed Claims at the address for each such holder indicated on the Debtors' records on the date of any such distribution; provided, however, that the manner of such distributions will be determined at the discretion of the Debtors, and provided further that the address

for each holder of an Allowed Claim will be deemed to be the address set forth in any proof of Claim filed by that Allowed Claim holder.

2.      Compliance with Tax Requirements/Allocations

In connection with the Plan, to the extent applicable, the Post-Confirmation Debtors will comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan will be subject to such withholding and reporting requirements. For tax purposes, distributions received by holders in full or partial satisfaction of Allowed Claims will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

B.      *Timing and Calculation of Amounts to be Distributed*

On the Effective Date or as soon as practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim or as soon as practicable thereafter), each holder of an Allowed Claim against the Debtors will receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims will be made pursuant to the provisions set forth in Article VIII. Except as otherwise provided in the Plan, or as required under applicable law, holders of Claims will not be entitled to interest on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

## ARTICLE VIII.

## PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS OR EQUITY INTERESTS

A.      *Resolution of Disputed Claims*

Goldman or the Debtors, with the consent and approval of Goldman, may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether Goldman or the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a

maximum limitation on such Claim, Goldman or the Debtors, with the consent and approval of Goldman, may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of such Claim and objection estimation and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

B.    *Claims Allowance*

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim will be deemed Allowed unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) in the Chapter 11 Cases allowing such Claim.

## ARTICLE IX.

## CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

A.    *Conditions Precedent to Confirmation*

It is a condition precedent to Confirmation of the Plan that all provisions, terms and conditions in the Plan are approved in the Confirmation Order.

It is also a condition precedent to the Confirmation of the Plan that the Plan and the proposed Confirmation Order are in a form and substance reasonably acceptable to the Debtors; provided that the Debtors may seek an expedited hearing before the Bankruptcy Court to address any objection to any of the foregoing.

B.    *Conditions Precedent to the Effective Date*

It is a condition to the Effective Date that the following conditions occur or be satisfied or waived pursuant to the provisions of Article IX.C:

1.    The Confirmation Order confirming the Plan, as the Plan may have been modified, has been entered and become a Final Order in a form and substance reasonably satisfactory to the Debtors and Goldman.

2.    All instruments, documents and agreements necessary to implement the Plan have been: (a) executed and delivered and (b) all conditions precedent in such instruments, documents and agreements have been satisfied.

3.      All actions, documents, certificates and agreements necessary to implement this Plan have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental authorities in accordance with applicable laws.

4.      A mutual release agreement substantially in the form attached to this Plan as Exhibit IX.B.4 (the "Mutual Release"), between the Debtor Related Parties and the Goldman Related Parties (as such terms are defined in the Mutual Release) has been executed and delivered by all parties to such agreement.

5.      All conditions precedent to the obligations of the Debtors have been satisfied or waived in accordance with the terms of this Plan.

C.      *Waiver of Conditions*

The Debtors, with the consent and approval of Goldman (except with respect to the condition set forth in Article IX.B.4 above in the event that any Goldman Related Party fails to execute and deliver the Mutual Release; in which case such condition may be waived by the Debtors in their sole discretion), may at any time waive any of the conditions to the Effective Date set forth in this Article IX without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

D.      *Effect of Non-Occurrence of Conditions to Effective Date*

If the Effective Date does not occur, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will: (a) constitute a waiver or release of any Claims by or Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any holders of Claims or Equity Interests or any other parties in interest; or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any holders of any claims or any other parties in interest in any respect.

## ARTICLE X.

## SETTLEMENT, RELEASE, INJUNCTION
## AND RELATED PROVISIONS

A.      *Compromise and Settlement*

From and after the Effective Date, Goldman or the Post-Confirmation Debtors, with the consent and approval of Goldman, may compromise and settle, with Goldman's consent, Claims without further Bankruptcy Court approval; provided,

however, that Goldman shall have exclusive authority to compromise or settle any insider claims.

B.    *Releases by the Debtors*

As of the Effective Date, for good and valuable consideration, the adequacy of which is confirmed, the Debtors, the Post-Confirmation Debtors, and any Person or entity seeking to exercise the rights of the Debtors' Estates, including, without limitation, any estate representative appointed or selected pursuant to Section 1123(b)(3) of the Bankruptcy Code (collectively, the "Debtor Releasors"), will be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action (including claims or causes of action arising under Chapter 5 of the Bankruptcy Code), and liabilities whatsoever (other than claims resulting from fraud, gross negligence, or willful misconduct) in connection with or related to the Debtors, the conduct of the Debtors' business, the Chapter 11 Cases, or the Plan (other than the rights of the Debtors, Goldman and the Goldman Transferee(s) to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the conduct of the Debtors' business, the Post-Confirmation Debtors, the Chapter 11 Cases, or the Plan, and that may be asserted by or on behalf of the Debtors, the Estates or the Post-Confirmation Estates against (i) either of the Debtors, (ii) any of the present or former limited or general partners of the Debtors or any of the present or former officers, directors or employees of such general or limited partners of the Debtors or any of the Debtors' affiliates, David O'Halloran, Patrick Murphy, Niall McFadden and Patrick Kelly, (iii) any professionals of the Debtors, and (iv) Goldman, the Goldman Transferee(s), Archon Group, L.P., Goldman Sachs Bank USA, Goldman Sachs Lending Partners LLC, Goldman Sachs & Co., Sandelman Partners CRE CDO I, Ltd. and Sandelman Realty Loan Funding Corp. I, together with each of their predecessors, successors, assigns, representatives, parents, subsidiaries, affiliates, and its and their respective present and former employees, officers, directors, managing directors, principals, agents, heirs, executors, administrators, predecessors, successors, assigns, representatives and legal advisors (collectively, the "Lender Releasees").

C.    *Releases by Holders of Claims*

As of the Effective Date, for good and valuable consideration, the adequacy of which is confirmed, each holder of a Claim that affirmatively votes in favor of the Plan is deemed to forever release, waive, and discharge all claims, obligations,

suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever against (i) the Debtors, (ii) the Post-Confirmation Debtors, (iii) present or former the limited or general partners of the Debtors or any of the present or former officers, directors or employees of any of such general or limited partners of the Debtors or any of the Debtors' affiliates (collectively, the "Debtor Releasees"), and (iv) the Lender Releasees, in connection with or related to the Debtors, the conduct of the Debtors' business, the Chapter 11 Cases, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures, and other instrument, agreement or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the conduct of the Debtors' business, the Chapter 11 Cases, or the Plan, except for acts or omissions that are the result of fraud, gross negligence, or willful misconduct.

Each of the Debtor Releasees is deemed to forever release, waive, and discharge any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever arising on or prior to the Effective Date in any way relating to the Debtors, the conduct of the Debtors' business, the Chapter 11 Cases, or the Plan, that such Debtor Releasees may hold in their individual capacities against each holder of a Claim that affirmatively votes in favor of the Plan.

D.    *Discharge of the Debtors*

1.    Except as otherwise provided in the Plan or in the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtors, the Post-Confirmation Debtors, the Encumbered Property, Goldman and the Goldman Transferee(s), or any of their assets or properties and, regardless of whether any property is abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to the Plan on account of such claims, upon the Effective Date, the Debtors and the Goldman Transferee(s), and each of them, will (i) be deemed discharged and released under Section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in Section 502 of the Bankruptcy Code. This is so whether or not (A) a Proof of Claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code, (B) a Claim based upon such debt is allowed under Section 502 of the Bankruptcy Code (C) a Claim based upon such debt is or has been disallowed by order of the

Bankruptcy Court, or (D) the holder of a Claim based upon such debt accepted the Plan.

2.    As of the Effective Date, except as provided in the Plan or the Confirmation Order, all Persons are precluded from asserting against the Debtors, the Post-Confirmation Debtors, the Encumbered Property, Goldman, or the Goldman Transferee(s), any other or further claims, debts, rights, causes of action, claims for relief, liabilities, or Equity Interests relating to the Debtors based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order is a judicial determination of the discharge of all such Claims and other debts and liabilities against the Debtors, the Post-Confirmation Debtors, the Encumbered Property, Goldman and the Goldman Transferee(s), pursuant to Sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtors, the Post-Confirmation Debtors, the Encumbered Property, Goldman, or the Goldman Transferee(s) at any time, to the extent that such judgment relates to a discharged Claim.

E.    *Injunction*

1.    Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim or other debt or liability that is discharged or an Equity Interest that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtors, the Post-Confirmation Debtors, the Encumbered Property, Goldman and the Goldman Transferee(s), and their respective subsidiaries or their property on account of any such discharged Claims, debts, or liabilities or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors, the Post-Confirmation Debtors, Goldman, or the Goldman Transferee(s); or (v) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

2.    As of the Effective Date, all Persons that have held, currently hold, or may hold, a Claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, or liability that is released, or an interest that is terminated, are permanently enjoined from taking any of the following actions on

account of such released Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities, or interests: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien or encumbrance; (iv) asserting a setoff against any debt, liability, or obligation due to any released Person; or (v) commencing or continuing any action, in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

3.      Without limiting the effect of the foregoing provisions upon any Person, by accepting distributions pursuant to the Plan, each holder of an Allowed Claim receiving distributions pursuant to the Plan is deemed to have consented to the injunctions set forth above.

4.      Nothing in this Article X impairs (i) the rights of any holder of a Disputed Claim to establish its Claim in response to an objection filed by the Debtors, the Post-Confirmation Debtors, Goldman or the Goldman Transferee(s), (ii) the rights of any defendant in an avoidance action filed by the Post-Confirmation Debtors to assert defenses in such action, or (iii) the rights of any party to an Executory Contract that has been assumed by the Debtors and assigned to the Goldman Transferee(s) pursuant to an order of the Bankruptcy Court or the provisions of the Plan to enforce such assumed contract or lease.

F.      *Exculpation and Limitation of Liability*

1.      None of the Debtors, the Post-Confirmation Debtors, the Lender Releasees, the Goldman Transferee(s), or any of their respective present or former shareholders, limited or general partners, or any of the present or former directors, officers, employees, advisors, professionals, or agents of the Debtors, the Post-Confirmation Debtors, the Lender Releasees, the Goldman Transferee(s), and any general or limited partners of the Debtors or any of the Debtors' affiliates, will have or incur any liability to any holder of a Claim or any interest, or any other party-in-interest, or any of their respective agents, employees, representatives, advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the Consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence, or willful misconduct. The foregoing is not intended to limit or otherwise

impact any defense of qualified immunity that may be available under applicable law.

2.     Notwithstanding any other provision of the Plan, no holder of a Claim or an Equity Interest, no other party-in-interest, none of their respective agents, employees, representatives, advisors, attorneys, or affiliates, and none of their respective successors or assigns have any right of action against any of the Debtors, the Post-Confirmation Debtors, the Encumbered Property, the Lender Releasees, the Goldman Transferee(s), or their respective present or former, limited or general partners, or any of the present or former officers, employees, advisors, professionals, or agents of the Debtors, the Post-Confirmation Debtors, the Goldman Transferee(s), and any general or limited partners of the Debtors or any of the Debtors' affiliates, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, negotiation, or implementation of the Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the Consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence, or willful misconduct.

G.     *Preservation of Rights of Action*

1.     <u>Maintenance of Causes of Action and Claim Objections</u>

Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the Post-Confirmation Debtors, with Goldman's consent and approval, shall have all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, in any court or other tribunal including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases. Furthermore, Goldman, or the Post-Confirmation Debtors, with Goldman's consent and approval, shall have the right to object to the allowance of any Claim on any ground, including pursuant to Section 502(d) of the Bankruptcy Code; provided, however, that Goldman shall have the exclusive authority to object to any Claim asserted by an insider of the Debtors (including without limitation any Claim asserted by SGR or Interstate).

2.     <u>Preservation of All Causes of Action Not Expressly Settled or Released</u>

With the exception of the Claims and Causes of Action released pursuant to this Plan, the Debtors reserve all Claims or Causes of Action for later adjudication by the Debtors, the Post-Confirmation Debtors, with Goldman's consent and approval, or by Goldman (including, without limitation, Claims and Causes of Action not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances

unknown to the Debtors at this time or facts or circumstances which may change or be different from those the Debtors now believe to exist). No preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, Claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Claims or Causes of Action upon or after the Confirmation or Consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such Claims or Causes of Action have been released in the Plan (including, without limitation, and for the avoidance of doubt, the releases by Debtors contained in Article X.B) or any other Final Order (including the Confirmation Order).

3. <u>Preservation of All Causes of Action Against Interstate</u>

Notwithstanding anything to the contrary in this Plan, this Plan shall not operate to release or discharge Interstate Management Company, L.L.C., Interstate Hotels and Resorts Management, LLC, or any of their predecessors, successors, assigns, representatives, parents, subsidiaries, affiliates, or any of their respective present and former employees, officers, directors, managing directors, principals, agents, heirs, executors, administrators, predecessors, successors, assigns, representatives and legal advisors (the "Interstate Parties") from any claims, demands, actions, causes of action, contracts, obligations, suits, debts, costs or liabilities. For the avoidance of doubt, the terms Debtor, Debtors, Post-Confirmation Debtors, and Debtor Releasees do not include any of the Interstate Parties.

**ARTICLE XI.**

**RETENTION OF JURISDICTION**

Notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, after the Effective Date, the Bankruptcy Court will retain such jurisdiction over the Chapter 11 Cases, the Post-Confirmation Debtors' Estates, and all Persons and Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and the Plan as legally permissible, including, but not limited to, jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests;

2. grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

3.     resolve any matters related to the assumption or rejection of any Executory Contract to which either of the Debtors is party or with respect to which either of the Debtors may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

4.     ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.     decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date or instituted by Goldman or the Post-Confirmation Debtors after the Effective Date; provided, however, that Goldman and the Post-Confirmation Debtors will reserve the right to commence actions in all appropriate jurisdictions;

6.     enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan, and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Reorganization Transaction, the Plan, the Confirmation Order or the Disclosure Statement;

7.     resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Reorganization Transaction, the Plan, the Confirmation Order, or any Person's or entity's obligations incurred in connection with the Plan;

8.     issue injunctions, enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or entity with Consummation or enforcement of the Plan, except as otherwise provided in the Plan;

9.     enforce Article X of the Plan;

10.     resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in Article X, and enter such orders as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

11.     enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

12.     resolve any other matters that may arise in connection with or relate to the Reorganization Transaction, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

13.    enter an order and/or final decree closing the Chapter 11 Cases.

# ARTICLE XII.

## MISCELLANEOUS PROVISIONS

A.    *Effectuating Documents, Further Transactions and Corporate Action*

The president of the Debtors' general partners, acting on behalf of the Post-Confirmation Debtors, is authorized to execute, deliver, file or record such contracts, instruments, releases, security agreements, mortgages, collateral assignments, conveyance documents, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan.

Prior to, on or after the Effective Date (as appropriate), all matters provided for in the Plan that would otherwise require approval of the general or limited partners of the Debtors (or any Person or entity required to and authorized to act on behalf of the Debtors) are deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to the applicable state law without any requirement of further action by the general or limited partners of the Debtors (or any Person or entity required to and authorized to act on behalf of the Debtors).

B.    *Payment of Statutory Fees*

All fees payable pursuant to Section 1930 of title 28 of the United States Code after the Effective Date, as determined by the Bankruptcy Court at a hearing pursuant to Section 1128 of the Bankruptcy Code, will be paid prior to the closing of the Chapter 11 Cases on the earlier of when due or the Effective Date, or as soon thereafter as practicable.

C.    *Modification of Plan*

Effective as of the date this Plan is filed, and subject to the limitations contained in the Plan: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with Section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan. Any such modification will be made subject to the reasonable consent of the Debtors, provided that if any party objects to such modification, the Debtors may seek an expedited hearing before the Bankruptcy Court to address such objection.

D. *Successors and Assigns*

The rights, benefits and obligations of any Person or entity named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or assign of such Person or entity.

E. *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan will have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order. Neither the filing of the Plan, any statement or provision contained in the Plan, nor the taking of any action by the Debtors or any Person with respect to the Plan will be or will be deemed to be an admission or waiver of any rights of: (a) the Debtors with respect to the holders of Claims or Equity Interests or other parties in interest; or (b) any holder of a Claim or other party in interest prior to the Effective Date.

F. *Further Assurances*

The Debtors, all holders of Claims receiving distributions under the Plan and all other parties in interest will, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order. Further, the Post-Confirmation Debtors will use commercially reasonable good faith efforts to (i) effectuate the transfer of all licenses and permits relating to the Encumbered Property to Goldman and (ii) cause the Restated Courses Agreement to become effective.

G. *Severability*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision then will be applicable as altered or interpreted; provided, however, that any such alteration or interpretation must be in form and substance reasonably acceptable to the Debtors, provided that the Debtors may seek an expedited hearing before the Bankruptcy Court to address any objection to any of the foregoing. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

H.    *Notices*

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtors will be sent by first class U.S. mail, postage prepaid to:

| | |
|---|---|
| Smith Hulsey & Busey | RQB Resort, LP |
| Attention: Cynthia C. Jackson, Esq. | RQB Development, LP |
| 225 Water Street, Suite 1800 | Attn:  David O'Halloran |
| Jacksonville, Florida 32202 | 1000 PGA Tour Blvd. |
| | Ponte Vedra Beach, Florida 32082 |

I.    *Filing of Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

SMITH HULSEY & BUSEY


By:___*/s/ Cynthia C. Jackson*___
       Cynthia C. Jackson


Florida Bar Number 498882
225 Water Street, Suite 1800
Jacksonville, Florida  32202
(904) 359-7700
(904) 359-7708 (facsimile)
cjackson@smithhulsey.com

Attorneys for the Debtors

Dated:  September 20, 2011

Respectfully submitted,

RQB RESORT, LP

By:  RQB Resort GP, Inc., a Delaware
corporation, its general partner

_David O'Halloran_

David O'Halloran, its President

RQB DEVELOPMENT, LP

By: RQB Development GP, Inc., a Delaware
corporation, its general partner

_David O'Halloran_

David O'Halloran, its President

## SCHEDULE I-22

### *Condominium Leases*

1.      Residential Lease dated as of June 16, 2011 by and between RQB Resort, LP, and Andrei Bobretsov for certain property located generally at Grand Cay Villas at Ponte Vedra, 190 Vera Cruz #127, Ponte Vedra Beach, Florida 32082 in St. Johns County, Florida.

2.      Residential Lease dated as of July 18, 2011 by and between RQB Resort, LP and Petrit and Ariana Muhamtaj for certain property located generally at Grand Cay Villas at Ponte Vedra, 160 Vera Cruz #1438, Ponte Vedra Beach, Florida 32082 in St. Johns County, Florida.

3.      Residential Lease dated as of July 18, 2011 by and between RQB Resort, LP and Blanca Gonzaltez-Albor for certain property located generally at Grand Cay Villas at Ponte Vedra, 221 Colima Ct. #1018, Ponte Vedra Beach, Florida 32082 in St. Johns County, Florida.

4.      Residential Lease dated as of January 31, 2011 by and between RQB Resort, LP and Charles Lucas for certain property located generally at Grand Cay Villas at Ponte Vedra, Building 150, Unit 533, Ponte Vedra Beach, Florida 32082 in St. Johns County, Florida

00769240.DOC

## ESTIMATED SOURCES AND USES

| USES | Estimated Claim / Amt | Plan Distribution | % Recovery | SOURCES | | |
|---|---|---|---|---|---|---|
| **Secured Claims:** | | | | | | |
| Class 2 - Goldman Sachs Secured Claim | $ 196.0000 | $ 132.0000 | 67.3% | Value of Resort | $ | 132.0000 |
| **Asset Transfer** | | **$ 132.0000** | | | | |
| | | | | | | |
| **Administrative Expenses: ❶** | | | | **Estimated Cash: ❶** | | |
| A. Legal/Professionals Reserve | $ 0.6476 | $ 0.6476 | 100.0% | Estimated Cash on Balance Sheet | $ | 7.5310 |
| B. Marriott - Cure Amount | $ 0.4070 | $ 0.4070 | 100.0% | | | |
| C. Golf Portal/Other Executory Contracts - Cure Amts | $ 0.0400 | $ 0.0400 | 100.0% | **Estimated Reserves** | $ | 2.3400 |
| D. Florida DOR's Allowed Claim (Tax Reserve) | $ 0.3000 | $ 0.3000 | 100.0% | less: Insurance Escrow True-up ❷ | $ | (0.0027) |
| E. Expense Reserve Fund ❺ | $ 0.3000 | $ 0.3000 | 100.0% | less: RE Tax Escrow True-up ❸ | $ | (0.0010) |
| F. U.S. Trustee Fee Reserve Fund | $ 0.0200 | $ 0.0200 | 100.0% | | | |
| Vernon Kelly Tax Services Fee | $ 0.0900 | $ 0.0750 | 83.3% | **Total Cash For Distribution** | $ | 9.8673 |
| JLL | $ 0.1500 | $ 0.1500 | 100.0% | | | |
| G. Contingency Fund | $ 0.2042 | $ 0.2042 | 100.0% | | | |
| **Subtotal of Other Expenses** | | **$ 2.1438** | | | | |
| **Protective Expenses/Other:** | | | | | | |
| Estimated Tax/FF&E Reserve | $ 2.3400 | $ 2.3400 | 100.0% | | | |
| Hotel Working Capital | $ 0.8880 | $ 0.8880 | 100.0% | | | |
| FF&E Reserve Partial Catch-up | $ 0.9140 | $ 0.2500 | 27.4% | | | |
| H. Class 1 - 2009 and 2010 Taxes (Tax Reserve) | $ 2.0160 | $ 2.0160 | 100.0% | | | |
| **Total Protective Expenses/Other** | | **$ 5.4940** | | | | |
| **Unsecured Claims:** | | | | | | |
| Class 3 - Trade Claims Fund | $ 0.1910 | $ 0.0955 | 50.0% | | | |
| Class 4 - Unsecured Claims Fund | $ 76.4000 | $ 2.1340 | 2.8% | | | |
| **Subtotal of Distributions to Unsecured Creditors** | | **$ 2.2295** | | | | |
| **Total Uses** | | **$ 141.8673** | | **Total Sources** | **$** | **141.8673** |

❶ Estimated (i) reserves and (ii) Cash available to fund Plan expenses and distributions as of November 4, 2011 based on Debtors' good faith projections. To the extent the Debtors' actual
  Cash available to fund Plan expenses and distributions, as of the Effective Date, is higher or lower than $7,531,000, the Unsecured Claims Fund will be adjusted accordingly.
❷ Asumes Debtors make September and October payments of $79,000
❸ Assumes Debtors make September and October payments of $113,000
❹ If any of the Allowed Claims and expenses in categories A through F and H above (collectively, the "Estimated Expenses") are less than the respective amounts set aside for them (the
  "Reserve Amounts"), then such savings (if any) shall be transferred to the Reserve Cash account as supplemental FF&E Partial Catch-up payment(s). If any of the Estimated Expenses are
  greater than the respective Reserve Amounts, then such shortage(s), (if any) shall be funded with Cash in the Contingency Fund. If there is excess Cash in the Contingency Fund after all
  Plan expenses (including the Distribution Agent's fees and expenses) are paid, then such excess Cash shall be transferred to the Reserve Cash account as a final supplemental FF&E
  Partial Catch-up payment.
❺ Subject to agreement with Goldman as  described within the definition of Expense Reserve Fund in the Plan.

# SCHEDULE I-43

## *Equipment Leases*

1. License Agreement dated as of June 12, 2009 by and between RQB Resort, LP, a Delaware limited partnership and New Cingular Wireless PCS, LLC, a Delaware limited liability company for the right to install, maintain, remove and operate certain equipment on the roof of the building located at 1000 PGA Blvd., Ponte Vedra Beach, Florida 32082.

2. Lobby/On-Site Agreement dated as of September 1, 2008 by and between Enterprise Leasing Company, a Florida corporation d/b/a Enterprise Rent-A-Car and RQB Resort, LP, d/b/a Sawgrass Golf Resort and Spa for the right to lease, occupy and use certain space in the Hotel located at 1000 PGA Tour Blvd., Ponte Vedra Beach, Florida 32082 for the purpose of providing motor vehicle rental services.

3. ATM Placement Agreement dated as of February 11, 2008 by and between Fairshares LLC, d/b/a ATM Experts USA and ATMExpertsUSA.com, a Florida limited liability company and ATM Systems, LLC, a Florida limited liability company and The Sawgrass Golf Resort and Spa for the right to install, operate and maintain an ATM on the property located at 1000 PGA Blvd., Ponte Vedra Beach, Florida 32082.

4. Print Management Agreement dated as of April 29, 2008 by and between Sawgrass Marriott and Copytronics Inc. Information Systems for which Copytronics provides print management services for the property located at 1000 PGA Blvd., Ponte Vedra Beach, Florida 32082.

5. Master Agreement dated as of March 11, 2005 by and between Marriott at Sawgrass and Danka Office Imaging Company, a Delaware corporation for which Danka supplies equipment, maintenance, services, software and/or supplies for the property located at 1000 PGA Blvd., Ponte Vedra Beach, Florida 32082.

6. Xerox Service Agreements dated as of August 1, 2007 by and between Xerox Corporation and Resort Holdings I LTD for equipment rentals installed at 1000 PGA Blvd., Ponte Vedra Beach, Florida 32082.

*Trade Claims*

1. AAA Trophy Mart
   6935 Beach Blvd.
   Jacksonville, FL  3221

2. ADP, Inc.
   Time Resource Management
   P.O. Boz 371967
   Philadelphia, PA  19170-0351

3. ADT Security Services, Inc.
   P.O. Box 371967
   Pittsburgh, PA  15250

4. Air Cycle
   2000 South 25th Street,Suite C
   Broadview, IL 60155

5. All-State Vacuum Company
   c/o Paul R. Kelly, Vice President
   5234 Beach Blvd.
   Jacksonville, FL 32207-5035

6. ALSCO
   P.O. Box 41149
   Jacksonville, FL  32204

7. American Electric of Jax, Inc.
   8751 Atlantic Blvd.
   Jacksonville, FL  32211

8. American Staffing Resources
   Compensation Management, Inc.
   P.O. Box 16659
   Greenville, SC  29606

9. Applied Industrial Technology
   7037 Commonwealth Avenue, #26
   Jacksonville, FL  32220

10. Applied Mechanical Equipment
    P.O. Box 54309
    Jacksonville, FL  32245

11. Arata Expositions, Inc.
    721 Eugene Road
    Palm Springs, CA  92264

12. ASCAP
    21678 Network Place
    Chicago, IL  60673

13. Ashberry Acquisition Company
    706 G Street
    Brunswick, GA  31520

14. Astor Chocolate Corporation
    651 New Hampshire Avenue
    Lakewood, NJ  8701

15. At Work Uniforms
    P.O. Box 40
    Orange Beach, AL  36561

16. Atlantic Self
    65 Executive Way
    Ponte Vedra Beac, FL  32082

17. Babor Cosmetics America
    c/o Matthew Schorr
    580 Village Blvd., Suite 140
    W. Palm Beach, FL 33409-1956

18. Beauty Systems Group
    P.O. Box 650715
    Dallas, TX  75265

19. Blue Buddha
    2703 Rosselle Street
    Jacksonville, FL  32205

20. Brinks Inc.
    c/o Nicole Cooper
    555 Dividend Drive, Suite 100
    Coppelli, TX 75019

21. Brink's Incorporated
    P.O. Box 101-031
    Atlanta, GA 30392

22. Broadcast Music
    P.O. Box 406741
    Atlanta, GA  30384-3062

23. Buchanan Sign & Flag
    6755 Beach Blvd.
    Jacksonville, FL  32216

24. Burns Packaging
    2801 Rosselle Street
    Jacksonville, FL 32205

25. Cendyn
    1515 N. Federal Hwy.
    Boca Raton, FL  33432

26. Certigy Check Services
    P.O. Box 30038
    Tampa, FL 33630

27. China Misst
    Restaurant Tea Svc of NF, Inc.
    11250-15 Old St. Augustine Rd.
    Jacksonville, FL  32257

28. Cinotti's Bakery
    1523 Penman Road
    Jacksonville Beach, FL 32250

29. Cintas Corporation
    1595 Transport Court
    Jacksonville, FL  32218

30. Cintas Corporation
    97627 Eagle Way
    Chicago, IL  60678

31. Cirqua
    330 Cortez Circle
    Camarillo, CA  93012-8630

32. Cleveland Menu Printing, Inc.
    1441 East 17th Street
    Cleveland, OH  44114

33. Courtesy Products
    P.O. Box 17488
    Saint Louis, MO  63178-7488

34. Creative Water Concepts, Inc.
706 G Street
Brunswick, GA 31520

35. Culinary Software Services
1900 Folsom Street, Suite 210
Boulder, CO 80302

36. Darsco, Inc.
120 Stockton Street
Jacksonville, FL 32204

37. Dell, Inc.
Attn: Michael Keller
Sr. Credit Manager
One Dell Way, RR!, MS 52
Round Rock, TX 78682

38. Displays2go
ATTN: Accounts Receivable
55 Broadcommon Road
Bristol, RI 2809

39. Donald Ross Sportswear
P.O. Box 4377
Pinehurst, NC 28374

40. Double J's Repair Shop, Inc.
2-B South Roscoe Blvd.
Ponte Vedra Beac, FL 32082

41. Duvall Paint & Decorating, Inc
2855 St. Johns Bluff Rd., S
Jacksonville, FL 32246

42. Edy's Grand Ice Cream
3852 Collections Center Drive
Chicago, IL 60693

43. Envirosax
8520 Production Ave.
San Diego, CA 92121

44. Erwyn Products Company
c/o Marina Popivker
200 Campus Drive, Suite C
Morganville, NJ 07751-2100

45. Evolution The Salon Source, Inc.
5858 St. Augustine Rd.
Jacksonville, FL 32207

46. Ferguson Enterprises, Inc.
c/o Andrea Murtha
3003 Phillips Hwy
Jacksonville, FL 32207-4305

47. First Coast Security
1 Independent Drive
Jacksonville, FL 32202

48. Flickering Floor Covering, Inc
1703 Lambert Street
Jacksonville, FL 32206

49. Florida Event Decor
4630 S. Kirkman Road #174
Orlando, FL 32811

50. Florida Laundry Systems
15370 C.R. 565A, Suite B
Groveland, FL 34736

51. Fortessa, Inc.
22601 Davis Drive
Sterling, VA 20164

52. Fryer Renew
Filta Environmental Kitchen
Palm Coast, FL 32164

53. Ganz, Inc.
60 Industrial Parkway
Buffalo, NY 14227-9903

54. Gate Petroleum Co.
P.O. Box 40505
Jacksonville, FL 32203

55. Grainger
Dept. 384
Palatine, IL 60038-0001

56. Graybar Electric Company, Inc.
P.O. Box 403062
Atlanta, GA 30384-3062

57. GSAE
233 Peachtree St., NE, Suite 751
Atlanta, GA 30303

58. Guest Supply
c/o Michael Hall
Customer #031689
Post Office Box 910
Monmouth Junction, NJ 08852-0910

59. Hasty's Communications of FL
7033 Commonwealth Avenue
Suite 6
Jacksonville, FL 32220

60. Heartland Food Products, Inc.
1900 W. 47th Place, Suite 302
Mission, KS 66205-1815

61. Helga!Gas Products, Inc.
P.O. Box 24246
Omaha, NE 68124

62. Helms Briscoe
USA Corporate Office
c/o Leslie Drolshagen
20875 N. 90th Place
Scottsdale, AZ 85255

63. Heritage Food Service Equipment, Inc.
c/o Brian Reed
Post Office Box 8710
Fort Wayne, IN 46898-8710

64. Home Depot Credit Services
P.O. Box 6029
The Lakes, NV 88901

65. Hotel Credit Association
P.O. Box459
Grafton, IL 62037

66. Imperial Headwear, Inc.
1086 Paysphere Circle
Chicago, IL 60674

67. Interline Brands, Inc.
d/b/a Trayco
801 West Bay Street
Jacksonville, FL 32204

68. International Laser Group
Dept. LA 23300
Pasadena, CA 91185-3300

69. Iron Mountain Information
Management, Inc.
c/o Joseph Corrigan, Esq.
745 Atlantic Avenue, l0th Floor
Boston, MA 02111

70. J.B. Prince Company, Inc.
36 E. 31st Street
New York, NY 10016

71. JaCo Distributors, Inc.
1014 Blackwood Lane
Lafayette, CA 94549

72. Jax Beach Winneison Company
P.O. Box 51285
Jacksonville Bea, FL 32240-1285

73. JD Vaughn & Sons Plumbing
2822 Huffman Blvd.
Jacksonville, FL 32246-4030

74. Johnstone Supply
c/o Thomas S. Royer
16710 Centra Parkway
Jacksonville, FL 32224

75. Johnstone Supply
c/o Thomas S. Royer
522 Park Street
Jacksonville, FL 32204-2931

76. Konica Minolta Business
P.O. Box 122366
Dallas, TX 75312

77. Krisam Group
P.O. Box 17363
Baltimore, MD 21297

78. Lee & Cates Glass
P.O. Box 41146
Jacksonville, FL 32203

79. Level 3 Communications
P.O. Box 931843
Atlanta, GA 31193

80. Liz Stewart Floral Design
1404 South Third Street
Jacksonville Beach, FL 32250

81. Lovette's Floor Installation
15444 Sears Road
Jacksonville, FL 32218

82. Massey Services, Inc.
ATTN: Vonetta Duggan
5150 Palm Valley Road, Suite 407
Ponte Vedra Beac, FL 32082

83. Maui Jim USA, Inc.
6534 Eagle Way
Chicago, IL 60678-1065

84. Metro Property Services, Inc.
3530 St. Augustine Road
Jacksonville, FL 32207

85. More than Gourmet
c/o Bethany M. Richeson
Post Office Box 74914
Cleveland, OH 44194-4914

86. Naddaf Wholesale, Inc.
602 W. 21st Street
Jacksonville, FL 32206

87. National Print Group
P.O. Box 116424
Atlanta, GA 30368

88. Nike USA, Inc.
P.O. Box 847648
Dallas, TX 75284-7648

89. Office Depot
P.O. Box 633211
Cincinnati, OH 45263-3211

90. Oneida Ltd.
23752 Network Place
Chicago, IL 60673

91. OpenTable, Inc.
c/o Corporate Counsel
799 Market Street, 4th floor
San Fransico, CA 94103-2048

92. Optimum Painting and Pressure
Christopher Gordon
310 N. Roscoe Blvd.
Ponte Vedra Beac, FL 32082

93. Oreck Commercial Sales
c/o Edmar Corp.
100 Armstrong Road, Suite 101
Plymouth, MA 2360

94. Oriental Trading Co., Inc.
P.O. Box 2049
Omaha, NE 68103

95. Otis Elevator Company, et al.
c/o John Parent
1 Farm Springs
Farmington, CT 06032

96. Over Kill Mulch Products
6599 Stated Road 21 North
Keystone Heights, FL 32656-9715

97. Oxford Golf
12564 Collections Center Drive
Chicago, IL 60693

98. Paper Direct
P.O. Box 2933
Colorado Springs, CO 80901

99. Pathogen Control Assoc., Inc.
270 Scientific Drive, Suite 3
Norcross, GA 30092

100. Pick on Us
c/o Francine Ridgway
2320 La Mirado Dr.
Vista, CA 92081-7862

101. Ponte Vedra Promotional Mktg
P.O. Box 849
Ponte Vedra Beach, FL 32082

102. PRI Productions, Inc.
1819 Kings Avenue
Jacksonville, FL 32207

103. Proctor Ace Hardware
580 Atlantic Blvd.
Neptune Beach, FL 32266

104. Proforma Creative Bus Products
P.O. Box 640814
Cincinnati, OH 45264

105. R.L. Schreiber, Inc.
1741 NW 33rd Street
Pompano Beach, FL 33064

106. Raintree Graphics
P.O. Box 5967
Jacksonville, FL 32247

107. Ready Care Industries
c/o Stacey Lamas
15845 E. 32nd Ave.; Unit A
Aurora, CO 8011-1570

108. Renaissance Pools & Spas, Inc.
P.O. Box 10899
Jacksonville, FL  32247

109. Savelberg Cleaners
Sawgrass Village
Ponte Vedra Beac, FL  32082

110. Sawyer Mobile Gas
98 S. Penman Road
Jacksonville Bea, FL  32250

111. Scrip Company
DeptCH 17615
Palatine, IL 60055-7615

112. Seaboard Waste Systems
P.O. Box 9001099
Louisville, KY  40290-1099

113. Self
P.O. Box 37659
Boone, IA  50037-0659

114. Simplex Grinnell
Dept. CH 10320
Palatine, IL  60055-0320

115. Ski & Sea International
1445 West Tufts Ave.
Englewood, CO 80110

116. Sothys USA, Inc.
1500 NW 94th Ave.
Miami, FL 33172

117. Soundstrategies/DFC, Inc.
P.O. Box 10
Loomis, CA  95650-0010

118. Stanley Access Tech.
65 Scott Swamp Rd.
Farmington, CT 06032

119. Strategic Welding Supply Company
P.O. Box 37330
Jacksonville, FL 32236-7330

120. Sumi Ware Designs
P.O. Box545
Groveland, FL 34736

121. Sysco Jacksonville
P.O. Box 37045
Jacksonville, FL  32236-7045

122. Tea Forte
23 Bradford Street
Concord, MA 01742-2971

123. Therma Serve, Inc.
6676-1 Columbia
Jacksonville, FL  32258

124. Trademark Q, Inc.
c/o Kim Coty
222 Ojibway Ave.
Titusville, FL 32780-5014

125. Transportation Equipment Spec.
P.O. Box 351089
Jacksonville, FL  32235-1089

126. Treasures of Bali, LLC
912 Krikcaldy Yard
Gastonia, NC 28054

127. Tropical Equipment Sales
P.O. Box 10
Glen Saint Mary, FL  32040

128. Tropical Security, Inc.
P.O. Box 213247
West Palm Beach, FL 33421

129. Tropitone Furniture Company, Inc.
Post Office Box 884400
Milwaukee, WI 53288-0400

130. Turner Ace Hardware
13164 Atlantic Blvd.
Jacksonville, FL  32225-3126

131. T-Y Group
c/o Christian Chomat
10800 N.W. 103rd Street, Suite 1
Miami, FL 33178

132. Uline Shipping Services
c/o Jared Beach
2200 S. Lakeside Drive
Waukegon, IL 60085

133. USFI
12100 Ford Road, Suite 100
Dallas, TX 75234

134. Voluspa
20761 Canada Road
Lake Forest, CA 92630

135. Welner's, Ltd.
7182 Highway 14, Suite 0010
Middleton, WI  53562

136. Zephyrhills
P.O. Box 856680
Louisville, KY  40285

137. Zobha
591 Redwood Hwy, Ste. 2350
Mill Valley, CA  94941

00769292

EXHIBIT IX.B.4

## MUTUAL RELEASE AGREEMENT

This MUTUAL RELEASE AGREEMENT (this "Mutual Release") is entered into as of _____, 2011, among RQB Resort, LP, a Delaware limited partnership, RQB Development, LP, a Delaware limited partnership (together with RQB Resort, LP, the "Debtors"), SGR Asset Management, LLC, a Delaware limited liability company, Niall McFadden, an individual, Patrick Kelly, an individual, Patrick Murphy, an individual, David O'Halloran, an individual (collectively, such parties are referred to as the "Debtor Related Parties"), and Goldman Sachs Mortgage Company, a New York limited partnership, Archon Group, L.P., a _____ limited partnership, Goldman Sachs Bank USA, a _____ _____, Goldman Sachs Lending Partners LLC, a _____ limited liability company, Goldman Sachs & Co., a _____ _____, Sandelman Partners CRE CDO I, LTD., a _____ _____, Sandelman Realty Loan Funding Corp. I, a _____ corporation, and **[the Goldman Transferee(s)]** (collectively, such parties are referred to as the "Goldman Related Parties"). The Debtor Related Parties and the Goldman Related Parties may be referred to individually as a "Party" and collectively as the "Parties". All capitalized but undefined terms used in this Mutual Release shall have the meanings set forth in the Debtors' Amended Plan of Reorganization (the "Plan") filed on September 14, 2011 with the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division (the "Bankruptcy Court").

## RECITALS

WHEREAS, the Debtors are the owners of the Marriott Sawgrass Resort and Spa in Ponte Vedra Beach, Florida ("Marriott Sawgrass Resort");

WHEREAS, on March 1, 2010 ("Petition Date"), the Debtors filed a petition for relief under the Bankruptcy Code with the Bankruptcy Court (the "Chapter 11 Cases");

WHEREAS, Goldman Sachs Mortgage Company ("Goldman") and Goldman Sachs Lending Partners LLC ("GS Lending Partners") are the Debtors' largest creditors in the Chapter 11 Cases;

WHEREAS, the Plan, as supported by Goldman and GS Lending Partners, proposes, among other things, to satisfy Goldman's secured claim by transferring substantially all of the Debtors' assets to Goldman or the Goldman Transferee(s);

WHEREAS, as a condition precedent to the Plan becoming effective, the Parties are to execute and deliver this Mutual Release on the Effective Date.

NOW THEREFORE, in consideration of the mutual promises set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.  **Release of the Goldman Related Parties by the Debtor Related Parties**

    The Debtor Related Parties fully, finally and forever release and discharge the Goldman Related Parties together with each of the Goldman Related Parties' predecessors, successors, assigns, representatives, parents, subsidiaries, affiliates and present and former limited and general partners, and its and their respective present and former employees, officers, directors, managing directors, principals, agents, heirs, executors, administrators, predecessors, successors, assigns, representatives and legal advisors (collectively, the "Lender Releasees") and each of them, from any and all claims, demands, actions, causes of action, contracts, obligations, suits, debts, costs or liabilities, whether known or unknown, which the Debtor Related Parties ever had, now have, or may hereafter claim to have had, against any of the Lender Releasees on or before the date of this Mutual Release that are in any way relating to, or arising out of, the loan from Goldman to the Debtors as reflected by the Loan Documents, the limited guaranty of such loan by Niall McFadden and Patrick Kelly, the lending relationship between Goldman and the Debtors, or the Chapter 11 Cases or that relate in any way to the dealings of any kind between the Debtor Related Parties and any of the Lender Releasees in connection with the Marriott Sawgrass Resort on or before the Effective Date of the Plan. The release in this paragraph shall apply to all claims, whether known, unknown, anticipated or unanticipated that the Debtor Related Parties may have against the Lender Releasees on or before the Effective Date of the Plan. Furthermore, the general release provided in this paragraph shall remain in effect as a full, final and complete release, notwithstanding the existence or discovery of any presently-unknown, different or additional facts and claims. The Debtor Related Parties expressly waive the right to argue or claim, under any statute, legal or equitable doctrine or precedent, that this release does not extend to matters that the Debtor Related Parties do not know about or suspect to exist in their favor as of the Effective Date of the Plan. Furthermore, the Debtor Related Parties agree never to commence, prosecute or cause to be prosecuted against any of the Lender Releasees any complaint, suit, arbitration, or proceeding of any kind based upon any claim, demand, cause of action, damage or liability which is released in this paragraph, or upon any other fact or assertion relating to any aspect of the claims which any of the Debtor Related Parties asserted or could have asserted against the Lender Releasees.

2.  **Release of the Debtor Related Parties by the Goldman Related Parties**

    The Goldman Related Parties fully, finally and forever release and discharge the Debtor Related Parties, together with each of the Debtor Related Parties' predecessors, successors, assigns, representatives, parents,

subsidiaries, affiliates and present and former limited and general partners, and its and their respective present and former employees, officers, directors, managing directors, principals, agents, heirs, executors, administrators, predecessors, successors, assigns, representatives and legal advisors (collectively, the "Debtor Releasees") and each of them, from any and all claims, demands, actions, causes of action, contracts, obligations, suits, debts, costs or liabilities, whether known or unknown, which the Goldman Related Parties ever had, now have, or may hereafter claim to have had, against any of the Debtor Releasees on or before the date of the Effective Date of the Plan that are in any way relating to, or arising out of, the loan from Goldman to the Debtors as reflected by the Loan Documents, the limited guaranty of such loan by Niall McFadden and Patrick Kelly, the lending relationship between Goldman and the Debtors, or the Chapter 11 Cases or that relate in any way to the dealings of any kind between the Goldman Related Parties and any of the Debtor Releasees in connection with the Marriott Sawgrass Resort on or before the Effective Date of this Plan. The release in this paragraph shall apply to all claims, whether known, unknown, anticipated or unanticipated that the Goldman Related Parties may have against the Debtor Releasees on or before the Effective Date of the Plan. Furthermore, the general release provided in this paragraph shall remain in effect as a full, final and complete release, notwithstanding the existence or discovery of any presently-unknown, different or additional facts and claims. The Goldman Related Parties expressly waive the right to argue or claim, under any statute, legal or equitable doctrine or precedent, that this release does not extend to matters that the Goldman Related Parties do not know about or suspect to exist in their favor on the Effective Date of the Plan. Furthermore, the Goldman Related Parties agree never to commence, prosecute or cause to be prosecuted against any of the Debtor Releasees any complaint, suit, arbitration, or proceeding of any kind based upon any claim, demand, cause of action, damage or liability which is released in this paragraph, or upon any other fact or assertion relating to any aspect of the claims which any of the Goldman Related Parties asserted or could have asserted against the Debtor Releasees.

3.    **Exclusion of Interstate**

Notwithstanding anything to the contrary in this Mutual Release, this Mutual Release shall NOT operate to release or discharge Interstate Management Company, L.L.C., Interstate Hotels and Resorts Management, LLC (collectively, "Interstate"), or any of their predecessors, successors, assigns, representatives, parents, subsidiaries, affiliates, or any of their respective present and former employees, officers, directors, managing directors, principals, agents, heirs, executors, administrators, predecessors,

successors, assigns, representatives and legal advisors (the "Interstate Parties") from any claims, demands, actions, causes of action, contracts, obligations, suits, debts, costs or liabilities. For the avoidance of doubt, the terms Debtor Related Parties and Debtor Releasees do not include any of the Interstate Parties.

3.      **Representations**

The Parties represent and warrant that no person other than the Parties to this Mutual Release had or has any interest in the matters referred to herein, that the Parties have the sole right and exclusive authority to execute this Mutual Release, and that the Parties have not sold, assigned, transferred, conveyed, or otherwise disposed of any claim or demand relating to any matter covered by this Mutual Release. The Parties further represent that they have not sold, transferred, conveyed, assigned, hypothecated, liened, mortgaged, or granted a security interest in all or any portion of the claims released herein.

4.      **Entire Mutual Release**

The Parties acknowledge and agree that no representations or promises have been made to or relied upon by any of them or by any person acting for or on their behalves in connection with the subject matter of this Mutual Release that are not specifically set forth herein. All prior representations and promises made by any Party to another, whether in writing or orally, are understood by the Parties to be merged into this Mutual Release.

5.      **Counterparts**

It is understood and agreed that this Mutual Release may be executed in counterparts, each of which shall, for all purposes, be deemed an original when executed by all Parties, and all of such counterparts, taken together, shall constitute one and the same Mutual Release, even though all of the parties hereto may not have executed the same counterpart of this Mutual Release. This Mutual Release shall not constitute the agreement of the Parties until such time as it has been executed by all the Parties.

6.      **Fees and Costs**

The Parties shall bear their own costs and legal fees incurred in connection with this Agreement and enforcement therewith.

6.      **Governing Law**

This Mutual Release shall be governed by the laws of the State of Florida, without giving effect to principles of conflicts of laws.

(Signatures on following pages)

IN WITNESS WHEREOF, the Parties have executed this Mutual Release on the dates written below.

**RQB RESORT, LP**

By: RQB Resort GP, Inc., a Delaware corporation, its general partner

_____

David O'Halloran, its President

**RQB DEVELOPMENT, LP**

By: RQB Development GP, Inc., a Delaware corporation, its general partner

**SGR ASSET MANAGEMENT, LLC**

_____

David O'Halloran, its Co-Manager

_____

Niall McFadden, its Co-Manager

_____

**David O'Halloran, individually**

_____

**Niall McFadden, individually**

_____

**Patrick Kelly, individually**

_____

**Patrick Murphy, individually**

**GOLDMAN SACHS MORTGAGE COMPANY**

By: _____
Name:_____
Its: _____


**ARCHON GROUP, L.P.**

By: _____
Name:_____
Its: _____


**GOLDMAN SACHS LENDING PARTNERS LLC**

By: _____
Name:_____
Its: _____


**SANDELMAN PARTNERS CRE CDO I, LTD.**

By: _____
Name:_____
Its: _____


**SANDELMAN REALTY LOAN FUNDING CORP. I**

By: _____
Name:_____
Its: _____


**GOLDMAN SACHS BANK USA**

By: _____
Name:_____
Its: _____

**GOLDMAN SACHS & CO.**

By: _____

Name:_____

Its: _____

**[THE GOLDMAN TRANSFEREE(S)]**

00769171